Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:16-cv-24939-KMW

ADAM DRISIN,

        Plaintiff,

vs.

FLORIDA INTERNATIONAL UNIVERSITY
BOARD OF TRUSTEES, a public body
corporate; MARK B. ROSENBERG, individually
and in his capacity as President of Florida
International University; SHIRLYON MCWHORTER
individually and in her capacity as Title IX
Coordinator and Director of the Office of Equal
Opportunity Programs and Diversity; KENNETH
FURTON; individually and in his capacity as
Provost Executive Vice President & Chief
Operating Officer; BRIAN SCHRINER, individually
and in his capacity as Dean, College of
Architecture + The Arts; and JAFFUS HARDRICK,
individually and in his capacity as Vice
President for Human Resources,

        Defendants.

        601 Brickell Key Drive
        Miami, Florida
        July 24, 2018
        9:40 a.m. - 12:48 p.m.

V I D E O T A P E D

D E P O S I T I O N

OF

ADAM DRISIN

Taken on Behalf of the Defendant
Pursuant to Notice of Taking Deposition

Drisin vs. Florida                                      July 24, 2018

## Page 2

```
1
2                    APPEARANCES
3
        On behalf of the Plaintiff:
4
        HOWARD J. LEVINE, ESQ.
5       The Law Offices of Howard Levine
        1560 Lenox Avenue
6       Suite 307
        Miami Beach, Florida  33139
7
8
        On behalf of the Defendant:
9
10      TERESA RAGATZ, ESQ.
        CHRISTOPHER M. YANNUZZI, ESQ.
11      Iscicoff Ragatz
        601  Brickell Key Drive
12      Suite 750
        Miami, Florida  33131
13
14      Also Present:
15      OLIVER LEE, VIDEOGRAPHER
        IRIS ELIJAH, ESQ.
16
17            I N D E X
18
        Witness       Direct    Cross
19
        ADAM DRISIN
20      (By Ms. Ragatz)        5
        (By Mr. Levine)                 132
21
22
23
24
25
```

## Page 3

```
1
2            E X H I B I T S
3       Defendant's Exhibit 1,  Page   14
        Defendant's Exhibit 2,  Page   21
4       Defendant's Exhibit 3,  Page   38
        Defendant's Exhibit 4,  Page   42
5       Defendant's Exhibit 5,  Page   46
        Defendant's Exhibit 6,  Page   47
6       Defendant's Exhibit 7,  Page   48
        Defendant's Exhibit 8,  Page   51
7       Defendant's Exhibit 9,  Page   55
        Defendant's Exhibit 10, Page   59
8       Defendant's Exhibit 11, Page   62
        Defendant's Exhibit 12, Page   64
9       Defendant's Exhibit 13, Page   73
        Defendant's Exhibit 14, Page   78
10      Defendant's Exhibit 15, Page   81
        Defendant's Exhibit 16, Page   83
11      Defendant's Exhibit 17, Page   86
        Defendant's Exhibit 18, Page   89
12      Defendant's Exhibit 19, Page   91
        Defendant's Exhibit 20, Page   92
13      Defendant's Exhibit 21, Page   94
        Defendant's Exhibit 22, Page   96
14      Defendant's Exhibit 23, Page   97
        Defendant's Exhibit 24, Page   99
15      Defendant's Exhibit 25, Page  100
        Defendant's Exhibit 26, Page  101
16      Defendant's Exhibit 27, Page  102
        Defendant's Exhibit 28, Page  102
17      Defendant's Exhibit 29, Page  104
        Defendant's Exhibit 30, Page  105
18      Defendant's Exhibit 31, Page  106
        Defendant's Exhibit 32, Page  107
19      Defendant's Exhibit 33, Page  113
        Defendant's Exhibit 34, Page  115
20      Defendant's Exhibit 35, Page  119
21
22
23
24
25
```

## Page 4

```
1           (Thereupon, the following proceedings were
2    held:)
3           THE VIDEOGRAPHER:  Okay.  In the case
4    styled Adam Drisin versus Florida International
5    University Board of Trustees, Mark B. Rosenberg,
6    Shirlyon McWhorter, Kenneth Furton, Brian Schriner,
7    and Jaffus Hardrick, Case Number 1:16-cv-24939-KMW.
8    This is the videotaped deposition of Adam Drisin.
9           This deposition is taking place at 601
10   Brickell Key Drive, Miami, Florida, on July 24,
11   2018.  The time is now 9:40 a.m.
12          Our videographer is Oliver Lee.
13          Counsel will state their appearances for
14   the record, after which our court reporter, Sally,
15   will swear in the witness.
16          MR. LEVINE:  Howard Levine.  I represent
17   the plaintiff, Adam Drisin.
18          MS. RAGATZ:  Good morning.  Teresa Ragatz
19   and Christopher Yannuzzi on behalf -- of Iscicoff
20   Ragatz on behalf of the defendants in this case.
21   Also present is Iris Elijah from the general
22   counsel's office of Florida International
23   University.
24   THEREUPON:
25            ADAM DRISIN
```

## Page 5

```
1    was called as a witness and, having been duly sworn,
2    was examined and testified as follows:
3            DIRECT EXAMINATION
4    BY MS. RAGATZ:
5       Q.   Could you state your full name for the record,
6    please?
7       A.   Adam Drisin.
8       Q.   Do you have a middle name?
9       A.   Not that I use.
10      Q.   Okay.  What is your current address?
11      A.   Oh, my gosh.  I'm having a moment.  I can't
12   believe it.  2932 N.E. 36th Street, Lighthouse Point,
13   Florida.
14      Q.   It's okay.  I have been using the same ATM pin
15   number for decades, and I went up to the ATM the other
16   day and drew a blank, so it happens.
17      A.   Yeah.
18      Q.   How long have you resided at that address?
19      A.   Two years.
20      Q.   What is your date of birth?
21      A.   10-17-62.
22      Q.   Have you ever been deposed before?
23      A.   As an expert witness.
24      Q.   On how many occasions?
25      A.   Once.
```

Drisin vs. Florida                                                 July 24, 2018

## Page 6

1  Q.  When was that?
2  A.  I think it was 2005.
3  Q.  In what area did you serve as an expert?
4  A.  It was a litigation related to construction
5  and architecture design.
6  Q.  You understand that the court reporter just
7  had you raise your hand and you swore to tell the
8  truth?
9  A.  Yes.
10  Q.  Yes.  And do you understand that there is a
11  criminal penalty for perjury?
12  A.  Yes.
13  Q.  Even though you're being videoed, you're on
14  video today, you have to give audible responses so the
15  court reporter can transcribe your responses.  So you
16  can't respond with just a nod of the head or a shake of
17  the head or an uh-huh.
18      You have to --
19  A.  Understood.
20  Q.  -- answer the question.
21      If you don't understand any question I ask,
22  ask me to rephrase it.  I'm happy to do that or repeat
23  it.  If you do answer a question, I will assume that
24  you understood it.
25      Fair enough?

## Page 7

1  A.  Yes.
2  Q.  Okay.  And any time you want to take a break,
3  I'm happy to accommodate you, as long as there is no
4  question pending.  If you need to take a break, and we
5  will take some regular breaks, if there is a question
6  pending, I'll ask you to answer it before we break.
7  A.  Okay.
8  Q.  What, if anything, did you do to prepare for
9  your deposition today?
10  A.  I read through all the court documents, all
11  the documents, including the process that I went
12  through with FIU, and then the filings that we have
13  made.
14  Q.  The files in this case as well as related
15  cases?
16  A.  No.  Just this case.
17  Q.  Are you using any drugs or taking any
18  medication today that would affect your ability to
19  understand and respond to my questions?
20  A.  No, I'm not.
21  Q.  Are you currently married?
22  A.  Yes.
23  Q.  To whom are you married?
24  A.  Irena Drisin.
25  Q.  When were you married?

## Page 8

1  A.  Four months ago.
2  Q.  And what is your wife's maiden name?
3  A.  It's a Polish name.  It's impossible to
4  pronounce.
5  Q.  Can you spell it for me?
6  A.  Iwozyiak.
7  Q.  Okay.
8  A.  I-W-O-Z-Y-I-A-K.
9  Q.  Have you previously been married?
10  A.  Yes.
11  Q.  How many times?
12  A.  Once.
13  Q.  And what is your ex-wife's name?
14  A.  Rebecca Seaman.
15  Q.  When were you married the first time?
16  A.  2004.
17  Q.  Now, your ex-wife, Rebecca Seaman, filed for
18  divorce in Broward County Circuit Court on September 4
19  of 2015; is that correct?
20  A.  Yes.
21  Q.  Do you have any children?
22  A.  No.
23  Q.  Okay.  Can you tell us just briefly your
24  educational background?
25  A.  Sure.  I have a bachelor's of architecture

## Page 9

1  from Cornell University and a master's of design
2  studies from Harvard University.
3  Q.  When did you obtain your bachelor's?
4  A.  1985.
5  Q.  And your master's?
6  A.  I think it was 1997.
7  Q.  Can you go through your employment since you
8  obtained your master's degree in 1997?
9  A.  A professor at Harvard University, professor
10  at the University of Tennessee, and a professor at
11  Florida International University.
12  Q.  When did you start work at FIU?
13  A.  2004.
14  Q.  So you worked at FIU for, what, approximately
15  11 years?
16  A.  2004 through my termination, yes.
17  Q.  Which was in 2016?
18  A.  Correct.
19  Q.  Now, when you started at Florida International
20  University in 2004, you came in as a tenured associate
21  professor and as director of the architecture program,
22  correct?
23  A.  Correct.
24  Q.  And then in 2011, you were named as associate
25  dean of the College of Architecture + the Arts?

3  (Pages 6 to 9)

Page 10

1    A.  Correct.
2    Q.  And a couple of years later, 2013, you were
3  appointed senior associate dean of the College of
4  Architecture + the Arts, correct?
5    A.  Correct.
6    Q.  Did that appointment to senior associate dean
7  of College of Architecture + the Arts bring with it
8  increased compensation?
9    A.  Yes, it did.
10   Q.  When you assumed the role of associate dean
11 and then senior associate dean, was your role at FIU
12 solely administrative?
13   A.  No.  I always had a teaching component.
14   Q.  Okay.  You know Larisa Sherbakova, correct?
15   A.  Yes.
16   Q.  So she was a student in the Department of
17 Architecture at FIU?
18   A.  Yes.
19   Q.  And when she attended FIU, she was married and
20 her name was Larisa Marenco; is that correct?
21   A.  Yes.
22   Q.  So if I refer in this deposition to Larisa
23 Sherbakova or Ms. Marenco, you know I'm referring to
24 the same person?
25   A.  Yes.

Page 11

1    Q.  Okay.  When did you meet Larisa Marenco?
2    A.  I don't remember the exact date.
3    Q.  Can you approximate?
4    A.  It was probably her first year as a student.
5    Q.  Were you her teacher?
6    A.  No.  I don't think I have ever been her
7  teacher.
8    Q.  And what were the circumstances of your
9  meeting her?
10   A.  I actually don't recall.  I think it might
11 have been at the Miami Beach Urban Studios.  At one
12 point I was the director of that and she was taking
13 classes there.
14   Q.  What was the Growlight Project?
15   A.  It was a project supported by the Knight
16 Foundation to support youth in Liberty City.  The idea
17 was to introduce them to careers in the arts and
18 design.
19   Q.  What was your role in that project?
20   A.  I was the lead.  I created it.
21   Q.  Did Ms. Marenco ever serve as a graduate
22 assistant on that project at any point in time?
23   A.  Yes, she did.
24   Q.  When?
25   A.  The year right before my removal.

Page 12

1    Q.  Did you appoint her as a graduate assistant?
2    A.  I am not sure I would use the term "appoint."
3    Q.  What term would you use?
4    A.  She was selected as a graduate assistant.
5    Q.  Did you select her?
6    A.  I was part of the process.  But ultimately I
7  think the dean, the senior dean signs off on all
8  graduate assistants.
9    Q.  Was that a paid position for Ms. Marenco?
10   A.  It was.
11   Q.  And that position was paid through a grant
12 from the Knight Foundation then to FIU?
13   A.  The Knight Foundation paid money to support
14 the grant, and the grant had funding in it for a
15 graduate assistant.
16   Q.  Now, when you met Larisa Marenco, she was
17 married to an individual by the name of Augusto
18 Marenco, correct?
19   A.  Yes.
20   Q.  When is the last time you communicated in any
21 way with Larisa Marenco?
22   A.  Probably six months ago.
23   Q.  When is the last time you saw Ms. Marenco?
24   A.  Again, probably six months ago.
25   Q.  Where did you see her six months ago?

Page 13

1    A.  Actually, I don't recall where.  I think we
2  had dinner in South Beach.
3    Q.  Just the two of you?
4    A.  Yeah.
5    Q.  Have you ever been in a romantic relationship
6  with Ms. Marenco?
7    A.  No.
8    Q.  Have you ever at any time had romantic
9  feelings towards her?
10   A.  No.
11   Q.  Have you at any time had sexual feelings
12 towards Ms. Marenco?
13   A.  No.
14   Q.  Have you at any point in time had a sexual
15 relationship with Ms. Marenco?
16   A.  No.
17   Q.  No?
18   A.  No.
19   Q.  So how would you describe your relationship
20 with Ms. Marenco in the fall of 2014?
21   A.  In the fall of 2014, that was -- I'm trying to
22 --
23   Q.  In context, that was before or around the time
24 of the semester abroad in Genoa.
25   A.  We had a -- so before she went off to Genoa,

4 (Pages 10 to 13)

## Page 14

1  so we had a professional relationship that was
2  friendly. We sort of -- I remember the first few times
3  we had met, we discussed Russian literature, and we
4  both have similar -- well, she is obviously Russian.
5  My family background is from Russia.
6       So I remember, so we discussed that. We
7  discussed architecture. We discussed Italy and her
8  interest in her going to Italy.
9       Q.  So in a nutshell, your relationship in the
10  fall of 2014 was friendly and professional?
11       A.  Yes.
12          MS. RAGATZ:  Let me mark as Exhibit 1.
13       (Thereupon, the document referred to was
14  marked as Exhibit No. 1 for Identification.)
15  BY MS. RAGATZ:
16       Q.  Thank you. Here, I am going to give you a
17  copy.
18          It's an e-mail dated October 23 of 2014, from
19  you to Larisa Marenco.
20       A.  Uh-huh.
21       Q.  Can you take a look at it and tell me --
22       A.  Sure.
23       Q.  -- whether that is an e-mail that you wrote?
24       A.  Yes, it is.
25       Q.  Is that a document you reviewed prior to this

## Page 15

1  deposition?
2       A.  No. Actually, I haven't seen this document in
3  a long time, but I am familiar with it.
4       Q.  Okay. Do you want to take a moment to review
5  it or are you familiar with it?
6       A.  No. I know it, yeah.
7       Q.  Okay. Now, you begin your e-mail by stating:
8  All the text is below. There are many -- there are
9  many new chapters that you have not read, at least
10  three new ones to read. The last one in green is very
11  steamy. Happy face. It's for you. I got overheated
12  writing it rather late last night. I'm so happy that
13  you found a ballet class. Honestly, I wish you were
14  having dreams about kissing me instead of kissing your
15  piggy roommate -- lOL. I'm pretty sure I'm a better
16  kisser. Miss you. The photos of you on Facebook from
17  the last day in Florence are great. You look happy.
18  They made me miss you when I looked at them.
19          You wrote those words?
20       A.  Uh-huh.
21       Q.  Okay. Do you consider that friendly and
22  professional?
23       A.  So, I mean, what I would say is we had a
24  flirtatious relationship.
25       Q.  So it was friendly, professional, and

## Page 16

1  flirtatious?
2       A.  Uh-huh.
3       Q.  Yes?
4       A.  Uh-huh.
5       Q.  You need to respond audibly.
6       A.  Yes, I am sorry.
7       Q.  Okay. What follows after that introductory
8  section we just read? What are they chapters of?
9       A.  What do you mean chapters?
10       Q.  Well, you say at the beginning:  All the text
11  is below. There are many new chapters you have not
12  read.
13          Chapters of what?
14       A.  We were writing -- so we -- I remember at one
15  point in our relationship, we had sort of invented a
16  story about people. And so we were sort of writing
17  back and forth about we were making up a story.
18       Q.  So Larisa Marenco was also writing chapters of
19  this story?
20       A.  I believe so.
21       Q.  Now, the male character in your writing in
22  this e-mail you call Alexander Davidovich?
23       A.  Uh-huh.
24       Q.  Correct?
25       A.  I don't remember.

## Page 17

1       Q.  Well, look at the first page, bottom
2  paragraph:  The gentleman's name was Alexander
3  Davidovich.
4          Do you see that?
5       A.  Right. Yes.
6       Q.  Okay.
7       A.  And I think that -- yeah, I mean, as I told
8  you, we had sort of become -- we were both interested
9  in kind of Russian literature, so, yeah.
10       Q.  And the character Alexander Davidovich makes
11  gelato, right?
12       A.  I guess. I mean, we were just making stuff
13  up, yeah.
14       Q.  That is what you wrote, correct?
15       A.  Right. Yeah, yeah, yeah.
16       Q.  And you make gelato, don't you?
17       A.  A lot of people make gelato.
18       Q.  That wasn't my question. You make gelato,
19  don't you?
20       A.  I have made gelato, yes.
21       Q.  Any coincidence that your male character in
22  these chapters that you were sending Ms. Marenco has
23  the same initials as you?
24       A.  No.
25       Q.  Okay. Now, you state at the top that the last

## Page 18

1  chapter in green is very steamy and it is for
2  Ms. Marenco.
3      Why did you write a steamy chapter for her?
4      A.  I don't remember what I was thinking at the
5  time.  As I said, I think we were being flirtatious,
6  which I told you that we were.
7      Q.  Okay.  So let's go to the green steamy
8  chapter, which starts on page 5 at the bottom.
9      A.  Uh-huh.  Uh-huh.
10     Q.  And if you look at the last 15 lines or so,
11 which is on page 6.
12     Your steamy chapter written for Larisa, the
13 female character you call Laura, correct?
14     A.  I don't recall.
15     Q.  Did you have a professional and friendly
16 relationship with any other female students at FIU?
17     A.  Did I have a what, professional?
18     Q.  Friendly and professional relationship with
19 any other female students at FIU?
20     A.  Friendly and professional, yeah.
21     Q.  Did you send this content to any other student
22 with whom you had a friendly, professional
23 relationship?
24     A.  No.
25     Q.  Okay.  Let's talk about the incident that is

## Page 19

1  at the heart of this and related lawsuits.
2      Architecture students from FIU could choose to
3  participate in a semester-long study-abroad program in
4  Genoa, Italy, correct?
5      A.  Uh-huh.
6      Q.  And that's a program that you created, you
7  started?
8      A.  It started when I was there, yeah.
9      Q.  Okay.
10     A.  There were a lot of people involved in
11 starting it.
12     Q.  Did you encourage Ms. Marenco to attend that
13 program in the fall of 2014?
14     A.  She expressed interest in it.  I remember that
15 was one of our conversations before she went, that she
16 was excited about going, and it was definitely one of
17 the things that we connected over.
18     Q.  Okay.  And you flew to Genoa on December 12 of
19 2014, toward the end of that fall semester, correct?
20     A.  Correct.
21     Q.  When did you make the decision to go to Genoa
22 in December 2014?
23     A.  So it wasn't my decision.  It was a collective
24 decision because the college had been having problems
25 with a faculty member that was teaching there, and

## Page 20

1  there was a litany of student complaints about it.  And
2  we sort of discussed what to do about it.  And the
3  students were asking for someone to come because they
4  were terrified that the professor there was going to
5  basically tear them all apart in their final reviews.
6      Q.  So whose decision was it for you to go to
7  Genoa in December 2014?
8      A.  Laura Badon; Jason Chandler, who was the chair
9  of the department; Brian Schriner, who was the dean;
10 and myself.  I mean, I was involved.
11     Q.  Okay.  And in late November, early December of
12 2014, what was the nature of your relationship with
13 Ms. Marenco?
14     A.  In late?
15     Q.  November, early December.
16     A.  So right before the trip?
17     Q.  Yes.
18     A.  She was away.  We were, you know, I guess
19 communicating, but --
20     Q.  Still friendly and professional?
21     A.  You know, I guess, yeah, I mean, our
22 relationship was our relationship, sure.
23     Q.  Friendly, professional, and flirty?
24     A.  Probably I would say flirty too.  I mean --
25     Q.  Had she done something to hurt you?

## Page 21

1      A.  To hurt me?
2      Q.  Yes.
3      A.  I don't -- I don't know.  I don't recall.
4      Q.  Okay.  Let me mark as Exhibit 2 an e-mail from
5  Larisa Marenco to you dated December 1 of 2014.
6      (Thereupon, the document referred to was
7  marked as Exhibit No. 2 for Identification.)
8      A.  I don't remember, actually, what this was
9  about.  I mean, I think she was --
10     Q.  My question is, do you recall this e-mail?
11     A.  Not off the top of my head, no.
12     Q.  The e-mail is to AdamMDrisin@gmail.com.
13     Do you see that?
14     A.  Yeah.
15     Q.  And was that a private e-mail address you used
16 at the time?
17     A.  I guess I did, yeah.
18     Q.  What other e-mail addresses did you have at
19 that time?
20     A.  I think that was probably the only one.
21     Q.  Now, in her e-mail to you of December 1 of
22 2014, Ms. Marenco starts out stating:  I feel very bad
23 because of the way I treated you all this time,
24 particularly past two days.  Actually, all the time.
25     What was your understanding of what she was

Drisin vs. Florida                                          July 24, 2018

## Page 22

1    referring to?
2        A.  I actually have no memory of what this was
3    about.  I mean, I think she was -- I mean, I remember
4    at the time she was discussing her marriage with me,
5    that her marriage was in trouble.  She wasn't sure what
6    she wanted to do.
7        So, I mean, there is no question that, you
8    know, we had become closer and closer through
9    communication.  And she was probably flirting with me.
10   I mean, I know she was flirting with me.
11       Q.  She goes on in the e-mail and states:  I
12   should have believed you and shouldn't have belittled
13   your feelings.  For some reason, I really couldn't just
14   let go my guard and couldn't just read your texts
15   written in black and white I think she meant to say
16   instead of back and white.  I kept reading you with
17   suspicion and look what happened, I broke your heart.
18   I am very sorry and I ask you to forgive me.
19       Did she break your heart?
20       A.  She didn't break my heart.  Actually, now I
21   remember what this was about.  She was going to -- she
22   was planning a trip to go visit a friend while she was
23   still married.  And I remember we had a discussion
24   about that.
25       It was, I think, during spring break or

## Page 23

1    something, fall break, and I told her, I remember I
2    said, I think it is a terrible idea, I don't think you
3    should do it.  I mean, we actually did spend a fair
4    amount of time talking about both of our marriages, and
5    that was part of our friendship.
6        Q.  So she was going to visit a male friend?
7        A.  I believe so, yeah.  I can't remember his
8    name.  I think he lives in Vienna or Germany.
9        Q.  Now, she said she couldn't just read your
10   texts written in black and white.
11       What texts had you sent her that she was
12   referencing there?
13       A.  I actually don't know, because I don't -- I
14   don't know what she was talking about, because I don't
15   think we texted because she was in Italy.  I don't
16   think we texted.  But I don't know what she is talking
17   about.
18       Q.  The e-mail continues:  I am sorry to bother
19   you again.  I know I have done enough already to fuck
20   up your life for a while.  You don't have to write me
21   back.  I know that we already said our good-byes.  I
22   just want to feel a little bit more at peace by
23   acknowledging my wrong acting in front of you and in
24   front of myself.  Please forgive me for all the cruelty
25   and mistreatment I gave you in response to you opening

## Page 24

1    me your heart, allowing yourself to be vulnerable and
2    being honest with me.
3        Had you opened your heart to her?
4        A.  Yeah.
5        Q.  In what way?
6        A.  I told her probably too much about my
7    marriage, which I think was a mistake, considering that
8    we had a professional relationship and she was a
9    student and I was a professor.  And she shared with me
10   a lot of stuff about her marriage.
11       Q.  And what did you understand her to mean when
12   she discussed having treated you with cruelty?
13       A.  As I said, I mean, she was flirty.  And then I
14   think she was, you know, she would sort of go back and
15   forth between being flirty and then not being flirty.
16   I think she was confused.
17       Q.  What did you tell her about your marriage that
18   you now feel that you went too far and shouldn't have
19   told her?
20       A.  I shared with her my wife at the time had some
21   health challenges that were significant and
22   problematic.
23       Q.  Anything else?
24       A.  She was pretty cold, and our -- there was very
25   little intimacy in our marriage.

## Page 25

1        Q.  And what did she tell you about her marriage?
2        A.  That Augusto -- that she had grown and Augusto
3    had not and that he was violent with her at times and
4    that she wasn't quite sure what to do about it.
5        Q.  In the next paragraph of the e-mail
6    Ms. Marenco states that she is still going to France.
7        Do you see that?
8        Top of the second page of the exhibit.
9        A.  Top of the second page.
10       Q.  Where she starts:  I'm still going to France.
11       A.  Yes.
12       Q.  And she states:  I thought that I would love
13   to see you because I do enjoy your company and our
14   conversations and the way I feel when I am with you.
15   But then now I understand how deeply and not lightly
16   you are taking this and what troubles you will have to
17   go through just to come to see me for two days.  It is
18   just not worth it for you, because to me it will just
19   be fun, a lot of fun, though.  And, also, even if it is
20   okay for you to come, you are already hurt and fucked
21   up.  So the next person to be hurt will be my
22   husband.  Somehow all the shit I do comes out, and I
23   know that somehow I will feel guilty that I had a
24   romantic trip with another man and I will not be able
25   to hide it.  I already did it once to my husband before

7 (Pages 22 to 25)

## Page 26

1  we got married, and somehow a couple of years ago he
2  found out about it and until now he is hurt.
3         When -- prior to this e-mail you had discussed
4  going on a trip to France with Ms. Marenco; isn't that
5  correct?
6      A.  I don't believe I ever planned on going to
7  France.  I went to France a lot because I had family
8  that lives in France.  But I think she was trying to
9  figure out where she wanted to go for a break or I
10  can't remember if it was fall break or spring break,
11  and she ended up -- well, I think there were two trips
12  here.  One is to visit this friend in Germany, and then
13  I think in the end she did decide to go to France, to
14  go to Nice or something, but not with me.
15      Q.  So you never discussed going to France with
16  her?
17      A.  I think she discussed it, but I don't think I
18  ever said I was going to go to France with her.
19      Q.  Based on this e-mail, is it fair to say that
20  you had expressed having feelings for Ms. Marenco that
21  were not reciprocated at that time?
22      A.  Say that again.
23      Q.  Based on this e-mail, is it fair to say that
24  you had expressed to Ms. Marenco that you had feelings
25  for her that were not reciprocated?

## Page 27

1      A.  I don't think I would characterize it that
2  way, no.
3      Q.  How would you characterize it?
4      A.  That, again, we had a sort of -- we were
5  friends and that there was a flirtiness to our
6  friendship.  Yeah, and that it sort of went back and
7  forth.
8      Q.  So it was 10 or 11 days after this e-mail was
9  sent that you flew to Genoa, correct?
10      A.  What is the date of the e-mail?
11      Q.  This is December 1.
12      A.  Right.  Okay.  Yeah.
13      Q.  Okay.  And on the evening of December 12,
14  2014, you and other faculty members and students went
15  to dinner together, correct?
16      A.  Yeah.  Actually, just I wanted to return to
17  the document that you just presented with me to make
18  something clear, which is that these were also stolen
19  documents from my personal computer, which were then
20  given to FIU.
21         You understand that, right?
22      Q.  These -- and we're certainly going to get into
23  that.  But this e-mail from Larisa Marenco to you,
24  subject "I am sorry," was written on her FIU e-mail, as
25  well.

## Page 28

1         Do you see that?
2      A.  But the document was stolen from my e-mail is
3  all I'm saying, so...
4      Q.  All right.  Well, we'll discuss that.
5      A.  Okay.
6      Q.  So going back to my question.  On the evening
7  of December 12 in 2014, when you were in Genoa, you and
8  other faculty members and students went to dinner
9  together, correct?
10      A.  Yes.
11      Q.  And then you and a smaller subset of students
12  went to some other establishment and had drinks; isn't
13  that correct?
14      A.  Ask that again.
15      Q.  You and a smaller subset of students went to
16  another establishment?
17      A.  No, that is actually incorrect.
18      Q.  Okay.
19      A.  Yeah.
20      Q.  Did you and a smaller subset of students after
21  the dinner go somewhere else?
22      A.  I went with the other faculty and all of the
23  students to a cafe, yeah.
24      Q.  Okay.  So everyone that was at the dinner went
25  to a cafe?

## Page 29

1      A.  The majority of people, yeah.
2      Q.  Okay.  So not all?
3      A.  I think there were a few that peeled off,
4  yeah.
5      Q.  Okay.  And in the early morning hours, you and
6  three female students went up to your apartment hotel,
7  correct?
8      A.  Correct.
9      Q.  And those three female students were Larisa
10  Marenco, Andrea Rivera, and Lorena, is it Behamon?
11      A.  Yes.
12      Q.  Behamon.  Okay.  So those are the three
13  students who went up to your apartment?
14      A.  Yes.  The context of this is at the conclusion
15  of the, you know, being at the cafe, the evening ended
16  and everybody was dispersing, and I realized that I
17  didn't know how to get back to my hotel.  And five
18  students said, oh, we know where you're staying and
19  your place is on the way to where we live, so we will
20  walk you to your door.  So, yes.
21      Q.  Now, at some point subsequent to that evening,
22  you became aware that Ms. Rivera brought a complaint at
23  FIU that you had had nonconsensual sexual contact with
24  her?
25      A.  Can you ask that again?

Drisin vs. Florida                                    July 24, 2018

## Page 30

1    Q.   Sure.  At some point subsequent to that
2    evening --
3    A.   Uh-huh.
4    Q.   -- you became aware that Ms. Rivera had
5    brought a complaint at FIU that you had nonconsensual
6    sexual contact with her that evening, correct?
7    A.   Correct.  Yes.
8    Q.   When did you first learn of Ms. Rivera's
9    complaint to FIU?
10   A.   It was, I think, April.  Was it April 10th,
11   somewhere thereabouts, when Shirlyon McWhorter asked me
12   to come see her.
13   Q.   So is it your testimony today that you had no
14   idea that Ms. Rivera had complained about you prior to
15   April?
16   A.   That is my recollection.
17   Q.   Now, hadn't Larisa Marenco told you that
18   Andrea Rivera had contacted someone from FIU to
19   complain about what had occurred that evening?
20   A.   I'm sorry, yes.  In fact, she had, yes.
21   Q.   When did she tell you that?
22   A.   The following -- I think it was the following
23   day, yeah.  Yeah, but officially I was not notified
24   until the --
25   Q.   You knew the day after these students had been

## Page 31

1    up in your apartment that Andrea Rivera had contacted
2    someone at FIU to complain about your conduct?
3    A.   I think what I knew is that my recollection is
4    that Larisa said that Andrea got whipped into, you
5    know, I don't know what the term is, but she was all
6    whipped up and that she had gone from being -- feeling
7    guilty that she had done something to feeling like
8    something was perpetrated upon her and that she wanted
9    to call -- I can't remember who she called.  I think it
10   was Marylys Nepomechie.
11   Q.   In connection with the complaint that
12   Ms. Rivera brought about you and your conduct, you were
13   interviewed on May 7, 2015, by Shirlyon McWhorter, FIU
14   Title IX coordinator, correct?
15   A.   Yes.
16   Q.   And when you were interviewed by
17   Ms. McWhorter, you told her that when the four of you
18   were up in the apartment, Ms. Behamon, I'm going to
19   call her Lorena.
20   A.   That's fine.
21   Q.   Because I'm going to have difficulty with that
22   name.  Lorena looked tired and put her head down on the
23   bed, right?
24   A.   Yes, that's my recollection.
25   Q.   Okay.  And you told Ms. McWhorter that Larisa

## Page 32

1    and Andrea chitchatted for about -- and you,
2    chitchatted for about 45 minutes, right?
3    A.   I think I had said we had a professional
4    conversation about, you know, where people were going
5    to work, what they were going to do when they got back.
6    I wouldn't describe it as chitchat.
7    Q.   Okay.  And then according to the statement you
8    gave Ms. McWhorter, you started to do some work on a
9    notepad while lying on the bed and you fell asleep.
10        Do you recall telling her that?
11   A.   Correct.  Yes.
12   Q.   And you told Ms. McWhorter that you partially
13   woke up fully clothed realizing that you were being
14   kissed on the neck and the ear by Andrea Rivera.
15        Do you recall telling her that?
16   A.   Yes.
17   Q.   And you told Ms. McWhorter that you heard
18   Ms. Rivera say:  I want to fuck you and I want you to
19   fuck me.
20        Do you recall telling her that?
21   A.   I do recall telling her that.
22   Q.   Okay.
23   A.   There are some events that actually happened
24   between those things as part of Ms. Rivera's attempted
25   seduction of me, but, yes.

## Page 33

1    Q.   And you told Ms. McWhorter that you kissed
2    Ms. Rivera back, didn't you?
3    A.   What I told her in more nuanced language was
4    that I woke up in a very drowsy state with someone kind
5    of nuzzling my ear and my neck and kissing me and
6    whispering in my ear, and I was in a half-awake state.
7    Q.   Okay.  And you went on to tell Ms. McWhorter
8    that while Ms. Rivera was kissing you, she unbuttoned
9    your jeans, she fondled you, and that you became
10   aroused.
11        Didn't you tell her that?
12   A.   Yes.
13   Q.   Okay.  According to the statement you gave
14   Ms. McWhorter, you heard then Larisa Marenco ask
15   Ms. Rivera:  Are you enjoying this?  Does this feel
16   good?
17        Do you recall telling her that?
18   A.   Uh-huh.
19   Q.   Yes?
20   A.   Uh-huh.
21   Q.   You have to answer audibly.
22   A.   I'm sorry, yes.
23   Q.   And you told Ms. McWhorter that it was at that
24   point you realized that Ms. Rivera was straddling you,
25   correct?

www.taylorjonovic.com     Taylor, Jonovic, White, Gendron & Kircher-Echarte          305.358.9047
                                                                              Fax 305.371.3460

Drisin vs. Florida                                           July 24, 2018

Page 34

1    A.  I think what I said is I had become -- at that
2  point, I had become more conscious of what was
3  happening and my surroundings and I was aware that she
4  was on top of me, yeah.
5    Q.  And you told her that you pushed Ms. Rivera
6  off of you and told her that you couldn't do this, and
7  you got out of bed; is that fair?
8    A.  Yeah.  I think -- I'm not sure if I said, you
9  can't do this or we can't do this, but something to
10 that effect, yeah, and I got up.
11   Q.  And you stated that you asked Larisa Marenco
12 to stay with Ms. Rivera and you went into the other
13 room; is that correct?
14   A.  Yes.
15   Q.  Now, Mr. Drisin, if, as you contend you were
16 being essentially sexually assaulted against your will
17 in your sleep, does it strike you as odd that
18 Ms. Marenco would ask your assailant whether she was
19 enjoying herself and whether it felt good?
20   A.  No, not particularly.
21   Q.  Strikes you as a normal thing to say in those
22 circumstances?
23   A.  So, first of all, I wouldn't describe it as
24 being sexually assaulted.  I think it was a very kind
25 of confusing moment.  So I have never -- yeah, I have

Page 35

1  always had trouble describing what happened.
2    Q.  So you wouldn't describe it as if you were
3  sexually assaulted?
4    A.  I think for some reason she thought that I
5  would be a willing participant in, I don't know what.
6  I don't know if she just wanted to play around or if
7  she wanted to have sex.  I mean, but she was not -- you
8  know, I mean, she was certainly the aggressor.
9    Q.  She was naked, right?
10   A.  Honestly, I don't know if she was naked or if
11 she had underwear on, but she did not have her street
12 clothes on, that's for sure.
13   Q.  Well, if she had -- is it your contention that
14 you had intercourse?
15   A.  I actually don't know, and I actually doubt
16 it, because I didn't -- I mean, I have certainly had
17 intercourse and I know what it feels like, and when I
18 woke up, I didn't feel like I was in somebody, and I
19 very quickly realized that she was on top of me, and in
20 panic I pushed her off.
21   Q.  Didn't you tell Ms. McWhorter that you assume
22 that you had intercourse?
23   A.  No.  What I told Ms. McWhorter was that since
24 Andrea was stating that there was intercourse, I sort
25 of accepted her statement, not as fact, but that she

Page 36

1  was kind of arguing that.
2    But truth be told, in her original complaint,
3  she actually never said there was intercourse.
4    Q.  When you pushed Ms. Rivera off you and got out
5  of bed and talked to Larisa Marenco, were you wearing
6  pants?
7    A.  I think at that point I was in such a state of
8  panic, my pants were sort of -- I think there was like
9  one leg in pants, one leg not, and I remember getting
10 up and trying to figure out, you know, like how to get
11 into the other room.  So I think the pants came off
12 while I was trying to get out of bed.
13   Q.  Were you wearing a condom?
14   A.  No.  No.  And at that point, I hadn't -- I
15 don't think I had bought condoms in quite a long time.
16   Q.  After this incident, you have stated you were
17 extremely upset, correct?
18   A.  Yeah, I had basically a complete breakdown.
19   Q.  You were panicked, that is what your
20 characterization of it was?
21   A.  Yeah.  Yeah, I had a panic attack.
22   Q.  And you felt that Ms. Rivera had taken
23 advantage of you, correct?
24   A.  To be honest, I mean, at that moment I wasn't
25 sure what the hell happened.  All I knew is I woke up,

Page 37

1  I was aroused, someone was kissing me.  It turned out
2  not to be someone that I wanted kissing me.  She is on
3  top of me.  So I was quite confused.
4    Q.  Did you feel you had been taken advantage of?
5    A.  It took me a long time to understand.  I still
6  to this day, actually, have a hard time putting a tag
7  on whether I'm a victim, whether I am -- I mean, I
8  think that -- I don't know.  I mean, I think maybe she
9  got miscued somehow.  Maybe she thought I was willing
10 to have sex with her.  I don't know.  Maybe she wanted
11 to have -- I don't know, a threesome or -- I have no
12 idea what she was thinking.
13   Q.  Well, you have taken the position since then
14 that you were sexually assaulted; isn't that true?
15   A.  Yeah.  I mean, she tried to have sex with me
16 or at least engage in inappropriate activity with
17 someone that was -- that certainly didn't give consent.
18   Q.  And you have taken the position that
19 Ms. Rivera took advantage of you, haven't you?
20   A.  What do you mean by took advantage of me?
21   Q.  Just those words.  Have you ever stated that?
22   A.  Yeah, I guess she did.  Yeah, I would say she
23 took advantage of me.  I was sleeping.
24   Q.  Let me mark as Exhibit 3 an e-mail from you to
25 Andrea Rivera dated December 12th, but I have a feeling

10  (Pages 34 to 37)

Drisin vs. Florida                                July 24, 2018

## Page 38

1  that the timing --
2         (Thereupon, the document referred to was
3  marked as Exhibit No. 3 for Identification.)
4     A.  Because of Europe, yeah.  Yeah, I know what
5  you mean.
6     Q.  It's December 13.
7     A.  Yeah.
8     Q.  Now, you wrote this e-mail after the incident
9  where you woke up with Ms. Rivera on top of you,
10 correct?
11    A.  Correct.
12    Q.  And at this time, you used an e-mail
13 A.Drisin@me.com?
14    A.  I think that might have been just because that
15 was through my phone.
16    Q.  But that's an e-mail you used?
17    A.  I actually don't know.  I never use that
18 e-mail.  I think it is because I sent it on my phone or
19 something.  I actually don't even know what that e-mail
20 is.
21    Q.  Okay.  But it's an e-mail you wrote?
22    A.  Yes.
23    Q.  Okay.  And you state:  Andrea, this is very
24 difficult for me to write because I feel terrible right
25 now.  I don't know when you are departing Genoa, but

## Page 39

1  I'm hoping I can have a moment of your time on Saturday
2  morning, and hoping in my heart of hearts that I can
3  speak with both you and Larisa together.  It won't take
4  long, but I owe you both something important, and I
5  need to deliver it to you in person before you leave
6  and before I leave.
7         Those are your words, correct?
8     A.  Yes, uh-huh.
9     Q.  And what was it that you felt terrible about?
10    A.  What had happened.  I felt awful.  I told you,
11 I had -- I was having a panic attack.  I didn't know
12 which end was up.  I couldn't understand what had
13 happened.
14    Q.  What is it you were referring to when you
15 stated to Ms. Rivera that you owed both her and Larisa
16 something important that you needed to deliver in
17 person?
18    A.  Yeah.  So, apparently, this has been
19 misunderstood from the beginning of the
20 investigation.  What I meant by this, and I thought I
21 was being clear, was in my mind what I meant was I owed
22 them -- what I wanted to give them was my assurance
23 that I wasn't going to make a stink about this.  I
24 wasn't going to get them kicked out of school.  I wasn't
25 going to file charges against her.  I thought that what

## Page 40

1  she did was inappropriate and wrong, but I wasn't going
2  to make a stink.  I wanted her to just kind of go away.
3         That is what I wanted to tell her in front of
4  Larisa.
5     Q.  And what was it that you owed Larisa?
6     A.  I guess the same thing, that I wasn't going to
7  create a problem for anybody, that I couldn't
8  understand what had happened, and I just wanted to sort
9  of move on.  And it was written in a state of absolute
10 panic.
11    Q.  And why did that message have to be delivered
12 in person to both of them together?
13    A.  Well, I didn't think that she would want to
14 meet me by herself based on what had happened, so I
15 thought better to do it in front of another party.
16 That's all.
17        And at the time, as I said, I was thinking,
18 well, this would be the best way to deal with this,
19 face to face.
20    Q.  Did you receive any response to this e-mail
21 from Andrea?
22    A.  No, I didn't.
23    Q.  But you did meet with Larisa Marenco following
24 this incident in Genoa, correct?
25    A.  Yeah.  I mean, I was really having a bad -- a

## Page 41

1  bad moment.  And I think later that day, I don't know
2  if it was before this or after this, Larisa brought me
3  some food because I was just -- I can't pull my meeting
4  with Professor Rice.  I was like in my bed in tears
5  having a meltdown.  And Larisa, you know, said:  You've
6  got to eat.  Let me bring you some food.
7         So she brought food and, yeah.
8     Q.  So had you spoken to her on the phone or
9  texted with her, Larisa?
10    A.  I don't -- I think probably we spoke on the
11 phone, but, honestly, I don't remember.
12    Q.  Okay.  And it was when she brought you the
13 food and met with you the following day that she told
14 you that Andrea Rivera had or was planning to make a
15 complaint against you, if I have that right?
16    A.  Actually, I don't recall the sequence of all
17 of that.  It is all sort of just a big blur.
18    Q.  But it was around that time?
19    A.  Yeah.  It was before everybody left.  And
20 Larisa was very clear that things were getting -- that
21 Andrea had to with her -- one of the other roommates
22 had sort of whipped things up and made it seem like I
23 had perpetrated this thing.
24    Q.  What was your relationship with Lorena at that
25 time?

11 (Pages 38 to 41)

Page 42

1      A.  She was just -- she was a student.  She seemed
2  like a nice, young woman.
3      Q.  Were you friends?
4      A.  I don't know if I would describe us as
5  friends.
6      Q.  Let me show you what I'm marking as Exhibit 4
7  to this deposition.  And it is an e-mail from you to
8  Lorena.
9          (Thereupon, the document referred to was
10  marked as Exhibit No. 4 for Identification.)
11      A.  Uh-huh.
12      Q.  And it is kind of dark.
13      A.  Yes.  It is more or less the same message.
14      Q.  I'm going to mark this light one.
15      A.  Okay.
16      Q.  Because I think it will be easier for you to
17  read.
18          So that is an e-mail that you sent to Lorena,
19  correct?
20      A.  Correct.
21      Q.  And you sent that to her at or around the same
22  time that you sent Exhibit 3, the e-mail to Andrea,
23  correct?
24      A.  Correct.
25      Q.  In here you state:  Lorena, it's been a very

Page 43

1  difficult day for me.  I don't know when you are
2  departing Genoa, but I'm hoping that you will be able
3  and willing to meet me for a cappuccino Saturday
4  morning if you have time.  As you might imagine, I need
5  to talk with you, and this is not easy.  I hope you
6  will indulge me.
7          That was your message, correct?
8      A.  Correct.
9      Q.  And the day had been difficult for you because
10  of the incident the night before or the early morning
11  of that day?
12      A.  Yes.  Yes.
13      Q.  Involving Andrea Rivera?
14      A.  Correct.
15      Q.  Why did you feel you needed to talk to Lorena
16  about this?
17      A.  Because she woke up with her apartment-mate
18  naked in my bed.  She had assumed, I think, that
19  something untoward happened.  And she -- you know, she
20  was there.  So I felt bad.  And I felt like I needed to
21  kind of explain what happened.
22          And, also, I felt some culpability that I let
23  these three graduate students into my apartment to use
24  the bathroom.  So I felt like I maybe -- you know, that
25  that was inappropriate in some way.  Not that it was a

Page 44

1  violation of any policy, but that had I not done that,
2  none of this would have happened.
3      Q.  Now, your e-mail to Lorena said:  As you might
4  imagine, I need to talk to you.
5          What caused you to believe that Lorena would
6  understand that you needed to talk to her?
7      A.  Well, I would think that if you wake up and
8  you see your apartment-mate naked in your professor's
9  -- in a professor's bed, that there is something pretty
10  peculiar about that.
11      Q.  Were you ever her professor, Lorena's?
12      A.  No.
13      Q.  How about Andrea's?
14      A.  No.
15      Q.  Did Lorena respond to your e-mail?
16      A.  I actually don't remember.  I think she did
17  later, after everybody left.  I think she wrote and
18  said, I missed your message, but we can touch base when
19  we're all back in Miami.
20      Q.  Did you meet with her in Genoa?
21      A.  No.
22      Q.  Did you meet with her when you got back to
23  Miami?
24      A.  I did.
25      Q.  How soon after you got back to Miami?

Page 45

1      A.  I don't remember the date.  We had coffee.
2      Q.  Where?
3      A.  In Coconut Grove.
4      Q.  And what was the nature of the discussion you
5  had with her?
6      A.  She actually asked for the meeting.  And she
7  said -- she basically said, I feel awful about what has
8  happened to you.  It is totally inappropriate.  You
9  know, I know Andrea.  I know the kind of stuff that she
10  does.
11          And she had also mentioned something that she
12  was saying bad things about me on -- I can't remember
13  if it was Facebook or something, but that she felt bad,
14  and that she hoped that justice would be served,
15  something to that effect.
16      Q.  Had she witnessed the incident?
17      A.  No.  I think she was asleep.
18      Q.  Then how would she know what justice needed to
19  be served?
20      A.  Well, because she heard what -- she, according
21  to her, saw the transformation back in the
22  apartment.  She saw Andrea go from saying things like,
23  I can't believe I do this.  I fuck everything up when I
24  have sex.  I'm just like my father.  There were a whole
25  series of statements that apparently she heard made.

12 (Pages 42 to 45)

Drisin vs. Florida                                    July 24, 2018

## Page 46

1  And then she watched as Andrea then moved from feeling
2  guilty to feeling like the victim.
3      Q.  Now, this discussion you had with Lorena in
4  Coconut Grove, that wasn't immediately upon your return
5  to Miami, that was months and months later; isn't that
6  true?
7      A.  I believe so.
8      Q.  Did you have any discussion with Lorena about
9  the incident shortly thereafter?
10     A.  I don't think so.
11     Q.  Okay.  How about Ms. Rivera, did you have any
12 discussion with her after this incident?
13     A.  No, no.  When we got back, I tried to stay as
14 far away from her as possible.
15     Q.  Now, when you left Genoa, you continued,
16 though, to communicate with Larisa; isn't that correct?
17     A.  Yes.
18     Q.  And the two of you were on good terms?
19     A.  Yeah.  She was really helpful with me, I would
20 say.
21     Q.  What I'm marking as Exhibit 5 is an e-mail
22 chain between you and Larisa Marenco dated December 16
23 of 2014.  The bottom e-mail on the first page is an
24 e-mail you sent, correct, Tuesday, December 16, 2014?
25         (Thereupon, the document referred to was

## Page 47

1  marked as Exhibit No. 5 for Identification.)
2      A.  December 16th?  Uh-huh.
3      Q.  Yes.
4      A.  I guess it is me, yeah.
5      Q.  Okay.  And you state to Larisa that it was
6  nice to have gotten a text from her the previous night,
7  correct?
8      A.  Yeah.
9      Q.  Let me show you what I'm marking as Exhibit 6.
10 And this is another e-mail from you to Larisa dated
11 December 16.  And this is an e-mail you wrote, correct?
12         (Thereupon, the document referred to was
13 marked as Exhibit No. 6 for Identification.)
14     A.  Uh-huh.
15     Q.  And you state in this e-mail that you checked
16 your Gmail and saw for the first time Larisa's e-mail
17 to you dated December 1 of 2014.
18         Do you see that?
19     A.  Uh-huh.
20     Q.  Are you referring to what we have marked --
21 let me just find it.
22     A.  Yeah.  I think it's that -- yeah, it's this
23 one, right, the first one, Exhibit 1.  No, sorry.  It
24 is Exhibit 2.
25     Q.  Yeah, it is Exhibit 2.

## Page 48

1      A.  Yeah.  So I actually never even read it.
2      Q.  So on December 16, you for the first time read
3  Larisa's e-mail to you of December 1 that we have
4  marked as Exhibit 2, correct?
5      A.  Uh-huh.
6      Q.  And you described it as one of the most
7  beautiful letters you have ever gotten, right?
8      A.  Uh-huh.
9      Q.  Yes?
10     A.  Yes.
11     Q.  What I'm marking as Exhibit 7 is an e-mail
12 exchange between you and Larisa Marenco dated December
13 27th and 28th of 2014.
14         Do you recognize these e-mails?
15         (Thereupon, the document referred to was
16 marked as Exhibit No. 7 for Identification.)
17     A.  Uh-huh.
18     Q.  You have to answer.
19     A.  Yes.
20     Q.  Okay.  Now, the first e-mail starting at the
21 bottom of the second page.
22     A.  Uh-huh.
23     Q.  Bottom of the second.  Ms. Marenco tells you
24 that the whole day -- sorry, it is the third page, I
25 guess.  The bottom of the second, starting with:

## Page 49

1  Hello, my dear Adam.
2          Do you see that at the very bottom of page 2?
3      A.  Yes.
4      Q.  Okay.  Ms. Marenco tells you that the whole
5  day she was thinking about you and how you did not text
6  her.
7          Do you see that?
8      A.  Uh-huh.
9      Q.  And she states that she missed your texts and
10 being able to share things with you, correct?
11     A.  Uh-huh.  Uh-huh, yes.
12     Q.  And in the middle e-mail going up, she states
13 that she misses Italy and Europe, and you wrote back
14 that you miss her more.
15         Do you see that?
16     A.  Uh-huh.
17     Q.  Yes?
18     A.  Uh-huh.
19     Q.  Yes or no?
20     A.  Yes.
21     Q.  Okay.  At this point is your relationship
22 still friendly, professional, and flirty?
23     A.  I would say after the event we had gotten
24 closer, although I wouldn't describe it as a sexual
25 relationship.  We weren't having an affair.  But she

13 (Pages 46 to 49)

Drisin vs. Florida                                        July 24, 2018

## Page 50

1  was someone that I was relying on very heavily, and,
2  yeah, and as things were sort of falling apart around
3  me, she was an important part of my life.
4       Q.  When you were in Genoa and Larisa Marenco told
5  you that Andrea Rivera either had or was planning to
6  file a complaint against you with FIU, did she offer to
7  help you?
8       A.  Actually, she hadn't -- she hadn't said that.
9  She did say that she would file a complaint.  I think
10 what she said was that Andrea was calling Professor
11 Nepomechie.
12      Q.  At FIU?
13      A.  Yeah.
14      Q.  To tell somebody at FIU that --
15      A.  Yeah, but I don't think the term "complaint"
16 was ever brought up, so --
17      Q.  Okay.
18      A.  But she felt like she needed to tell somebody
19 what had happened.
20      Q.  So Larisa told you that Andrea Rivera was
21 planning to call someone or had called someone at FIU
22 to let them know that you had engaged in some sort of
23 sexual misconduct; is that fair?
24      A.  Well, I think what I would say is that she was
25 going to tell somebody or had told somebody her version

## Page 51

1  of what had happened.
2       Q.  And when Larisa gave you that information, did
3  she offer to help you?
4       A.  I don't remember what she offered.
5       Q.  Did she say that she would step up and say
6  what she thought the version of events were?
7       A.  I don't remember.  She might have said that,
8  and I would assume that she would because she saw what
9  had happened, so, yeah.
10          MS. RAGATZ:  What I'm marking as Exhibit 8
11      is an e-mail exchange between you and Larisa on
12      December 28th and December 29.
13          (Thereupon, the document referred to was
14      marked as Exhibit No. 8 for Identification.)
15          MR. LEVINE:  I'm going to object on the
16      record that you are introducing a series of e-mails
17      that fall within the ambit of a request for
18      production within the time frame after December 13,
19      2014, that were not produced.
20          MS. RAGATZ:  Okay.  And certainly note
21      your objection.  But I think that if you look at
22      your request for production, these documents that
23      I'm introducing are not at all responsive.  But
24      certainly you can preserve your objection.
25 BY MS. RAGATZ:

## Page 52

1       Q.  Now, you recognize these e-mails, Mr. Drisin?
2       A.  Yes.
3       Q.  And on December 28 of 2015, you wrote to
4  Larisa and told her you had a nice dream about her the
5  night before, right?
6       A.  Yes.
7       Q.  What kind of dream had you had about her?
8       A.  It was actually an erotic dream.
9       Q.  Is that what you described as a nice dream?
10      A.  Yeah.
11      Q.  And --
12      A.  So she was -- we were talking about some
13 issues with my marriage, and she was giving me some
14 advice on how to deal with that.  And, I mean, to be
15 blunt, she was sort of basically saying that I should
16 be more aggressive with my wife and more demanding of
17 intimacy.
18          So -- and then right after we had had that
19 discussion, I had this crazy dream that was about her.
20      Q.  And her response was:  Was the dream domestic
21 again?
22          Do you see that?
23      A.  Was the dream domestic.  I don't know.  I
24 don't -- yeah, I don't know what that means.
25      Q.  Well, you answered:  Yes, but it had a

## Page 53

1  frustrating twist.  I'll explain.
2          Do you see that?
3       A.  Yeah.  I actually don't know what any of that
4  means.  I don't know -- I don't know what she meant by
5  domestic again.
6       Q.  And you don't know what you meant by:  Yes,
7  but it had a frustrating twist?
8       A.  I don't, yeah.  I don't recollect what I meant
9  by that.
10      Q.  Okay.
11      A.  Maybe that I woke up and didn't make love with
12 my wife.
13      Q.  I'm sorry?
14      A.  Maybe that I woke up and didn't make love with
15 my wife.  I actually don't know what I meant.
16      Q.  Okay.  In December, at the end of December of
17 2015, while Larisa Marenco's mother was in town, you
18 had the two of them for lunch at your home, right?
19      A.  Yes.
20      Q.  Was your wife there?
21      A.  No, she wasn't.  She was away.
22      Q.  Where was she?
23      A.  I think she was at a conference.  I don't
24 remember.
25      Q.  Now, in early 2015, Ms. Marenco was using a

14 (Pages 50 to 53)

Page 54

1  laptop computer that you had loaned her, right?
2      A.  Yes.
3      Q.  And on Friday, January 2, 2015, you and Larisa
4  had lunch together, correct?
5      A.  On -- what is the date?
6      Q.  Friday, January 2, 2015.
7      A.  Yes.
8      Q.  And do you recall that on Sunday, January 4,
9  2015, you sent Ms. Marenco an e-mail describing an
10 erotic dream that you had about her --
11     A.  Yes.
12     Q.  -- that Friday night?
13     A.  Yes, I do.
14     Q.  Okay.  So looking at Exhibit 8, when you had a
15 dream about -- when you related that you had a dream
16 about her, that was before you had the exotic -- erotic
17 dream that you related to her; isn't that true?
18     A.  I guess I was confusing it with the other,
19 with the one that you were mentioning.
20     Q.  Does that help refresh your recollection that
21 --
22     A.  Then I don't actually -- yeah, so this -- so
23 all this was then is a nice dream.  I don't know what
24 it was.  It might have just been a pleasant dream.  I
25 thought you were referring to the erotic dream.

Page 55

1      Q.  Well, let's get to that then.
2      A.  Okay.
3      Q.  I'm marking as Exhibit 9 an e-mail dated
4  January 4, 2015, from you to Larisa Marenco.
5          (Thereupon, the document referred to was
6      marked as Exhibit No. 9 for Identification.)
7      A.  Uh-huh.
8      Q.  And the subject is:  My dream as per your
9  request.
10         Do you see that?
11     A.  I'm sorry, what are you referring to?
12     Q.  The subject.
13     A.  Yeah.
14     Q.  The subject is:  My dream as per your request,
15 correct?
16     A.  Yes.  So I think we probably -- I probably
17 told her I had a crazy dream, and she probably said,
18 oh, you know, tell me about it.  And I wrote it's
19 graphic and sexual, so if you don't want to read, stop.
20     Q.  So this is an e-mail you sent Larisa Marenco
21 on January 4, 2015, correct?
22     A.  Yes.
23     Q.  And it's your testimony that you told Larisa
24 Marenco that you had a dream about her and she
25 requested that you relate it to her?

Page 56

1      A.  It's not my testimony.  It is what seems to be
2  the case based on reading the e-mail line, as per your
3  request.
4      Q.  And do you recall the circumstances of Larisa
5  Marenco requesting that you relate this dream to her?
6      A.  No, I don't.  I don't.  I mean, it probably
7  was just in the context of one of our many
8  conversations about life at that point.
9      Q.  And you sent this from your Gmail account,
10 right?
11     A.  Yes.
12     Q.  But you sent this to Ms. Marenco at her FIU
13 e-mail address?
14     A.  Apparently.  And I think this was the document
15 that was stolen from my computer by Augusto Marenco and
16 then, I guess, delivered to FIU to show that we were
17 having an affair.
18     Q.  So you start your e-mail by stating:  My dear
19 Larisa, okay, so I'm going to tell you about my erotic
20 dream from Friday night, but it is graphic and sexual,
21 so if you don't want to read that stuff, you should
22 stop now.
23         Do you know if Ms. Marenco read the e-mail?
24     A.  I assume she did.
25     Q.  Did you discuss it with her after you sent it?

Page 57

1      A.  I don't recall.
2      Q.  Did she send you any response?
3      A.  I don't recall.
4      Q.  And you go on by stating:  So I need to
5  preface this by telling you again that I thought you
6  looked lovely on Friday at lunch.  Your eyes were the
7  most beautiful shade of green in the sun, and I felt
8  the jacket you were wearing with no shirt underneath
9  was so fucking sexy.  Seeing the curve of your breasts
10 revealed by your jacket was such a wonderful
11 distraction that it left me totally aroused from our
12 hunch.  I just wanted to slip my hand inside your
13 jacket.
14         Now you state that you are telling Ms. Marenco
15 again how lovely she looked at lunch.
16         When had you previously told her that you
17 thought she looked lovely?
18     A.  Probably at lunch I made a comment that she
19 looked really nice and the dress she was wearing was
20 lovely.
21     Q.  So was it normal for you to tell someone with
22 whom your relationship was strictly friendly and
23 professional that they looked so fucking sexy that it
24 left you totally aroused?
25     A.  So, by that point, our relationship actually

Drisin vs. Florida                              July 24, 2018

## Page 58

1   had become quite flirty.  There is no question about
2   that, yeah.  That was part of the dynamic of our
3   relationship.
4       Q.   Now, your e-mail then goes on to describe in
5   detail --
6       A.   Uh-huh.
7       Q.   -- your erotic dream, wouldn't you agree?
8       A.   Yes, absolutely.  And in retrospect, I would
9   say it is probably inappropriate to send an e-mail like
10  that to someone that I was working with.
11      Q.   You describe in graphic detail the way in your
12  dream you touched and fondled her, don't you?
13      A.   Yes.
14      Q.   And you describe in graphic detail how you had
15  intercourse?
16      A.   In the dream.
17      Q.   Yeah.
18      A.   Yes.
19      Q.   And you describe in graphic detail your orgasm
20  and hers in your dream, right?
21      A.   Yes.
22      Q.   Is that what you consider flirting?
23      A.   Yeah.
24      Q.   I'm going to mark as Exhibit 10.  Thank you.
25  It's an e-mail from you to Larisa Marenco, dated

## Page 59

1   January 5, 2015, with the subject, OUR, in capitals,
2   O-U-R, Story.
3            (Thereupon, the document referred to was
4   marked as Exhibit No. 10 for Identification.)
5       A.   Yeah.
6       Q.   That's an e-mail you wrote?
7       A.   Yes.
8       Q.   And you state that you wrote another chapter
9   and you like writing for her, correct?
10      A.   Yeah.
11      Q.   And what is it that you were writing?
12      A.   We were both bouncing -- we were making up a
13  story about a bunch of people and we were sort of
14  bouncing back and forth.  We were adding to it.
15      Q.   You state that it is a return to Laura's dance
16  career.
17           Was the character Laura supposed to be Larisa?
18      A.   No.  It's a made-up character.
19      Q.   Now, on January 11, 2015, you took Larisa
20  Marenco to the Young Arts Ball; didn't you?
21      A.   She was one of about five graduate students
22  that attended the ball, yeah.
23      Q.   With you?
24      A.   Yes.
25      Q.   And at the time you were married, right?

## Page 60

1       A.   Yes.
2       Q.   And at the time Larisa was married, correct?
3       A.   Correct.
4       Q.   And isn't it true that Augusto Marenco,
5   Larisa's husband, showed up at that ball and found the
6   two of you dancing together?
7       A.   Actually, so to explain what happened, is that
8   he dropped her off to the event, and she was there
9   with, as I said, five other graduate students.  They
10  were working on, you know, with me on the project or my
11  GAs.  There was a nice event.  It was very public.  We
12  were all dancing together.  And Augusto apparently
13  became enraged.
14           I think he had -- my recollection is that he
15  texted or called Larisa and said, I want you to come
16  home now, and she said, what are you talking about?
17  No, I'm in the middle of this thing.  It's fine.  We're
18  outside.  We're -- you know, we're dancing.  We're, you
19  know, having fun.  I'm surrounded by a crowd.
20           And he became enraged and showed up and I
21  think hit her, pushed me, dragged her away.  We were
22  dancing with a huge crowd of people.  There was nothing
23  untoward about what was happening.
24      Q.   So he pushed you?
25      A.   Uh-huh.

## Page 61

1       Q.   Yes?
2       A.   Yes.
3       Q.   And he grabbed his wife and insisted she leave
4   with him, correct?
5       A.   I don't think they had a discussion.  I think
6   he, like, tugged her away.
7       Q.   Now, you became aware at some point in time
8   that Augusto Marenco had an altercation with his wife
9   when he took the laptop computer that you had loaned
10  her; isn't that true?
11      A.   No, I actually became aware that night,
12  because Larisa had called me either the next morning or
13  very late that night and said that he went into an
14  absolute rage, destroyed all of her architectural
15  models.  I think -- I think he hit her.  And that was
16  sort of the turning point in their relationship.  She,
17  I think, realized at that point that she needed to get
18  a divorce because he was violent.
19      Q.   And it's your testimony that when Augusto
20  Marenco walked into that event, it wasn't just you and
21  Larisa dancing?
22      A.   Oh, my god, no.  And, in fact, if he walked in
23  five minutes before that, she would have been dancing
24  with my female colleague.
25      Q.   Okay.  Let me mark as Exhibit 11 an e-mail

16 (Pages 58 to 61)

Drisin vs. Florida                                                July 24, 2018

## Page 62

1    exchange between you and Larisa, dated January 12th of
2    2015.
3           Do you recognize these e-mails?
4           (Thereupon, the document referred to was
5    marked as Exhibit No. 11 for Identification.)
6        A.  No, but, you know.  Oh, yeah, so I'm saying he
7    would have seen you rubbing and dancing with Helen
8    Maria.
9        Q.  So the question is, do you recognize these
10   e-mails?
11       A.  Yes.
12       Q.  And in the e-mail from you to Larisa, in the
13   middle of the first page, you state that you were glad
14   that Augusto had calmed down.
15          Do you see?
16       A.  Yes.
17       Q.  How did you come to learn that he had calmed
18   down?
19       A.  I think I told you, she, you know, she was
20   communicating with me.  She called me.
21       Q.  Okay.  And you state:  I was thinking that if
22   he showed up ten minutes earlier, he would have seen
23   you rubbing against and dancing provocatively with
24   Helen Maria and not me.
25       A.  Correct.

## Page 63

1        Q.  Would he have wanted to get in a fight with
2    her too or assume that you had started to have a
3    lesbian fling that night maybe?
4        A.  Right.  Right.
5        Q.  So you say that she was dancing with you,
6    right?
7        A.  Yes.  She was dancing with -- she was dancing
8    with a lot of people that night, yes.  And she is --
9    and she is, you know, a provocative dancer.
10       Q.  So when she was dancing with you and her
11   husband came in, was she dancing provocatively?
12       A.  I guess he thought so.
13       Q.  I am not asking what he thought.  I'm asking
14   you.
15       A.  No, I didn't take it as -- I mean, I just
16   thought it was Larisa being -- dancing flirty.
17       Q.  And Ms. Marenco responded:  So he was watching
18   for a while, spying.  I'm sorry, but that is just too
19   weird and creepy.  No trust.
20          Given the relationship that you and Larisa
21   were displaying in your e-mails, texts, et cetera, do
22   you think it was weird and creepy for her husband to
23   have manifested concern and lack of trust?
24       A.  So I think that Larisa was, and I don't know
25   if she still is, is very flirtatious.  And I think that

## Page 64

1    is part of her character, and I think maybe, you know,
2    it got her into trouble with her marriage.
3        Q.  Did it get you into trouble with your
4    marriage?
5        A.  I think so.  No, not with my marriage.  What
6    got me into trouble with my marriage was Andrea
7    Rivera's incident.
8        Q.  Did you and Ms. Marenco discuss the fact that
9    you should stop texting for security reasons and use
10   e-mail instead?
11       A.  I don't recall that.
12       Q.  Okay.  Do you want to take a short break?  Are
13   we good to go?  I'm fine.
14       A.  I'm fine.
15          MR. LEVINE:  I'm fine.
16   BY MS. RAGATZ:
17       Q.  Okay.  What I'm marking as Exhibit 12 is an
18   e-mail chain between you and Ms. Marenco on January 12,
19   2015.
20          (Thereupon, the document referred to was
21   marked as Exhibit No. 12 for Identification.)
22       A.  Uh-huh.
23       Q.  Do you recognize these e-mails?
24       A.  Yes.
25       Q.  Okay.  Now, you state in your e-mail:  I

## Page 65

1    understand that e-mail is more secure for you, but I
2    really miss the conversational aspect of our texting.
3    I guess I'll have to get used to this new reality, but
4    I feel a void in my day and hope that we can find some
5    way that is secure for our informal and immediate
6    messaging between 9:00 and 5:00.
7           What was the new reality you were referring
8    to?
9        A.  I think by that time her relationship with
10   Augusto was -- I mean, she wanted a divorce.  And I
11   think she was concerned that he was monitoring, I
12   guess, her phone which, in fact, he was.  He was, you
13   know, stalking her, basically.
14          So I think she was concerned that he would --
15   yeah, that he would, you know, be reading all of her
16   information and stuff.
17       Q.  So you had been texting more than e-mailing at
18   that point in time?
19       A.  I wouldn't -- I don't know.  I wouldn't
20   describe it that way.
21       Q.  Why is it that despite our request, you
22   haven't produced your texts between you and Larisa from
23   this period of time?
24       A.  Oh, they were long gone.  I mean, I have
25   changed providers.  I mean, there is no -- there is no

                                      17 (Pages 62 to 65)

Page 66

1  history of any texts.
2      Q.  How is it yet you were able to produce texts
3  from the same time period between you and Lorena about
4  setting up your meeting for coffee in Coconut Grove?
5      A.  Oh, because I captured those, because I knew
6  what was happening with the FIU investigation.  So I
7  was -- once I understood that -- that Andrea was coming
8  after me, I started, you know, preserving things --
9      Q.  Now, at some point in time --
10     A.  -- relative to the incident.
11     Q.  At some point in time, you became aware that
12  February 12, 2015, the day after the ball, Augusto
13  Marenco, Larisa's husband, filed a complaint against
14  you with FIU's Department of University Compliance and
15  Integrity, correct?
16     A.  Uh-huh, yes.
17     Q.  And you became aware that Mr. Marenco shared
18  with FIU's Department of University Compliance and
19  Integrity e-mails between you and his wife that he
20  obtained from your laptop computer that he deemed
21  inappropriate, correct?
22     A.  Yes.
23     Q.  And you would agree they were inappropriate,
24  right?
25     A.  Yes.

Page 67

1      Q.  You were interviewed on February 14 of 2015,
2  in connection with that investigation, weren't you?
3      A.  Yes.
4      Q.  Now, at that meeting, the chair of the
5  department, Jason Chandler, told you that you should
6  not have any reporting line to Larisa Marenco during
7  the term of her graduate assistant contract?
8      A.  Would you say that again?
9          MR. LEVINE:  Object to form.
10 BY MS. RAGATZ:
11     Q.  Sure.  At the meeting --
12     A.  What meeting?
13     Q.  The meeting on February 14th, when you were
14  interviewed.
15     A.  Yes.
16     Q.  Isn't it true that Jason Chandler told you
17  that you should not have any reporting line to Larisa
18  --
19     A.  No.
20     Q.  -- during the term of her graduate assistant
21  contract?
22     A.  No.  You're talking about a meeting with Karen
23  Boston?
24     Q.  Yes.
25     A.  Jason Chandler was not present.

Page 68

1      Q.  Did Jason Chandler at any point tell you that
2  you should not have any reporting line to Larisa during
3  the term of her graduate assistant contract?
4      A.  No, only later with Dean Schriner after Karen
5  Boston's report was released was that determination
6  made based on FIU 104.
7      Q.  So he told you that?
8      A.  No, he never told me that.
9      Q.  What determination made are you referring to?
10     A.  Excuse me?
11     Q.  I guess I am misunderstanding.
12     A.  That there was -- that there was a potential
13  conflict of interest, right.  The report came to the
14  conclusion that I did not -- that I did not violate any
15  policies or procedures in term of my relationship with
16  Larisa, that it was -- I think they said it was
17  professional, but that based on FIU 104, which talks
18  about the potential for conflict of interest, they
19  should separate us, which I was fine with.
20     Q.  And who told you that?
21     A.  I believe it was Brian Schriner.
22     Q.  During your interview on February 14, did you
23  --
24     A.  Actually, let me back up, because I don't
25  think anyone ever told me that.  I think that we agreed

Page 69

1  that Larisa would just simply be reassigned to another
2  faculty member so that she would be removed as a direct
3  report, which would solve the problem of a potential
4  violation of FIU 104.  I believe that is the correct
5  description of what had transpired.
6      Q.  And so up until that point in time, until she
7  was reassigned to another faculty member, she directly
8  reported to you?
9      A.  Yes.
10     Q.  And during this time that she directly
11  reported to you, you were sending her sexually graphic
12  e-mails, correct?
13     A.  Yes.  Yeah.  Actually, I think you used
14  plural.  I think it is one, right?
15     Q.  Well, you sent her the e-mail about your
16  erotic dream, right?
17     A.  Right.  That is the one.
18     Q.  And you sent her the writings of your chapters
19  that were sexually graphic, correct?
20     A.  That wasn't about us, that was just -- it was
21  a story about a bunch of Italians.
22     Q.  On February 14, 2015, during your meeting, did
23  --
24     A.  What -- can you be specific?  What meeting?
25     Q.  During your interview, your interview in

18 (Pages 66 to 69)

Page 70

1  connection with the investigation of the Department of
2  University Compliance and Integrity.
3      A.  Uh-huh.
4      Q.  Did you advise that you knew an e-mail you
5  sent to Larisa was wrong and that you had formally
6  apologized to her husband for sending it?
7      A.  I believe I did.
8      Q.  Did you apologize to her husband for sending
9  it?
10     A.  I did.  I think I -- I think I apologized for
11 things that he saw as inappropriate, yeah.
12     Q.  When did you do that?
13     A.  We had a meeting in the College of
14 Architecture, when he came in, and I was trying to kind
15 of calm things down.
16     Q.  And who was at that meeting?
17     A.  I believe Dean Schriner and the budget
18 director.
19     Q.  Okay.  And at that point, you told him that
20 you knew that you had been sending his wife
21 communications that were inappropriate?
22     A.  I don't think I used that language.
23     Q.  What language did you use?
24     A.  I think I just apologized for anything that
25 was inappropriate.  I didn't specifically state what

Page 71

1  was inappropriate.
2      Q.  And what was his response, Augusto Marenco's
3  response?
4      A.  I don't recall.
5      Q.  Isn't it true that during that interview, you
6  stated that your relationship with Larisa Marenco had
7  also been professional, except for some flirting from
8  time to time?
9      A.  Uh-huh.  Probably.
10     Q.  Is that how you still describe it?
11     A.  Yeah.  I mean, I would describe the e-mails,
12 the messages as, you know, maybe over-the-top flirting
13 or, you know, I would agree with you that there was an
14 inappropriate aspect to our relationship.  But that is
15 different than a violation of university policy.
16     Q.  Do you consider the e-mail you sent to Larisa
17 Marenco in which you graphically describe your dream
18 about a sexual encounter with her to be flirting?
19     A.  I would describe it as flirty and probably
20 inappropriate for a direct report.
21     Q.  Now, it was right around this time, early
22 2015, early February, that Ms. Marenco began to discuss
23 with you her plan to leave her husband; is that right?
24     A.  I don't recall what the dates were.
25     Q.  It was after you got back from Italy?

Page 72

1      A.  No.  I think it was after the event in
2  February.
3      Q.  Okay.
4      A.  When he beat her up and she filed a
5  restraining order.
6      Q.  You offered to help her move out, didn't you?
7      A.  I think I offered her a number of areas of
8  assistance.  I think I offered to help her move out.  I
9  think I gave her some recommendations for attorneys.  I
10 helped her with seeking a restraining order.
11     Q.  Well, Ms. Marenco didn't file a motion for a
12 restraining order until the following May.  Are you
13 aware of that?
14     A.  I don't remember the timing.
15         MR. LEVINE:  Object to form.
16 BY MS. RAGATZ:
17     Q.  Did you help her move out, Larisa?
18     A.  No, I don't think I did, actually.
19     Q.  Okay.
20     A.  Yeah, actually, I did not.
21     Q.  At the end of January of 2015, did you and
22 Ms. Marenco go on any trip together?
23     A.  The end of?
24     Q.  January.
25     A.  January '15?

Page 73

1      Q.  Yeah.  January of 2015, yes.
2      A.  I don't believe so.  January 2015.  This would
3  have been -- I don't recall, but I don't think so.
4      Q.  In January of 2015, did you ever spend the
5  night together?
6      A.  No, I don't believe so.  January 2015.
7      Q.  Let me mark as Exhibit 13 an e-mail from you
8  to Larisa Marenco, dated January 28 of 2015.
9         (Thereupon, the document referred to was
10 marked as Exhibit No. 13 for Identification.)
11     A.  I remember this.
12     Q.  Is that an e-mail you sent?
13     A.  Yes, it is.
14     Q.  And you state in this e-mail that you woke up
15 on Monday and the two of you spent an hour cuddling.
16     Do you see that?
17     A.  Yeah.
18     Q.  Where did you spend the night?
19     A.  In a hotel.
20     Q.  Where?
21     A.  In Savannah.  And she was having a nervous
22 breakdown at that point.
23     Q.  And this was a FIU sponsored trip to Savannah?
24     A.  Yes.
25     Q.  And did you each have your own hotel room?

19 (Pages 70 to 73)

Drisin vs. Florida                                      July 24, 2018

---

Page 74

1        A.   Yes.
2        Q.   But you spent the night in whose hotel room
3    together?
4        A.   I don't know if we spent the night, but she
5    came into my hotel room.  She was worried that her
6    husband -- her husband, who she was in the process of
7    divorcing, called her and threatened that he was going
8    to come up and beat her up again, and she was
9    terrified, and she wanted to go find another hotel.
10   She was absolutely terrified.
11       Q.   Now, you also state that while you may have
12   started it with giving a massage that was a result of
13   your bet, you were both active participants in the
14   physically intimate stuff.
15            Do you see that?
16       A.   Uh-huh.
17       Q.   Yes?
18       A.   Uh-huh.
19       Q.   Yes?
20       A.   Uh-huh.  Yes.
21       Q.   Thank you.
22            So you engaged in physically intimate conduct
23   with Ms. Marenco that night?
24            MR. LEVINE:  Object to form.
25   BY MS. RAGATZ:

---

Page 75

1        Q.   Yes or no?
2        A.   I believe we were cuddling.
3        Q.   Is that --
4        A.   Which is what I think what it says, right,
5    cuddling?
6        Q.   No, you say the physically intimate stuff.
7    Were both active participants in the physically
8    intimate stuff.
9        A.   Right, which is, I think, cuddling, right?  It
10   refers to cuddling.
11       Q.   The e-mail that you wrote reads:  You woke up
12   on Monday and spent an hour cuddling with me.  You
13   cuddled as much as I did, so you can't possibly suggest
14   you were uncomfortable that morning.
15       A.   Right.
16       Q.   You seemed so happy.
17       A.   Right.
18       Q.   And breakfast seemed to confirm that.
19   Everything seemed fine, even great.  I was obviously
20   happy that you seemed happy wanting to spoon and
21   cuddle.
22       A.   Uh-huh.
23       Q.   And then all of a sudden, I was in the gulag,
24   and here I am still.  I didn't do anything you didn't
25   want to do, and I was very careful to pull back when

---

Page 76

1    you let me know what was too far, and that stopped
2    immediately.  I think you are punishing me wrongly, and
3    I'm both very sad and also angry because you like to
4    flirt with me.  You clearly liked what we did Sunday
5    night and you set the boundaries, which I was very
6    attentive to.  You cuddled with me the next morning as
7    much as I cuddled with you.  And then 12 hours later
8    you were angry with me and punishing me.
9        A.   Uh-huh.
10       Q.   And then you go on in the next paragraph to
11   state:  You were pushing your body into mine and
12   clearly wanted to spoon with me.  For me, it was really
13   lovely to have you in my arms with your feet massaging
14   mine and you seemingly content to spoon with me for a
15   long time.  You were even stroking my chest lightly
16   when I was talking to my dad.
17            Do you see that?
18       A.   Uh-huh.
19       Q.   Okay.  Yes?
20       A.   Cuddling.
21       Q.   Okay.
22       A.   Cuddling and spooning.
23       Q.   If you go up to a little above that, you say:
24   So I am disappointed that you seem to be blaming me for
25   the fact that we had some light physical stuff happen

---

Page 77

1    Sunday night.  But while I may have started it with
2    giving a massage that was the result of our bet, we
3    were both active participants in the physically
4    intimate stuff.  In fact, you made it clear you were
5    enjoying it.  When you thought I went too far, you
6    pulled my hand away immediately.
7            Do you see that?
8        A.   Uh-huh.
9        Q.   So it was more physically intimate stuff than
10   cuddling, wasn't it?
11       A.   No, I wouldn't describe it that way.  It says
12   cuddling.  I mean --
13       Q.   So Sunday night was physically intimate stuff
14   and Monday morning was cuddling, right?
15       A.   No.
16            MR. LEVINE:  Object to form.
17       A.   No, I disagree with your interpretation of
18   this.
19       Q.   Where did she pull your hand away from?
20       A.   I think it was around her waist.
21       Q.   So, at this point, was your relationship still
22   friendly, professional, and a little flirty?
23       A.   It was flirty.  The flirtatious part of it was
24   growing, there's no question about that.
25       Q.   What I'm going to mark as Exhibit 14 is an

---

20  (Pages 74 to 77)

Page 78

1  e-mail exchange between you and Larisa Marenco dated
2  February 22 of 2015.
3       Do you recognize this exchange?
4       (Thereupon, the document referred to was
5  marked as Exhibit No. 14 for Identification.)
6       A.  Uh-huh.
7       Q.  Yes?
8       A.  Uh-huh.
9       Q.  You need to respond.
10      A.  Yes.
11      Q.  In this e-mail exchange, you and Larisa were
12 discussing research regarding taking steps to prevent
13 her husband from having access to your communications,
14 correct?
15      A.  I think it was about having access to her
16 communications.  It's not about me.
17      Q.  Now, on May 1 of 2015, you filed a petition in
18 the Circuit Court in Broward County seeking a temporary
19 injunction against Augusto Marenco for stalking,
20 correct?
21      A.  Yes.
22      Q.  What caused you to do that?
23      A.  He showed up at my house and was waiting
24 outside, and my neighbor, I believe, called the police.
25      Q.  Your neighbor called the police because

Page 79

1  somebody was waiting outside your door?
2       A.  He went over -- I live in a community where
3  that is not what happens.  He was sitting outside my
4  farm in his car just waiting, and my neighbor went over
5  to ask him what he was doing, and he didn't have a
6  reasonable explanation, and my neighbors were very
7  suspicious.
8       Q.  Were you home?
9       A.  No.
10      Q.  So it was that one incident where you learned
11 that he had been waiting outside your home that caused
12 you to --
13      A.  I think he came back.
14      MR. LEVINE:  Object to form.
15      A.  I think he came back another time as well.
16      Q.  Another time that same day or later?
17      A.  I think it was another day, yeah.
18      Q.  Okay.
19      A.  So he was engaging in what I would describe as
20 threatening behavior.
21      Q.  By being on a road outside your home?
22      A.  Actually, it was private property that he was
23 sitting on, yeah, and it was clear what his intent was.
24      Q.  What was his intent, in your view?
25      A.  To confront me or to do harm to my wife.  I

Page 80

1  wasn't sure which.  And this was a man who had already
2  beaten up his wife.
3       I think by that point, he had actually beaten
4  her up twice.  And I can't remember if he was Baker
5  acted before that or after that.
6       Q.  At that point in time, February 22 of 2015,
7  had you told your wife about what had occurred in
8  Genoa?
9       A.  I'm sorry, give me the dates.
10      Q.  February -- oh, I'm sorry, May 1 of 2015, when
11 you filed the petition in circuit court, had you told
12 your wife at that time about what had occurred in
13 Genoa?
14      A.  I believe she knew, yeah.  At that point,
15 yeah.
16      Q.  What was the outcome of this motion for
17 temporary injunction that you filed against Augusto
18 Marenco?
19      A.  He was hauled in -- he actually went to court,
20 and the judge sort of tore a strip off of him and said,
21 you know, Mr. Marenco, you can't engage in this kind of
22 behavior.  And he said, do you agree to never do this
23 again?  And he agreed.  He apologized to me.  And I
24 think at point, I said, I don't want to press charges.
25 I just want this to all go away.

Page 81

1       Q.  Was your wife aware of --
2       A.  Yes.
3       MR. LEVINE:  Let her finish.
4  BY MS. RAGATZ:
5       Q.  Yes.  Thank you.  Was your wife aware that you
6  had filed this action against Augusto Marenco?
7       A.  Yes.  And we talked about doing it together,
8  so she was party to it.
9       Q.  Okay.  Now, we discussed the fact that on May
10 7 of 2015, you were interviewed by Shirlyon McWhorter
11 in connection with Andrea Rivera's complaint against
12 you.
13      A.  Yes.
14      Q.  A few days after that interview, on May 11 of
15 2015, you resigned as senior associate dean of the
16 College of Architecture + Arts, correct?
17      A.  Correct.
18      Q.  And so let me mark as Exhibit 15 your letter
19 to Brian Schriner dated May 11th of 2015.
20      Is that a letter that you wrote?
21      (Thereupon, the document referred to was
22 marked as Exhibit No. 15 for Identification.)
23      A.  It certainly looks like it.
24      Q.  Okay.  Why did you submit your resignation as
25 the senior associate dean of academic affairs?

21 (Pages 78 to 81)

Drisin vs. Florida                                      July 24, 2018

Page 82

1      A.  I was accused of something untoward.  Things
2   were becoming very difficult.  And so this was
3   something that I also discussed with my attorney at the
4   time, who was representing me in the FIU internal
5   investigation.  And he thought it was a good -- he
6   thought that it would be a good idea to show that I was
7   willing to give -- you know, that I was willing to make
8   amends for some errors that I had made, clearly.
9          In addition to that, I would say that it was
10  very hard for me to concentrate on my job.
11     Q.  In the last paragraph, you state that on a
12  personal note, returning to the faculty of the
13  Architecture Department in the fall of 2015 will be a
14  much needed change for you.
15     A.  Uh-huh.
16     Q.  Why did you consider returning to the faculty
17  to be a much needed change?
18     A.  I can't remember what I was referring to.  I
19  mean, I think Brian knew that I was having some issues
20  at home, that my wife had been ill; that I was working
21  very, very hard for the college; and that, you know, I
22  was just looking forward to a new -- a new chapter.
23     Q.  But when you say returning to the faculty,
24  your testimony was that you had always had a teaching
25  component in your job, correct?

Page 83

1      A.  Yeah.  Yeah, but very small component.
2      Q.  Okay.
3      A.  Yeah.
4      Q.  So this was full-time faculty?
5      A.  Yes.
6      Q.  Now, Shirlyon McWhorter's investigative report
7   was issued on or about July 9.
8          Do you recall that?
9      A.  I'll take your word for it.
10         MS. RAGATZ:  Here.  Let me mark it.
11         (Thereupon, the document referred to was
12  marked as Exhibit No. 16 for Identification.)
13  BY MS. RAGATZ:
14     Q.  What I'm marking as Exhibit 16 is a letter to
15  you dated July 9 of 2015, with the attached report.
16     A.  Uh-huh.
17     Q.  You received this letter and attached report
18  by hand delivery, correct?
19     A.  Yes.
20     Q.  And looking at the second-to-the-last page, it
21  is marked in the bottom corner page 0361.
22         Do you see that?
23     A.  Yes.
24     Q.  Under findings, about three-quarters down the
25  page.

Page 84

1      A.  Uh-huh.
2      Q.  The finding was that based on the evidence and
3   using the preponderance of the evidence standard, the
4   charge of sexual misconduct against you was
5   substantiated, correct?
6      A.  Correct.
7      Q.  And if you turn to the last page of the
8   report, it advised you how to appeal, the timing of an
9   appeal, and the grounds for an appeal, correct?
10     A.  Correct.
11     Q.  And if you go to the page of the report that
12  is stamped in the bottom corner 0352.
13     A.  Yes.
14     Q.  And about three-quarters.  In fact, the one,
15  two -- third paragraph.  The end of the third paragraph
16  from the bottom.
17     A.  Uh-huh.
18     Q.  Ms. McWhorter notes that you sent an e-mail to
19  the complainant that said:  I owe you both something
20  and need to deliver it to you in person before you
21  leave.
22         Do you see that?
23     A.  No.  Which paragraph?
24     Q.  Okay.  It is the paragraph that starts:
25  Complainant stated that she and Witness 1.

Page 85

1      A.  Yeah.
2      Q.  And right towards the second-to-the-last
3   sentence of that paragraph.
4      A.  Yes.  Uh-huh.
5      Q.  Or just starting above.
6      A.  Uh-huh.
7      Q.  She stated, meaning, Rivera, stated that:
8   Associate Dean Drisin sent an e-mail to her and Witness
9   1.
10     A.  Yes.
11     Q.  That was Larisa.
12     A.  Right.
13     Q.  Stating that he felt horrible about the
14  incident.  He said, I owe you both something, and I
15  need to deliver it to you in person before you leave.
16     A.  Yes.
17     Q.  Do you see that?
18         Now, you took issue with that, didn't you?
19     A.  I took issue with what?
20     Q.  That statement.
21     A.  Plus --
22         MR. LEVINE:  Object to form.
23     A.  No, I don't know what you mean by that.
24     Q.  Okay.  Let me mark --
25     A.  I never denied that I wrote that.

Drisin vs. Florida                                                July 24, 2018

Page 86

1    Q.   Okay.  I'm going to mark as Exhibit 17, it's
2  an e-mail that same day, July 9, from you to
3  Ms. McWhorter.
4        (Thereupon, the document referred to was
5  marked as Exhibit No. 17 for Identification.)
6    A.   Uh-huh.
7    Q.   That's an e-mail you sent?
8    A.   Yes.
9    Q.   You say:  As per my phone request, please
10  e-mail my copy of the alleged communication that I sent
11  to Andrea in which your report claims -- contains a
12  statement that I had something I wanted to give them.
13    A.   Yeah, so when I was -- I guess, Shirlyon, I
14  can't remember if she told me about this or I guess it
15  was the report, I read this as if there was something
16  physical, like a payoff that she was alluding to, and I
17  was shocked about that, because I was, like, what is
18  this about?
19        So what I told Shirlyon was that this was
20  actually about me giving them assurances, not about
21  delivering a bag of cash.  I mean, the absurdity of
22  that was just beyond the pale.  I couldn't understand
23  what she was talking about.
24    Q.   Well, if you look at Exhibit 2, your e-mail
25  that you did send to Andrea Rivera --

Page 87

1    A.   Right.
2    Q.   -- the day after the incident.
3    A.   Right.
4    Q.   Ms. McWhorter reported the content accurately,
5  didn't she?
6    A.   I suppose.  But she was putting a spin on it
7  that I thought was inappropriate.
8    Q.   Where do you see in the report any spin, other
9  than reporting what you said, which we just read?
10    A.   In her -- when she was discussing it with
11  Witness Number 3, there was a discussion about, we can
12  get money from him and maybe he'll give us money.  So
13  there seemed to have been from their side the
14  implication that I was going to deliver something to
15  them, that there would be a payoff, which was just
16  absurd.
17    Q.   Now, after you received the unfavorable
18  outcome of Ms. McWhorter's investigation --
19    A.   Uh-huh.
20    Q.   -- you asserted a claim internally against
21  Andrea Rivera for sexual misconduct, didn't you?
22    A.   I did two things.  First, I filed an appeal
23  based on errors of fact, omissions, and what I saw as
24  significant bias in her report.  And at some point I
25  also filed a counterclaim, yes.

Page 88

1    Q.   Okay.  So you waited approximately seven or so
2  months after the incident in Genoa before you brought a
3  claim against Ms. Rivera; isn't that correct?
4    A.   I think the way I would frame that is it took
5  McWhorter four months to come forward with informing me
6  that a claim had been made.  So I really wasn't sure
7  what was going on.
8        And then eventually, yes, I filed a claim,
9  because I had always believed that there were no facts
10  that would suggest that I had done anything untoward.
11  In fact, the actual report from Ms. Rivera has no reus
12  actus described in her report.
13        She doesn't say anything happened.  She
14  eventually says, we went up to his room, to his
15  apartment.  I fell asleep.  I woke up without my
16  clothes and I left.  And only later someone told me
17  that they saw me fucking Drisin.  That is the nature of
18  her report.
19        So all along I kept thinking there is nothing.
20  First of all, I know that there is nothing here.  I
21  know that there is a witness that saw that there is
22  nothing here.  Her report claims that there is nothing
23  here.  So how could anyone possibly find me guilty of
24  this thing?
25        So I sort of believed that this was going to

Page 89

1  play itself out in a reasonable and fair manner.
2    Q.   So after the incident in Genoa, as you have
3  testified, you felt victimized, correct?
4    A.   I would say I felt confused.
5    Q.   And you felt that Ms. Rivera had taken
6  advantage of you, right?
7    A.   Yeah.
8    Q.   And you waited for about seven months after
9  the event before you ever brought a claim against her
10  alleging that she had engaged in sexual misconduct;
11  isn't that true?
12    A.   That is correct.
13        And, once again, the reason for that is
14  because I assumed -- I had faith in the ability of the
15  investigative process to use facts to support a
16  reasonable conclusion, which is not the case.
17    Q.   Let me show you a text message dated July 14,
18  2015, from what appears to be a text from you to Dean
19  Schriner.
20        Is that, in fact, what it is, a text on July
21  14, 2015, from you to Brian Schriner?
22        (Thereupon, the document referred to was
23  marked as Exhibit No. 18 for Identification.)
24    A.   No.  It is actually from Brian Schriner to me.
25    Q.   Okay.  And Brian Schriner states:  Are you

23 (Pages 86 to 89)

Drisin vs. Florida                                                July 24, 2018

Page 90

1   able to talk this morning?  If so, can you call my
2   cell?  Correct?
3       A.  Yes.
4       Q.  And this is a few days -- five days after
5   Shirlyon McWhorter had issued her report, correct?
6       A.  Yes.
7       Q.  Okay.  Did you, in fact, talk to him?
8       A.  I did.
9       Q.  What was the substance of the conversation you
10  had with Dean Schriner?
11      A.  I remember exactly where the conversation was.
12  I remember where I was standing.  He let me know that
13  things didn't look good.
14      Q.  Were you in person or on the phone?
15      A.  No, I was on the phone.
16      Q.  Okay.
17      A.  Yeah.  So we had a conversation.  He said
18  things don't look good.  The provost spoke with the
19  president, and they just want this kind of resolved
20  very quickly.
21          And we had a conversation about that.  And I
22  said, well, this is not a surprise to me based on
23  Shirlyon's report.  I think I reiterated that I thought
24  that the report was egregious and filled with innuendo
25  and, you know, some falsified things and left redacted

Page 91

1   facts that would help me, but put in facts that
2   obviously positioned her claim in a better light.
3          And I think at that point I said, well, Brian,
4   there's also, you know, the six-month issue.  That as a
5   tenured faculty member, one of my rights is that I have
6   a six-month period that I'm guaranteed, which will at
7   least give me some time to figure out what to do.
8          And he said he would get back to me.  He would
9   talk to the provost about that and see what he could
10  do.
11          I don't know if he ever did that.  I suspect
12  he didn't, since he is now claiming that it was his
13  decision all along.
14          So that was the extent of our conversation.
15      Q.  Okay.  Now, you mentioned that you appealed
16  the findings that had been made by Ms. McWhorter.
17          Let me mark as Exhibit 19 what I believe to be
18  a copy of that appeal.
19          Is that the appeal that you submitted in
20  response to the July 9, 2015, report issued by Shirlyon
21  McWhorter?
22          (Thereupon, the document referred to was
23  marked as Exhibit No. 19 for Identification.)
24      A.  Yes, it is.
25      Q.  Okay.  And who wrote this?

Page 92

1       A.  I did.
2       Q.  Okay.  Now, that appeal was ultimately
3   unsuccessful, correct?
4       A.  Correct.
5       Q.  What I'm going to mark as Exhibit 20 is a copy
6   of a letter to you dated July 30, 2015, from Jaffus
7   Hardrick.
8          You received this letter?
9          (Thereupon, the document referred to was
10  marked as Exhibit No. 20 for Identification.)
11      A.  Yes.
12      Q.  And in this letter Mr. Hardrick advises you
13  that he reviewed the records and he finds that
14  Ms. McWhorter's findings are supported by the evidence,
15  correct?
16      A.  He makes that claim.
17      Q.  And he states in this letter that no change in
18  the findings of the Office of Equal Opportunity and
19  Diversity is warranted, correct?
20      A.  Correct.
21      Q.  Okay.
22      A.  I think he also says that even if everything I
23  wrote was true, he still wouldn't reverse it.  Strange
24  position for someone adjudicating an appeal.
25      Q.  What are you referring to?

Page 93

1       A.  Even if true.
2       Q.  Is that -- that is not the beginning of the
3   sentence.
4       A.  Second paragraph:  Based on my review of the
5   record, I find that EOPD's findings are supported by
6   the evidence.
7          So he is arguing that there is evidence to
8   support the findings.
9          The additional information contained in your
10  appeal, even if true, does not negate the findings made
11  by EOPD.
12          Curious statement to make.
13      MS. RAGATZ:  Can we take five minutes?
14      MR. LEVINE:  Sure.
15      THE VIDEOGRAPHER:  Off the record at
16  11:32.
17          (Thereupon, a brief recess was taken.)
18      THE VIDEOGRAPHER:  Okay.  Back on the
19  record at 11:49.
20  BY MS. RAGATZ:
21      Q.  Okay.  Mr. Drisin, what I have marked as
22  Exhibit 21 to this deposition is a letter hand
23  delivered dated August 17 of 2015, to you from Dean
24  Schriner.
25          You received this letter, correct?

24 (Pages 90 to 93)

Drisin vs. Florida                                July 24, 2018

## Page 94

1          (Thereupon, the document referred to was
2     marked as Exhibit No. 21 for Identification.)
3          A.  Yes.
4          Q.  And this letter states:  In accordance with
5     the BOT-UFF policy on disciplinary action and job
6     abandonment, please consider this letter as
7     notification of the University's intent to dismiss you
8     from your position as associate professor in the
9     College of Architecture + The Arts of Florida
10    International University.
11          Do you see that?
12          A.  Yes.
13          Q.  And the letter stated that you had the right
14    to respond, correct?
15          A.  Correct.
16          Q.  So at this point in time, charges had been
17    filed by Andrea Rivera, correct?
18          A.  Yes, allegations.
19          Q.  An investigation had ensued, correct?
20          A.  Correct.
21          Q.  You had been found culpable, right?
22          A.  Correct.
23          Q.  And your appeal had been denied, right?
24          A.  Correct.
25          Q.  So you knew when you received this letter on

## Page 95

1     August 17, 2015, that you were being fired, didn't you?
2          A.  No, I did not.
3          Q.  Well, the letter states it was notification of
4     the University's intent to dismiss you from your
5     position, and you applied for another position the very
6     next day; isn't that true?
7          A.  Actually, I had been applying for positions,
8     for decanal positions, throughout my tenure at FIU.
9          But to answer your question more pointedly,
10    this letter is very clear.  It says intent, and then I
11    had ten days to respond to that intent.
12          Q.  So did you think you were going to fix this?
13          A.  You know, throughout this whole process, I had
14    always been very hopeful that someone would rationally
15    see that there was no -- there was nothing there, that
16    there was no evidence to suggest that I had committed
17    any form of sexual harassment under Title IX.
18          Q.  Well, you already testified that you spoke to
19    Dean Schriner, and he told you that the provost and the
20    president, they want you out of there, right?
21          A.  Yes.
22          Q.  And so you knew when you got this letter that
23    that's precisely what was going to happen, right?
24          A.  As I said, what I knew was that --
25          MR. LEVINE:  Object to form.

## Page 96

1          A.  -- their intent was to remove me and that that
2     was aligned with what he had told me the provost had
3     said.
4          Q.  Okay.
5          A.  But that by FIU policy, I had ten days to
6     respond.
7          Q.  What I'm marking as Exhibit 22 is a letter
8     dated August 18, 2015, to the search committee of
9     Broward College.
10          That is a letter you wrote, correct?
11          (Thereupon, the document referred to was
12    marked as Exhibit No. 22 for Identification.)
13          A.  Yes.
14          Q.  And the letter is dated August 18, 2015,
15    correct?
16          A.  Yes.
17          Q.  That is the day after you were hand delivered
18    a letter that said:  Please consider this letter as
19    notification of the University's intent to dismiss you
20    from your position, right?
21          A.  Yes.
22          Q.  And by this letter, you are applying for the
23    position of executive director of marketing and
24    communications at Broward College, correct?
25          A.  Yeah, I believe so.  I applied to so many

## Page 97

1     positions, I can't even remember which one this was.
2     But, uh-huh, it looks like it.
3          Q.  And you state in this letter that you are
4     looking towards a new chapter in your academic career.
5          Do you see that?
6          A.  No.  Can you guide me?
7          Q.  Sure.  On the first page, fourth paragraph.
8          A.  Uh-huh.
9          Q.  I am looking towards a new chapter in my
10    academic career.  Do you see that?
11          A.  Uh-huh.  Yes.
12          Q.  And you were looking towards a new chapter in
13    your academic career because the day before you had
14    been notified in writing about FIU's intent to
15    terminate you, right?
16          A.  In part, sure.
17          Q.  You responded to FIU's notice of intent to
18    terminate you from your position, didn't you?
19          A.  I responded to FIU, yeah.
20          Q.  Okay.  Let me mark as Exhibit 23 a letter from
21    you to Dean Schriner dated August 26 of 2015.
22          (Thereupon, the document referred to was
23    marked as Exhibit No. 23 for Identification.)
24          A.  Actually, regarding this letter, I think that
25    Howard gave you a spreadsheet of all of the jobs that I

www.taylorjonovic.com    Taylor, Jonovic, White, Gendron & Kircher-Echarte    305.358.9047
                                                                           Fax 305.371.3460

Drisin vs. Florida                                       July 24, 2018

Page 98

1   applied to both before and after the letter of intent
2   came out.  So to somehow suggest that I random -- that
3   this is linked to this letter because it happened after
4   is unreasonable.
5          So I just want to make that clear.
6     Q.  So going back to my question, this is a letter
7   that you wrote to Dean Schriner in response to the
8   August 17, 2015, letter of termination, right?
9     A.  Yes.
10    Q.  And in this response, you essentially
11  incorporated your arguments that you included in your
12  appeal of Ms. McWhorter's findings; isn't that true?
13    A.  In part, yes.
14    Q.  What else did you do in this letter other than
15  base it on the arguments that you had included in your
16  appeal of Ms. McWhorter's findings?
17    A.  Well, I also talked about how Vice President
18  Hardrick's rejection was also a violation of due
19  process.
20         So there was an added layer of, you know,
21  violation of due process and reasonableness in the
22  deliberative process that refute my appeal.
23    Q.  You state also here that your dismissal would
24  be in contravention of the collective bargaining
25  agreement, FIU's policies, and your contractual rights,

Page 99

1   don't you?
2     A.  Yes.
3     Q.  What I'm marking as Exhibit 24 is a letter to
4   you dated September 10 of 2015, from Shirlyon
5   McWhorter.
6          You received this letter, correct?
7          (Thereupon, the document referred to was
8   marked as Exhibit No. 24 for Identification.)
9     A.  Yes.
10    Q.  Okay.  And in this letter, Ms. McWhorter is
11  advising you as to the outcome of her investigation of
12  your complaint against Ms. Rivera, right?
13    A.  Yes.
14    Q.  And Ms. McWhorter's conclusion was that the
15  Equal Opportunity Programs and Diversity Office was
16  unable to conclude that the information in the record
17  establishes by a preponderance of the evidence a
18  violation of FIU's sexual misconduct regulation, right?
19    A.  That was her conclusion.
20    Q.  And this letter also sets forth for you your
21  appellate rights, right?
22    A.  Of her determination.
23    Q.  Yes.
24    A.  Yes.
25    Q.  What I'm marking as Exhibit 25 is a letter to

Page 100

1   you from Brian Schriner, dated September 11 of 2015.
2          This is a letter that you received, correct?
3          (Thereupon, the document referred to was
4   marked as Exhibit No. 25 for Identification.)
5     A.  Yes.
6     Q.  And this letter states that pursuant to his
7   letter to you dated August 17 of 2015, you are
8   dismissed from your position effective September 14,
9   2015, right?
10    A.  Correct.
11    Q.  And Dean Schriner states that the reasons for
12  your dismissal are as outlined in the August 17, 2015,
13  letter, correct?
14         And I'm referring to the first sentence of the
15  second paragraph:  The reasons for and the facts that
16  have led to this dismissal were outlined in the
17  enclosed August 17 letter to you and its enclosed
18  report and that there is no reason to repeat them in
19  this letter.
20    A.  Yes, correct.
21    Q.  Okay.  Now, at the end of the letter, Dean
22  Schriner states that the termination of your employment
23  is subject to the BOT-UFF policy on neutral internal
24  resolution of policy disputes and may be subject to the
25  grievance procedure thereunder.

Page 101

1          Do you see that?
2     A.  I do.
3     Q.  And you exercised your rights under that
4   grievance procedure, didn't you?
5     A.  No.  I tried.  Well, I tried to.
6     Q.  Okay.  What I'm marking as Exhibit 26 is an
7   e-mail from you to Shirlyon McWhorter dated September
8   12th of 2015.
9          That is an e-mail that you wrote on that date?
10         (Thereupon, the document referred to was
11  marked as Exhibit No. 26 for Identification.)
12    A.  Yes.
13    Q.  In this e-mail you advise Ms. McWhorter that
14  you received the investigative report on your Title IX
15  claim against Andrea Rivera and that you intended to
16  exercise your right to appeal, correct?
17    A.  Right.
18    Q.  And you hired a lawyer, Mark Richard, to
19  handle that appeal, didn't you?
20    A.  No.  I think at the time I hired -- I had a
21  lawyer named David Duncan, who was representing me in
22  the internal process with FIU.
23    Q.  Okay.
24    A.  I don't remember the date of when I hired Mark
25  Richard.

26 (Pages 98 to 101)

## Page 102

1    Q.  Let me mark as Exhibit 27 a letter from Mark
2  Richard to Dr. Jaffus Hardrick, dated September 30,
3  2015.
4         (Thereupon, the document referred to was
5  marked as Exhibit No. 27 for Identification.)
6    A.  Okay.  So that would have been the date.
7    Q.  Have you seen this letter before?
8    A.  Yes.
9    Q.  Okay.  And Mark Richard was your lawyer at the
10  time?
11    A.  Yes.
12    Q.  And that is the appeal presented on your
13  behalf of the determination of the Office of Equal
14  Opportunity Programs and Diversity's determination that
15  it was unable to establish a violation of FIU's sexual
16  harassment regulation on the part of Andrea Rivera,
17  right?
18    A.  Yes.
19    Q.  Now, that appeal was unsuccessful, correct?
20    A.  That is correct.
21    Q.  What I'm marking as Exhibit 28 is a letter to
22  you dated October 20 of 2015, from Jaffus Hardrick.
23         You received this letter, correct?
24         (Thereupon, the document referred to was
25  marked as Exhibit No. 28 for Identification.)

## Page 103

1    A.  Correct.
2    Q.  And in this letter, Mr. Hardrick advised you
3  that he found that the investigation of your complaint
4  was conducted in accordance with applicable law, didn't
5  he?
6    A.  That is his interpretation.
7    Q.  He advised you of that, right?
8    A.  Yes.
9    Q.  And he advised you that there was no due
10  process violation based on who conducted the
11  investigation of your complaint, correct?
12    A.  That was his claim.
13    Q.  I'm not asking you whether you agree with it
14  or not.  I'm just asking you, he advised you of that in
15  this letter?
16    A.  Yes.
17    Q.  And he advised you that he found that
18  substantial competent evidence supports the findings
19  made concerning your complaint, didn't he?
20    A.  Would you say that again?
21    Q.  Sure.  He advised you in this letter that he
22  found that substantial competent evidence supports the
23  findings made concerning your complaint, didn't he?
24    A.  That is his interpretation as expressed in the
25  letter, yes.

## Page 104

1    Q.  Okay.  Now, in the meantime, before you
2  received this October 20, 2015, letter denying your
3  appeal, you filed a grievance of your employment
4  termination, didn't you?
5    A.  I don't recall the dates of all of them.
6    Q.  Okay.  So let me mark that.  And I don't mean
7  for this to be a memory test.  So what I'm marking as
8  Exhibit 29 is a request for Step 2 Review, with an
9  attached grievance.
10         And on the last page of the grievance, is that
11  your signature?
12         (Thereupon, the document referred to was
13  marked as Exhibit No. 29 for Identification.)
14    A.  It is.
15    Q.  And by this grievance you contended that your
16  termination was without just cause, right?
17    A.  Correct.
18    Q.  And you sought reinstatement, back wages, and
19  lost benefits, correct?
20    A.  I think the majority of what we were seeking
21  was my job back.  I think that was the primary request
22  of what we wanted.
23    Q.  If you look at the second-to-the-last page
24  under remedy sought.
25    A.  Uh-huh.

## Page 105

1    Q.  It states:  Immediate reinstatement, back
2  wages, all lost benefits, and to be made whole.
3         Do you see that?
4         Last line of the second-to-the-last page.
5    A.  Uh-huh.
6    Q.  Yes?
7    A.  Uh-huh.  So my job back.
8    Q.  Your job back, back wages, lost benefits,
9  correct?
10    A.  Yep.
11    Q.  Okay.
12    A.  And, at that point, there were not a lot of
13  lost wages, so it would have been insignificant.  I
14  wanted my job back.
15    Q.  Now, in connection with this grievance that
16  you filed, you and your lawyer met with Elizabeth
17  Bejar, the vice president for academic affairs, didn't
18  you?
19    A.  I believe we met with Meredith Newman first
20  and then Elizabeth Bejar, yeah.  There were a number of
21  meetings along the way.
22    Q.  What I'm marking as Exhibit 30 is a letter to
23  you from Elizabeth Bejar dated January 15 of 2016.
24         You received this letter, didn't you?
25         (Thereupon, the document referred to was

27 (Pages 102 to 105)

Drisin vs. Florida                                         July 24, 2018

Page 106

1    marked as Exhibit No. 30 for Identification.)
2        A.  I did.
3        Q.  And in this letter, Dr. Bejar advised you that
4    she had reviewed your grievance, the university records
5    pertaining to the issues raised in your grievance, and
6    the statements you made at your January 5, 2016,
7    meeting, correct?
8        A.  Yes.
9        Q.  And she advised you that she finds your
10   dismissal was for just cause and in accordance with the
11   collective bargaining agreement, right?
12       A.  Yes.
13       Q.  She states in this letter that the decision to
14   dismiss you from FIU was affirmed, correct?
15       A.  Correct.
16       Q.  Now, your attorney responded to this letter.
17   Do you recall that?
18       A.  I do.
19       Q.  Okay.  So what I'm marking as Exhibit 31 is a
20   letter dated January 28 -- 29, sorry, 2016, to
21   Elizabeth Bejar from Libby Herrera-Navarrete at the law
22   firm of Phillips Richard & Rind, PA.
23           This is showing you as a recipient of a copy.
24           Do you recall receiving a copy of this letter?
25           (Thereupon, the document referred to was

Page 107

1    marked as Exhibit No. 31 for Identification.)
2        A.  Yes.
3        Q.  And in the last sentence of the letter, your
4    attorney advised Dr. Bejar that you were moving toward
5    arbitration.
6           Do you see that?
7        A.  Yes.
8        Q.  And you, in fact, did initiate arbitration,
9    didn't you?
10       A.  Correct.
11       Q.  Thank you.  What I'm marking as Exhibit 32 is
12   a document entitled "Notice of Arbitration."  This
13   document is dated February 2 of 2016.
14           Is that your signature at the bottom of the
15   first page?
16           (Thereupon, the document referred to was
17   marked as Exhibit No. 32 for Identification.)
18       A.  Yes, it is.
19       Q.  Now, if you look at the issues presented on
20   the front page of this document, it states:  The
21   following statement of issue before the arbitrator as
22   proposed "Whether Professor Drisin was discharged from
23   FIU without just cause in violation of Article 6 and 9
24   of the parties' collective bargaining agreement."
25           Do you see that?

Page 108

1        A.  I do.
2        Q.  Okay.  Now, you never arbitrated that issue to
3    conclusion, did you?
4        A.  Well, I think as you know quite well, we
5    attempted to, and I believe it was your office that
6    stonewalled my attorneys to the point where we were
7    unable to get to arbitration.
8           I believe that Ms. Renovitch found in our
9    favor against FIU regarding some claims that we could
10   not arbitrate.  And on numerous occasions, my attorney
11   asked you to deliver on behalf of FIU the name of the
12   arbitrator so that we could actually go into
13   arbitration, and that was never delivered.
14       Q.  So it is your position that you weren't given
15   the opportunity to arbitrate your claim to conclusion?
16       A.  I don't know if that is my position because
17   that is a legal -- that is a legal question and I'm
18   unprepared to answer that.  But what I do have is --
19   give me a moment, please.
20           What I do have is a letter that was sent on
21   November 30, 2016, to Mr. Isicoff, your partner, that
22   states:  On September 19, 2016, the attached letter was
23   sent to you requesting to move the matter of Professor
24   Drisin's arbitration forward.  And as required under
25   the collective bargaining agreement, select an

Page 109

1    arbitrator to hear this case.  You responded on October
2    14th advising you were not, quote, ignoring my letter,
3    end quote, and would get back to me once you spoke with
4    your client the following Monday.  It has now been over
5    two months since the request to move this matter
6    forward was made and you have, in fact, ignored my
7    letter.  But more importantly, you have demonstrated
8    the same tactics employed by your client FIU, that of
9    continuing to deny Professor Drisin his due process
10   rights.  His unjust termination of September 14, 2015,
11   has caused great financial harm and FIU has
12   continuously denied him the rights injured -- the
13   rights inured to him under the collective bargaining
14   agreement between FIU and the United Faculty of
15   Florida.
16           Please provide me the name of the arbitrator
17   you contend is next in line to hear this arbitration
18   and provide the basis as to which you contend that
19   arbitrator is next in line to do so.
20           Since you have taken over two and a half
21   months to obtain this information, I anticipate that
22   providing me this information before the end of the
23   business day today is sufficient additional time to
24   provide the arbitrator's name.
25           Thank you, signed Libby Herrera-Navarrete.

28  (Pages 106 to 109)

Drisin vs. Florida                                      July 24, 2018

Page 110

1      Q.   So you just read a letter from your lawyer to
2   this law firm?
3      A.   Correct.
4      Q.   And it's your contention that after that
5   letter was sent by your lawyer to this law firm, you
6   simply let the arbitration go without pursuing it
7   further?
8      A.   I believe that we were working against a
9   deadline.
10      Q.   What does that mean?
11      A.   My recollection is that there was -- we had to
12   file with the federal government.  So there was a clock
13   ticking relative to the EEOP.  So I think we were sort
14   of caught.
15         So my recollection is that we were simply out
16   of time, and we had to make a decision as to whether to
17   continue on the track of arbitration or to move into a
18   federal court case.
19      Q.   And you moved into a federal court case,
20   correct?
21      A.   My recollection is that we had no choice
22   because FIU and your office refused to tell us who the
23   arbitrator was, so it's hard to go into arbitration if
24   there is no arbitrator.
25      Q.   Well, you just said you had to make a decision

Page 111

1   whether to pursue arbitration or pursue a federal court
2   case.  That was your testimony just less than one
3   minute ago.
4      A.   Actually, I think what I said was that we
5   couldn't get the name of the arbitrator from your firm
6   or from FIU.
7      Q.   And in your view, FIU controlled that
8   information?
9      A.   In other words, it is not a choice if you only
10   have one option presented to you.
11      Q.   And it's your view, not being a lawyer, that
12   FIU controlled that information and you were
13   foreclosed?
14      A.   Actually, I don't have --
15         MR. LEVINE:  Objection, form.
16   BY MS. RAGATZ:
17      Q.   You have no idea?
18      A.   I have no knowledge who controlled it.
19      Q.   Yet you're sitting here saying that we
20   prevented you from going into arbitration without
21   knowing that that is accurate; isn't that true?
22      A.   No, that is not what I said.
23         MR. LEVINE:  Object to form.
24      A.   What I said is that my lawyer on numerous
25   occasions tried to get the name of the arbitrator so

Page 112

1   that we could go into arbitration, and the opposing
2   party never gave us the name.  So it's hard to go into
3   arbitration if the person who is supposed to give you
4   the name of the arbitrator wouldn't do it.
5      Q.   What is your -- what is the basis for your
6   contention that FIU had to provide you with the name of
7   an arbitrator?
8      A.   FIU has the list.
9      Q.   And you had no access, is that your testimony?
10      A.   Yes, of course.  It's in the contract between
11   -- it's in the FIU UFF contract.
12      Q.   The fact of the matter is you filed a charge
13   of discrimination with the EEOC and then pursued this
14   federal litigation; isn't that true?
15      A.   We filed with the -- excuse me, what is the
16   name of the --
17      Q.   EEOC.
18      A.   The EEOC, yes, but that doesn't preclude
19   arbitration.
20      Q.   You didn't pursue arbitration any further at
21   that point, right?
22      A.   No, that is not correct.  We tried to pursue
23   arbitration.
24      Q.   I'm not saying what you tried to do.  You did
25   not pursue arbitration, isn't that true?

Page 113

1      A.   We were blocked from pursuing arbitration.
2      Q.   And that is something you were told?
3      A.   No.  It's my interpretation of the events
4   based on the letter to your office from my attorney.
5      Q.   Based on the letter you just read into the
6   record?
7      A.   Correct.
8      Q.   What else do you have in that binder that you
9   brought with you that you just read from?
10      A.   The documents from the court case.
11      Q.   I'm sorry?
12      A.   The documents from the court case, all of
13   them.
14      Q.   What I'm marking as Exhibit 33 is your charge
15   of discrimination filed with the EEOC.
16         Is that your signature in the bottom left-hand
17   corner?
18         (Thereupon, the document referred to was
19   marked as Exhibit No. 33 for Identification.)
20      A.   Yes, it is.  A very bad reproduction of it,
21   but, yes.
22      Q.   And you signed this document on July 6, 2016?
23      A.   Correct.
24      Q.   In this charge you allege discrimination based
25   on your gender, correct?

29  (Pages 110 to 113)

Drisin vs. Florida                                           July 24, 2018

---

Page 114

1    A.  Correct.
2    Q.  And if you look at the last sentence of the
3    first paragraph, you say:  I allege disparate gender
4    treatment based on the acceptance of a false and
5    frivolous complaint by a female student when the
6    evidence is overwhelmingly supported by my contention
7    that I was the victim.
8        Do you see that?
9    A.  I do.
10   Q.  Is it your contention that Ms. Rivera received
11   more favorable treatment by FIU than you did because
12   she is female?
13   A.  I believe that her claim did.  When you
14   compare the two claims, I believe that there was
15   disparate treatment in how my claim was dealt with
16   versus her claim, yeah.
17   Q.  Now, at this point in time, when you filed
18   your charge of discrimination with the EEOC, were you
19   represented by counsel?
20   A.  Yes.
21   Q.  Were you represented by Mr. Levine?
22   A.  I was.
23   Q.  Okay.  What I'm marking as Exhibit 34 is a
24   document that you produced in this litigation, and it
25   is a copy of responses to an EEOC questionnaire.

---

Page 115

1        Are you familiar with this document?
2        (Thereupon, the document referred to was
3        marked as Exhibit No. 34 for Identification.)
4    A.  I have not seen it in a long time, but, yeah.
5    Q.  If you go to the third page of the document,
6    at the bottom where it says questions 8A, B and C.
7        Are you with me?
8    A.  Yes.
9    Q.  You're asked in this question to describe who
10   was in the same or similar situation as you and how
11   they were treated.
12       Do you see that?
13   A.  Yes.
14   Q.  The first sentence:  Describe who was in the
15   same or similar situation as you and how they were
16   treated.
17   A.  Yes.
18   Q.  And if you go down to the bottom of that page,
19   the response here is:  As to disparate treatment, the
20   female complainant was treated preferentially, as she
21   confabulated a false claim of sexual misconduct against
22   me, which was given credence by FIU despite the fact
23   that there was no reasonable, nonspeculative factual
24   basis upon which to believe that the claim could be
25   meritorious and despite the fact that two percipient

---

Page 116

1    witnesses rebut the plausibility of complainant's
2    confabulation beyond all reasonable doubt.
3        Is that your response?
4    A.  Yes, in part, sure.
5    Q.  Okay.  And when you use the term "female
6    complainant," you're referring to Andrea Rivera,
7    correct?
8    A.  Yes.
9    Q.  And when you refer to the two percipient
10   witnesses, you are referring to yourself and Larisa
11   Marenco, right?
12   A.  Yes.
13   Q.  What does the word "confabulation" mean?
14   A.  An invention.
15   Q.  Okay.  Actually, I will represent to you that
16   the dictionary definition means that somebody has
17   replaced a gap in their memory with a falsification
18   that they believe to be true.
19       Does that comport with your understanding of
20   the word?
21   A.  Yeah, sure.
22   Q.  Okay.  So it's your contention that Ms. Rivera
23   replaced a gap in her memory with a falsification that
24   she believes to be true?
25   A.  Actually, I don't -- I'm not in a position to

---

Page 117

1    --
2        MR. LEVINE:  Object to form.
3        Go ahead.
4    A.  I'm not in a position to answer what someone
5    else, you know, did.  But what I do believe very
6    strongly is that somebody -- I actually think it was
7    probably Shirlyon McWhorter, created a narrative from
8    whole cloth.  Because the report from Andrea Rivera
9    never claimed that there was any kind of sexual --
10   inappropriate sexual relationship.
11       She actually said, I have no memory of
12   anything that happened.  What I remember is falling
13   asleep, waking up without my clothes, feeling weird,
14   and then I left.
15   Q.  Well, these are your words.  You say that
16   Andrea Rivera, quote, confabulated a false claim of
17   sexual misconduct against you, right?
18   A.  Well, in the report, I mean, it comes from
19   Shirlyon McWhorter writes it as if it's coming from the
20   claimant.
21       But the fact is that when the claimant filed
22   her report originally, as I said, there was no reus
23   actus.  She never actually claimed that there was any
24   sexual harassment as defined by Title IX or by FIU's
25   policies.

---

30 (Pages 114 to 117)

Drisin vs. Florida                                          July 24, 2018

Page 118

1    Q.  Well, she claimed that --
2    A.  So it was only over a period of time that the
3  narrative became something different.
4    Q.  She claimed that there was sexual intercourse,
5  didn't she?
6    A.  No, no.  No, actually she didn't.
7    Q.  She claimed that there was a tampon that had
8  been moved up into her vagina, didn't she?
9    A.  I'm pretty sure I know what sexual intercourse
10  is, and I don't think having a tampon dislodged is
11  that.
12      So what she claims to have known is that she
13  had a tampon in a strange position that she was not
14  used to.  That is what she claimed.  But there is no
15  evidence.  There was no evidence that that, in fact,
16  happened, and that part of the story only came out
17  later.
18    Q.  That part of the story came out the next day,
19  didn't it?
20    A.  Yeah, I believe the next day.
21    Q.  After the night that you spent with the three
22  female graduate students?
23    A.  I believe it was the next day, yeah.
24      But, again, she never claimed that there was
25  sex or touching of any sort.

Page 119

1    Q.  You started seeing a mental health
2  professional at the end of February of 2015, correct?
3    A.  Yes.
4    Q.  And that was Debra Rode, licensed mental
5  health professional?
6    A.  Yes.
7    Q.  Is she a psychologist?
8    A.  I don't know.  I think she is an MSW, but I'm
9  not sure.
10    Q.  How did you get to her?
11    A.  I don't recall how I found her.
12    Q.  Had you ever gotten mental health treatment
13  before this time?
14    A.  Just as a child.
15    Q.  For what purpose?
16    A.  Childhood, divorced parents.
17    Q.  Now, you have produced medical records
18  regarding your sessions with Debra Rode, correct?
19    A.  Yeah, I believe so.
20      MS. RAGATZ:  All right.  So let me mark
21  them as Exhibit 35.
22      (Thereupon, the document referred to was
23  marked as Exhibit No. 35 for Identification.)
24  BY MS. RAGATZ:
25    Q.  So the first page of these notes is dated

Page 120

1  February 25 of 2015.  It says at the top, initial
2  office visit.
3      Was that your very first visit to Ms. Rode?
4    A.  I don't recall.  But if that is what she says,
5  I assume that it is correct.
6    Q.  Now, in these first page notes of your initial
7  visit --
8    A.  Uh-huh.
9    Q.  -- she wrote that you had been married for 14
10  years.  Your relationship had not been good for a while
11  and that there was a lack of trust in the relationship.
12      Do you see that?
13    A.  Can you tell me where you're reading?
14    Q.  Sure.  Relative content.  It says:  Married --
15    A.  Uh-huh.
16    Q.  -- 14 years.  States that wife is cold,
17  distant, has gotten -- grown apart.  Communication is
18  problematic.
19    A.  Uh-huh.
20    Q.  Intimacy has not been good for quite a while.
21  Lack of trust in relationship.
22      Do you see that?
23    A.  I do.
24    Q.  Are those things that you told Ms. Rode when
25  you had your initial visit with her?

Page 121

1    A.  I assume, yes.
2    Q.  Was the lack of trust that you discussed with
3  her on your wife's part or on your part or both?
4    A.  I actually don't know what she is referring to
5  there.  I don't -- I don't remember talking about a
6  lack of trust.  But I must have said something that
7  triggered that for her, I assume.
8    Q.  Go ahead.  Did your wife have a lack of trust
9  when you went to see her?
10    A.  I don't believe so.  I don't know.
11    Q.  She also wrote:  Issues at work.  He is dean
12  at FIU.  Issues involving interpersonal relationships
13  with female co-workers.
14      Do you recall discussing with her having
15  problems with relationships with female co-workers?
16    A.  I might have told her that I had a flirtatious
17  relationship, that it was troubling.  And I remember
18  seeing her and trying to get the courage to tell her
19  what had happened to me in general.  I remember that
20  was a significant part of those first --
21    Q.  Well, let's turn, and I will -- let me see.
22  I'll tell you what page it is.
23      You were seeing her weekly, right?
24    A.  I don't remember if it was every other week or
25  weekly.  I don't recall.

31 (Pages 118 to 121)

Page 122

1    Q.  Okay.  Go to the sixth page of these notes,
2  dated April 15 of 2015.
3        Do you see that page?
4    A.  I do.
5    Q.  And on this page Ms. Rode wrote:  Adam finally
6  has shared what he feels is the core of his anxiety and
7  panic; an incident that occurred while he was in Europe
8  with grad students.  A sexual encounter with a graduate
9  student he states now is cause for disciplinary at
10  school.  He has not told his wife about what occurred.
11        Do you see where I'm reading from there?
12    A.  Yep.  Sure do.
13        MR. LEVINE:  Could we stop and correct the
14        record to include the word "disciplinary
15        allegations" at school, as it states in the record?
16        MS. RAGATZ:  Sure.  I didn't mean to
17        misspeak.
18        MR. LEVINE:  Not a problem.
19  BY MS. RAGATZ:
20    Q.  So on or about April 15th, you told your
21  therapist for the first time about what had occurred in
22  Genoa, right?
23    A.  Yes.
24    Q.  And according to her notes, you talked about a
25  sexual encounter with a grad student, right?

Page 123

1    A.  Well, that is what she wrote.
2    Q.  Did you tell her that you had been sexually
3  assaulted?
4    A.  I was struggling with language to describe it.
5  I don't think I ever used that language.  What I would
6  do was to describe what had happened.
7    Q.  Well, you didn't tell her that the female grad
8  student with whom you had had a sexual encounter had
9  victimized you, did you?
10    A.  Again, I never used language like that.
11    Q.  And at this point in time, is she correct you
12  hadn't told your wife about this yet?
13    A.  Yes.
14    Q.  And when did you tell your wife?
15    A.  I don't recall.  It was probably a few weeks
16  after this.
17    Q.  And did you tell your wife that you had been
18  victimized?
19    A.  I described to her what happened.  It was
20  a difficult issue with my wife because she had been
21  gang raped.
22    Q.  You described what you contend happened in
23  Genoa?
24    A.  Yes.
25    Q.  Did she believe you?

Page 124

1    A.  Yes.
2    Q.  But she divorced you, right?
3    A.  Not necessarily for this.  But the notoriety
4  and the fact that it was a sexual thing made it very
5  difficult for her because of a lot of her baggage.
6    Q.  Did you tell her that Larisa supported your
7  story?
8    A.  Yes.
9    Q.  Did she know Larisa?
10    A.  I don't know if she met her.
11    Q.  Let's go to Ms. Rode's notes on September 2 of
12  2015.  Oh, I'm sorry, I meant September 9 of 2015.
13  It's the next page.
14        Are you there?
15    A.  Uh-huh.
16    Q.  And the notes state on September 9, 2015,
17  state that you were still in the house with your wife,
18  but you were going to divorce.
19        When did you and your wife decide to divorce?
20    A.  I don't remember when we came to that
21  conclusion.
22    Q.  Did you file or did she?
23    A.  She ultimately filed.
24    Q.  The notes also state that you're moving
25  forward with dating and you feel you have processed

Page 125

1  through grief for your marriage.
2        Is that something you told her at that time?
3    A.  Yes.
4    Q.  Would you agree that you got over grief with
5  the end of a 14-year marriage pretty quickly?
6    A.  No.  Actually, what I told the shrink was that
7  I had been grieving my marriage for a long time, ever
8  since my wife had become ill.
9    Q.  Were you ready to start dating as of September
10  9 of 2015?
11    A.  I guess I told her that, but I think she maybe
12  asked me are you ready to date or something and I told
13  her yeah.  I remember having a discussion with her
14  about grief.
15    Q.  Go on to notes of your session with Ms. Rode
16  of November 5 of 2015, and tell me when you're there.
17    A.  November 5?
18    Q.  Yes.
19    A.  I don't -- I don't see a November 5.  I see
20  9-2, 9-9, 9-16.
21    Q.  Keep going.
22    A.  9-20, October 7.
23    Q.  Yeah, and November.  I'm talking about
24  November.
25    A.  November, I'm sorry.

32  (Pages 122 to 125)

Drisin vs. Florida                                        July 24, 2018

Page 126

1    Q. November 5 of 2015.
2    A. Yeah.
3    Q. You found it?
4    A. Uh-huh.
5    Q. Okay. And in these notes, your therapist
6    wrote that you were dating and it appears she wrote
7    that you were attracted to colder women.
8        Do you see that?
9    A. Yes.
10   Q. Were you dating at that time?
11   A. I don't remember if I was dating. I mean, not
12   seriously.
13   Q. Do you remember telling your therapist that
14   you were attracted to colder women?
15   A. Yes.
16   Q. What does that mean?
17   A. For whatever reason, I seem to be attracted to
18   women that are cold, emotionally distant, and that I
19   was troubled by that, that I didn't want to make the
20   same mistake that I made in marrying Rebecca.
21   Q. Did you consider Larisa a colder woman?
22   A. No, actually.
23   Q. Okay. Now, if you go to the last page,
24   second-to-the-last page, December 15 of 2016.
25   A. Uh-huh.

Page 127

1    Q. Debra wrote that your treatment was completed.
2        Do you see that? Like in the middle,
3    Treatment Plan Progress.
4    A. Yeah.
5    Q. It said, Completed/Improved, right?
6    A. Yeah.
7    Q. Okay. And the prescribed frequency of
8    treatment was as needed.
9        Do you see that?
10   A. I do.
11   Q. Okay. Are you still in therapy?
12   A. No.
13   Q. Have you been back since December 15 of 2016?
14   A. No, I haven't.
15   Q. Do you take any medication?
16   A. Not anymore, but I did for quite some time
17   after this.
18   Q. What kind of medication did you take after
19   this?
20   A. Anti-anxiety and anti-depression.
21   Q. Who described that?
22   A. My doctor, Dr. Stevenson.
23   Q. What kind of doctor is he?
24   A. She.
25   Q. What kind of doctor is Dr. Stevenson?

Page 128

1    A. An internist, I think.
2    Q. What did she prescribe?
3    A. I don't remember the --
4    Q. Were you on the same medication throughout
5    your treatment?
6    A. Which treatment?
7    Q. Your treatment with --
8    A. With Dr. Rode?
9    Q. Yes.
10   A. Yes.
11   Q. So if you look at her notes on March 11 of
12   2015, she states that you were on medication of
13   Lexapro.
14   A. Yes.
15   Q. And Xanax.
16   A. Yes.
17   Q. Those are the two medications you took?
18   A. Yes. Yes.
19   Q. And those are the medications you took
20   throughout your treatment with her?
21   A. Yes, and beyond.
22   Q. How long beyond?
23   A. Until about a year ago.
24   Q. Okay. And what were the circumstances by
25   which you stopped taking that medication?

Page 129

1    A. I just sort of decided that my life was
2    relatively in order again and I didn't want to be on
3    medication.
4    Q. So did you take yourself off those
5    medications, or did you do it under the care of
6    Dr. Stevenson?
7    A. I think I consulted with her and she told me
8    to taper it slowly, and that was the extent of the
9    discussion.
10   Q. Okay. Are you presently employed?
11   A. Yes.
12   Q. What do you do?
13   A. Well, I'm an architect by training. I have an
14   architectural firm, and I consult with another
15   business.
16   Q. You have your own architecture firm?
17   A. Yes.
18   Q. What is it called?
19   A. Adam Drisin, P.A. -- sorry, Adam Drisin,
20   Architect, P.A.
21   Q. And when you say you consult for another
22   business, what business?
23   A. Triple A Architectural Fabricators.
24   Q. Where is that located?
25   A. In Deerfield Beach.

33 (Pages 126 to 129)

Drisin vs. Florida                                    July 24, 2018

## Page 130

1      Q.   Your firm, Adam Drisin, Architect, P.A., do
2  you have an office?
3      A.   In my home.
4      Q.   What has been your employment, if any, since
5  your departure from FIU?
6      A.   That's it, my own business.
7      Q.   Okay.
8      A.   I applied for, I think, two-hundred-plus jobs
9  and didn't get any.
10     Q.   When did you start your own architecture firm?
11     A.   Well, I have had a firm for -- since 1988, but
12 while I was teaching, it was essentially inactive.
13     Q.   And after you stopped teaching, you activated
14 it?
15     A.   Yeah.
16     Q.   And when did you start consulting with Triple
17 A Architectural Fabricators in Deerfield?
18     A.   About a year and a half ago.
19     Q.   What do you do for them?
20     A.   I manage the fabrication and delivery of
21 structural steel for buildings.
22     Q.   Are you an employee?
23     A.   I'm a consultant.
24     Q.   An independent contractor?
25     A.   Yes.

## Page 131

1      Q.   Do you have a contract?
2      A.   No.
3      Q.   How are you paid?
4      A.   Triple A Architectural Fabricators pays Adam
5  Drisin, P.A.
6      Q.   And do they pay you hourly, by job, or a
7  regular salary?
8      A.   It's not a salary, but I get paid generally
9  monthly.
10     Q.   Are you paid a particular consulting fee
11 monthly that remains the same regardless of how much
12 you work?
13     A.   Generally, yeah.
14     Q.   How much are you making from Triple A
15 Architectural Fabricators?
16     A.   I would have to look at my records, but I
17 think it's -- I want to say it is about 15,000 a month.
18     Q.   You mentioned that you applied to numerous
19 jobs.
20          Did you receive any job offers?
21     A.   No.  I was very close to getting a number of
22 deanships and then when, you know, when the court
23 case -- when Andrea Rivera's case against me came out
24 and there was an article, everybody just backed away.
25     Q.   So your answer is, no, you haven't received

## Page 132

1  any job offers?
2      A.   No.
3      Q.   Where did you meet your current wife?
4      A.   We dated.
5      Q.   I'm asking where you met her.
6      A.   Seasons 52.
7      Q.   What does she do?
8      A.   She runs a bed and breakfast.
9      Q.   Where?
10     A.   In Fort Lauderdale.
11          MS. RAGATZ:  Okay.  I'm going to take a
12 short break.  I think we may be done.
13          THE VIDEOGRAPHER:  Off the record at
14 12:41.
15          (Thereupon, a brief recess was taken.)
16          THE VIDEOGRAPHER:  Back on the record at
17 12:46.
18          MS. RAGATZ:  Mr. Drisin, I have no further
19 questions.  Thank you very much.
20          THE WITNESS:  Okay.
21          MR. LEVINE:  Just a couple of questions.
22          THE VIDEOGRAPHER:  I need you to put your
23 microphone back on.
24          CROSS EXAMINATION
25 BY MR. LEVINE:

## Page 133

1      Q.   Do you recall whether you had any
2  communications with Dean Schriner between the time that
3  you got the August 17, 2015, letter of intent to
4  terminate you and the September letter of termination?
5      A.   Can you ask me that again?  I'm just trying to
6  remember the dates.
7      Q.   Do you recall receiving the letter of intent
8  to terminate you from Dean Schriner on August 17, 2015?
9      A.   Yeah.  I believe that we had one, if not
10 multiple, conversations about the six-month issue,
11 because at that point it became very clear that the
12 intent was to dismiss me.  So I was at least trying to
13 make sure that I got the six-month window as afforded
14 me by the contract.
15          So I remember we had -- I remember at least
16 one conversation.
17     Q.   And do you recall that you asked about that in
18 the letter that you wrote within that ten-day window?
19          MS. RAGATZ:  Object to the form.  Leading.
20     A.   I actually don't recall the letter precisely.
21 But I do remember that we had that conversation and
22 that he said that he would bring that to the provost.
23     Q.   Did you ever hear back from him after he said
24 that?
25     A.   No, I don't believe so.

34 (Pages 130 to 133)

Drisin vs. Florida                               July 24, 2018

## Page 134

1    Q.  Did you ever inquire of him what the provost
2  said about your request for the six-month notice?
3    A.  I think at that point, Brian had been -- Dean
4  Schriner had become increasingly distant from me, and
5  our relationship, I think, turned, at least in my
6  opinion, turned more adversarial.  I didn't trust him
7  and I think he, you know, wasn't so interested in
8  helping me anymore.
9          MR. LEVINE:  I don't have anything else.
10          MS. RAGATZ:  All right.  Thank you.
11       Are you going to read?
12          MR. LEVINE:  Yes.
13          MS. RAGATZ:  Okay.
14          THE VIDEOGRAPHER:  Off the record at
15       12:48.
16          MS. RAGATZ:  Thank you.
17          (Thereupon, the deposition was concluded
18       at 12:48 p.m.)
19

20          EXCEPT FOR ANY CORRECTIONS MADE
         ON THE ERRATA SHEET BY ME,
         I CERTIFY THIS IS A TRUE AND
21          ACCURATE TRANSCRIPT.
         FURTHER DEPONENT SAYETH NOT.
22
23

24     _____,
         ADAM DRISIN
25

## Page 135

1       ) SS.
   COUNTY OF MIAMI-DADE )
2
   Sworn to and subscribed before
3  me this_____day of_____2018.
   PERSONALLY KNOWN _____OR ID._____
4
5
6
   _____
7       Notary Public in and for
       The State of Florida at Large
8       My commission expires:
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 136

1          CERTIFICATE OF OATH
2  STATE OF FLORIDA:
        SS.
3  COUNTY OF DADE:
4
       I, the undersigned authority, certify
5
   that ADAM DRISIN, personally appeared before me and
6
   was duly sworn.
7
       WITNESS my Hand and Official Seal this
8
   1st day of August, 2018.
9
10
11
       Sally Stark
12  SALLY STARK, COURT REPORTER
   Notary Public - State of Florida
13  Commission No. FF 976823
   Expires 5-13-2020
14
15
16
17
18
19
20
21
22
23
24
25

## Page 137

1       REPORTER'S CERTIFICATE
2  STATE OF FLORIDA:
        SS.
3  COUNTY OF DADE:
4
       I, SALLY STARK, Court Reporter and Notary
5
   Public in and for the State of Florida at Large, do
6
   hereby certify that I was authorized to and did
7
   stenographically report the foregoing deposition; and
8
   that the transcript is a true record of the testimony
9
   given by the witness.
10
       I further certify that I am not of
11
   counsel, am not related to nor employed by any attorney
12
   to this suit and am not financially interested in the
13
   outcome thereof.
14
       Dated this 1st day of August, 2018.
15
16
17
       Sally Stark
18  SALLY STARK
   Court Reporter
19
20
21
22
23
24
25

Drisin vs. Florida                                              July 24, 2018

---

## Page 138

```
 1    August 1, 2018
 2    TO:    ADAM DRISIN
              c/o HOWARD J. LEVINE, ESQ.
 3           The Law Offices of Howard Levine
              1560 Lenox Avenue
 4           Suite 307
              Miami Beach, Florida  33139
 5
 6    Re:    ADAM DRISIN vs. FLORIDA INTERNATIONAL
       UNIVERSITY BOARD OF TRUSTEES, et al.
 7    Depo of: ADAM DRISIN
       Taken:  July 24, 2018
 8    Number of Pages: 139
       Available for Reading until September 1, 2018
 9
10    Dear Mr. Drisin:
11         This is to advise you that the transcript of your
       deposition is completed and is available at this time
12    for your reading and signing.
           Please arrange to conclude this matter at your
13    earliest convenience.  We would suggest that you
       telephone this office and arrange an appointment
14    suitable for all concerned, or you may arrange to
       receive a copy of your transcript from any of the
15    attorneys on the case.
           If the reading and signing has not been concluded
16    prior to the above-referenced date, I shall then
       proceed to file the original of said transcript with
17    the party who took the deposition, without further
       notice to any parties.
18         Your prompt attention to this matter is
       appreciated.
19
20            Sincerely,
21
22            SALLY STARK, COURT REPORTER
23
24
25
```

---

## Page 139

```
 1              ERRATA SHEET
 2    Re:    ADAM DRISIN vs. FLORIDA INTERNATIONAL
       UNIVERSITY BOARD OF TRUSTEES, et al.
 3    Depo of: ADAM DRISIN
       Taken:  July 24, 2018
 4
       DO NOT WRITE ON TRANSCRIPT ENTER ANY CHANGES HERE
 5
       Page #  Line #   Change      Reason
 6    _____|_____|_____|_____
 7    _____|_____|_____|_____
 8    _____|_____|_____|_____
 9    _____|_____|_____|_____
10    _____|_____|_____|_____
11    _____|_____|_____|_____
12    _____|_____|_____|_____
13    _____|_____|_____|_____
14    _____|_____|_____|_____
15    _____|_____|_____|_____
16    _____|_____|_____|_____
17    _____|_____|_____|_____
18    _____|_____|_____|_____
19    _____|_____|_____|_____
20
       STATE OF FLORIDA)
21
       COUNTY OF MIAMI-DADE )
22
       Under penalties of perjury, I declare that I have read
23    my deposition transcript, and it is true and correct
       subject to any changes in form or substance entered
24    here.
25    _____    _____
```

36 (Pages 138 to 139)

| A | | | | |
|---|---|---|---|---|
| **A.Drisin@me....** 38:13 | 117:23 **Adam** 1:4,22 2:19 4:4,8,17 4:25 5:7 49:1 122:5 129:19 129:19 130:1 131:4 134:24 136:5 138:2,6 138:7 139:2,3 **AdamMDrisin...** 21:12 **added** 98:20 **adding** 59:14 **addition** 82:9 **additional** 93:9 109:23 **address** 5:10,18 21:15 56:13 **addresses** 21:18 **adjudicating** 92:24 **administrative** 10:12 **advantage** 36:23 37:4,19,20,23 89:6 **adversarial** 134:6 **advice** 52:14 **advise** 70:4 101:13 138:11 **advised** 84:8 103:2,7,9,14 103:17,21 106:3,9 107:4 **advises** 92:12 **advising** 99:11 109:2 **affair** 49:25 56:17 **affairs** 81:25 105:17 **affect** 7:18 **affirmed** 106:14 **afforded** 133:13 **aggressive** 52:16 | **aggressor** 35:8 **ago** 8:1 12:22,24 12:25 26:1 111:3 128:23 130:18 **agree** 58:7 66:23 71:13 80:22 103:13 125:4 **agreed** 68:25 80:23 **agreement** 98:25 106:11 107:24 108:25 109:14 **ahead** 117:3 121:8 **al** 138:6 139:2 **Alexander** 16:22 17:2,10 **aligned** 96:2 **allegations** 94:18 122:15 **allege** 113:24 114:3 **alleged** 86:10 **alleging** 89:10 **allowing** 24:1 **alluding** 86:16 **altercation** 61:8 **ambit** 51:17 **amends** 82:8 **amount** 23:4 **Andrea** 29:10 30:18 31:1,4 32:1,14 35:24 37:25 38:23 40:21 41:14,21 42:22 43:13 45:9,22 46:1 50:5,10,20 64:6 66:7 81:11 86:11,25 87:21 94:17 101:15 102:16 116:6 117:8,16 131:23 **Andrea's** 44:13 | **angry** 76:3,8 **answer** 6:20,23 7:6 33:21 48:18 95:9 108:18 117:4 131:25 **answered** 52:25 **Anti-anxiety** 127:20 **anti-depression** 127:20 **anticipate** 109:21 **anxiety** 122:6 **anybody** 40:7 **anymore** 127:16 134:8 **apart** 20:5 50:2 120:17 **apartment** 29:6 29:13 31:1,18 43:23 45:22 88:15 **apartment-mate** 43:17 44:8 **apologize** 70:8 **apologized** 70:6 70:10,24 80:23 **apparently** 39:18 45:25 56:14 60:12 **appeal** 84:8,9,9 87:22 91:18,19 92:2,24 93:10 94:23 98:12,16 98:22 101:16 101:19 102:12 102:19 104:3 **appealed** 91:15 **appearances** 2:2 4:13 **appeared** 136:5 **appears** 89:18 126:6 **appellate** 99:21 **applicable** 103:4 | **applied** 95:5 96:25 98:1 130:8 131:18 **applying** 95:7 96:22 **appoint** 12:1,2 **appointed** 10:3 **appointment** 10:6 138:13 **appreciated** 138:18 **approximate** 11:3 **approximately** 9:14 88:1 **April** 30:10,10 30:15 122:2,20 **arbitrate** 108:10 108:15 **arbitrated** 108:2 **arbitration** 107:5,8,12 108:7,13,24 109:17 110:6 110:17,23 111:1,20 112:1 112:3,19,20,23 112:5 113:1 **arbitrator** 107:21 108:12 109:1,16,19 110:23,24 111:5,25 112:4 112:7 **arbitrator's** 109:24 **architect** 129:13 129:20 130:1 **architectural** 61:14 129:14 129:23 130:17 131:4,15 **architecture** 1:13 6:5 8:25 9:21,25 10:4,7 10:17 14:7 |

19:2 70:14
81:16 82:13
94:9 129:16
130:10
**area** 6:3
**areas** 72:7
**arguing** 36:1
93:7
**arguments** 98:11
98:15
**arms** 76:13
**aroused** 33:10
37:1 57:11,24
**arrange** 138:12
138:13,14
**article** 107:23
131:24
**arts** 1:13 9:25
10:4,7 11:17
59:20 81:16
94:9
**asked** 30:11
34:11 45:6
108:11 115:9
125:12 133:17
**asking** 20:3
63:13,13
103:13,14
132:5
**asleep** 32:9
45:17 88:15
117:13
**aspect** 65:2
71:14
**assailant** 34:18
**assaulted** 34:16
34:24 35:3
37:14 123:3
**asserted** 87:20
**assistance** 72:8
**assistant** 11:22
12:1,4,15 67:7
67:20 68:3
**assistants** 12:8
**associate** 9:20,24
10:3,6,10,11

**assume** 6:23
35:21 51:8
56:24 63:2
120:5 121:1,7
**assumed** 10:10
43:18 89:14
**assurance** 39:22
**assurances**
86:20
**ATM** 5:14,15
**attached** 83:15
83:17 104:9
108:22
**attack** 36:21
39:11
**attempted** 32:24
108:5
**attend** 19:12
**attended** 10:19
59:22
**attention** 138:18
**attentive** 76:6
**attorney** 82:3
106:16 107:4
108:10 113:4
137:11
**attorneys** 72:9
108:6 138:15
**attracted** 126:7
126:14,17
**audible** 6:14
**audibly** 16:5
33:21
**August** 93:23
95:1 96:8,14
97:21 98:8
100:7,12,17
133:3,8 136:8
137:14 138:1
**Augusto** 12:17
25:2,2 56:15
60:4,12 61:8
61:19 62:14
65:10 66:12

71:2 78:19
80:17 81:6
**authority** 136:4
**authorized**
137:6
**available** 138:8
138:11
**Avenue** 2:5
138:3
**aware** 29:22
30:4 34:3 61:7
61:11 66:11,17
72:13 81:1,5
**awful** 39:10 45:7

——————
**B**
**B** 1:8 3:2 4:5
115:6
**bachelor's** 8:25
9:3
**back** 16:17
22:16 23:21
24:14 27:6
28:6 29:17
32:5 33:2
44:19,22,25
45:21 46:13
49:13 59:14
68:24 71:25
75:25 79:13,15
91:8 93:18
98:6 104:18,21
105:1,7,8,8,14
109:3 127:13
132:16,23
133:23
**backed** 131:24
**background**
8:24 14:5
**bad** 21:22 40:25
41:1 43:20
45:12,13
113:20
**Badon** 20:8
**bag** 86:21
**baggage** 124:5
**Baker** 80:4

**ball** 59:20,22
60:5 66:12
**ballet** 15:13
**bargaining**
98:24 106:11
107:24 108:25
109:13
**base** 44:18 98:15
**based** 26:19,23
40:14 56:2
68:6,17 84:2
87:23 90:22
93:4 103:10
113:4,5,24
114:4
**basically** 20:5
36:18 45:7
52:15 65:13
**basis** 109:18
112:5 115:24
**bathroom** 43:24
**Beach** 2:6 11:11
13:2 129:25
138:4
**beat** 72:4 74:8
**beaten** 80:2,3
**beautiful** 48:7
57:7
**becoming** 82:2
**bed** 31:23 32:9
34:7 36:5,12
41:4 43:18
44:9 132:8
**began** 71:22
**beginning** 16:10
39:19 93:2
**behalf** 1:24 2:3,8
4:19,20 102:13
108:11
**Behamon** 29:10
29:12 31:18
**behavior** 79:20
80:22
**Bejar** 105:17,20
105:23 106:3
106:21 107:4

**believe** 5:12
16:20 23:7
26:6 44:5
45:23 46:7
68:21 69:4
70:7,17 73:2,6
75:2 78:24
80:14 91:17
96:25 105:19
108:5,8 110:8
114:13,14
115:24 116:18
117:5 118:20
118:23 119:19
121:10 123:25
133:9,25
**believed** 22:12
88:9,25
**believes** 116:24
**belittled** 22:12
**benefits** 104:19
105:2,8
**best** 40:18
**bet** 74:13 77:2
**better** 15:15
40:15 91:2
**beyond** 86:22
116:2 128:21
128:22
**bias** 87:24
**big** 41:17
**binder** 113:8
**birth** 5:20
**bit** 23:22
**black** 22:15
23:10
**blaming** 76:24
**blank** 5:16
**blocked** 113:1
**blunt** 52:15
**blur** 41:17
**Board** 1:7 4:5
138:6 139:2
**body** 1:7 76:11
**Boston** 67:23
**Boston's** 68:5

**BOT-UFF** 94:5
100:23
**bother** 23:18
**bottom** 17:1
18:8 46:23
48:21,23,25
49:2 83:21
84:12,16
107:14 113:16
115:6,18
**bought** 36:15
**bouncing** 59:12
59:14
**boundaries** 76:5
**break** 7:2,4,6
22:19,20,25
23:1 26:9,10
26:10 64:12
132:12
**breakdown**
36:18 73:22
**breakfast** 75:18
132:8
**breaks** 7:5
**breasts** 57:9
**Brian** 1:12 4:6
20:9 68:21
81:19 82:19
89:21,24,25
91:3 100:1
134:3
**Brickell** 1:17
2:11 4:10
**brief** 93:17
132:15
**briefly** 8:23
**bring** 10:7 41:6
133:22
**broke** 22:17
**brought** 29:22
30:5 31:12
41:2,7,12
50:16 88:2
89:9 113:9
**Broward** 8:18
78:18 96:9,24

**budget** 70:17
**buildings** 130:21
**bunch** 59:13
69:21
**business** 109:23
129:15,22,22
130:6

**C**

**C** 115:6
**c/o** 138:2
**cafe** 28:23,25
29:15
**call** 16:22 18:13
31:9,19 50:21
90:1
**called** 5:1 31:9
50:21 60:15
61:12 62:20
74:7 78:24,25
129:18
**calling** 50:10
**calm** 70:15
**calmed** 62:14,17
**capacity** 1:8,9
1:11,12,13
**capitals** 59:1
**cappuccino** 43:3
**captured** 66:5
**car** 79:4
**care** 129:5
**career** 59:16
97:4,10,13
**careers** 11:17
**careful** 75:25
**case** 1:2 4:3,7,20
7:14,16 56:2
89:16 109:1
110:18,19
111:2 113:10
113:12 131:23
131:23 138:15
**cases** 7:15
**cash** 86:21
**caught** 110:14
**cause** 104:16
106:10 107:23

122:9
**caused** 44:5
78:22 79:11
109:11
**cell** 90:2
**certainly** 27:22
35:8,16 37:17
51:20,24 81:23
**CERTIFICATE**
136:1 137:1
**certify** 134:20
136:4 137:6,10
**cetera** 63:21
**chain** 46:22
64:18
**chair** 20:8 67:4
**challenges** 24:21
**Chandler** 20:8
67:5,16,25
68:1
**change** 82:14,17
92:17 139:5
**changed** 65:25
**changes** 139:4
139:23
**chapter** 18:1,3,8
18:12 59:8
82:22 97:4,9
97:12
**chapters** 15:9
16:8,9,11,13
16:18 17:22
69:18
**character** 16:21
17:10,21 18:13
59:17,18 64:1
**characterization**
36:20
**characterize**
27:1,3
**charge** 84:4
112:12 113:14
113:24 114:18
**charges** 39:25
80:24 94:16
**checked** 47:15

**chest** 76:15
**Chief** 1:11
**child** 119:14
**Childhood**
119:16
**children** 8:21
**chitchat** 32:6
**chitchatted** 32:1
32:2
**choice** 110:21
111:9
**choose** 19:2
**Christopher**
2:10 4:19
**circuit** 8:18
78:18 80:11
**circumstances**
11:8 34:22
56:4 128:24
**City** 11:16
**claim** 87:20 88:3
88:6,8 89:9
91:2 92:16
101:15 103:12
108:15 114:13
114:15,16
115:21,24
117:16
**claimant** 117:20
117:21
**claimed** 117:9
117:23 118:1,4
118:7,14,24
**claiming** 91:12
**claims** 86:11
88:22 108:9
114:14 118:12
**class** 15:13
**classes** 11:13
**clear** 27:18
39:21 41:20
77:4 79:23
95:10 98:5
133:11
**clearly** 76:4,12
82:8

**client** 109:4,8
**clock** 110:12
**close** 131:21
**closer** 22:8,8
49:24
**cloth** 117:8
**clothed** 82:13
**clothes** 35:12
88:16 117:13
**co-workers**
121:13,15
**Coconut** 45:3
46:4 66:4
**coffee** 45:1 66:4
**coincidence**
17:21
**cold** 24:24
120:16 126:18
**colder** 126:7,14
126:21
**colleague** 61:24
**collective** 19:23
98:24 106:11
107:24 108:25
109:13
**college** 1:12 9:25
10:3,7 19:24
70:13 81:16
82:21 94:9
96:9,24
**come** 20:3 25:17
25:20 30:12
60:15 62:17
74:8 88:5
**comes** 25:22
117:18
**coming** 66:7
117:19
**comment** 57:18
**commission**
135:8 136:12
**committed**
95:16
**committee** 96:8
**communicate**
46:16

Drisin vs. Florida                                        July 24, 2018

communicated
  12:20
communicating
  20:19 62:20
communication
  22:9 86:10
  120:17
communications
  70:21 78:13,16
  96:24 133:2
community 79:2
company 25:13
compare 114:14
compensation
  10:8
competent
  103:18,22
complain 30:19
  31:2
complainant
  84:19,25
  115:20 116:6
complainant's
  116:1
complained
  30:14
complaint 29:22
  30:5,9 31:11
  36:2 41:15
  50:6,9,15
  66:13 81:11
  99:12 103:3,11
  103:19,23
  114:5
complaints 20:1
complete 36:18
completed 127:1
  138:11
Completed/Im...
  127:5
Compliance
  66:14,18 70:2
component
  10:13 82:25
  83:1
comport 116:19

computer 27:19
  54:1 56:15
  61:9 66:20
concentrate
  82:10
concern 63:23
concerned 65:11
  65:14 138:14
concerning
  103:19,23
conclude 99:16
  138:12
concluded
  134:17 138:15
conclusion 29:14
  68:14 89:16
  99:14,19 108:3
  108:15 124:21
condom 36:13
condoms 36:15
conduct 31:2,12
  74:22
conducted 103:4
  103:10
confabulated
  115:21 117:16
confabulation
  116:2,13
conference
  53:23
confirm 75:18
conflict 68:13,18
confront 79:25
confused 24:16
  37:3 89:4
confusing 34:25
  54:18
connected 19:17
connection
  31:11 67:2
  70:1 81:11
  105:15
conscious 34:2
consent 37:17
consider 15:21
  58:22 71:16

82:16 94:6
  96:18 126:21
considering 24:7
construction 6:4
consult 129:14
  129:21
consultant
  130:23
consulted 129:7
consulting
  130:16 131:10
contact 29:23
  30:6
contacted 30:18
  31:1
contained 93:9
contains 86:11
contend 34:15
  109:17,18
  123:22
contended
  104:15
content 18:21
  76:14 87:4
  120:14
contention 35:13
  110:4 112:6
  114:6,10
  116:22
context 13:23
  29:14 56:7
continue 110:17
continued 46:15
continues 23:18
continuing
  109:9
continuously
  109:12
contract 67:7,21
  68:3 112:10,11
  131:1 133:14
contractor
  130:24
contractual
  98:25
contravention

98:24
controlled 111:7
  111:12,18
convenience
  138:13
conversation
  32:4 90:9,11
  90:17,21 91:14
  133:16,21
conversational
  65:2
conversations
  19:15 25:14
  56:8 133:10
coordinator 1:10
  31:14
copy 14:17
  86:10 91:18
  92:5 106:23,24
  114:25 138:14
core 122:6
Cornell 9:1
corner 83:21
  84:12 113:17
corporate 1:8
correct 8:19
  9:18,22,23
  10:1,4,5,14,20
  12:18 16:24
  17:14 18:13
  19:4,19,20
  26:5 27:9,15
  28:9,13 29:7,8
  30:6,7 31:14
  32:11 33:25
  34:13 36:17,23
  38:10,11 39:7
  40:24 42:19,20
  42:23,24 43:7
  43:8,14 46:16
  46:24 47:7,11
  48:4 49:10
  54:4 55:15,21
  59:9 60:2,3
  61:4 62:25
  66:15,21 69:4

69:12,19 78:14
  78:20 81:16,17
  82:25 83:18
  84:5,6,9,10
  88:3 89:3,12
  90:2,5 92:3,4
  92:15,19,20
  93:25 94:14,15
  94:17,19,20,22
  94:24 96:10,15
  96:24 99:6
  100:2,10,13,20
  101:16 102:19
  102:20,23
  103:1,11
  104:17,19
  105:9 106:7,14
  106:15 107:10
  110:3,20
  112:22 113:7
  113:23,25
  114:1 116:7
  119:2,18 120:5
  122:13 123:11
  139:23
CORRECTIO...
  134:19
counsel 4:13
  114:19 137:11
counsel's 4:22
counterclaim
  87:25
County 8:18
  78:18 135:1
  136:3 137:3
  139:21
couple 10:2 26:1
  132:21
courage 121:18
course 112:10
court 1:1 4:14
  6:6,15 7:10
  8:18 78:18
  80:11,19
  110:18,19
  111:1 113:10

113:12 131:22
136:11 137:4
137:18 138:22
**crazy** 52:19
55:17
**create** 40:7
**created** 11:20
19:6 117:7
**credence** 115:22
**creepy** 63:19,22
**criminal** 6:11
**Cross** 2:18
132:24
**crowd** 60:19,22
**cruelty** 23:24
24:12
**cuddle** 75:21
**cuddled** 75:13
76:6,7
**cuddling** 73:15
75:2,5,9,10,12
76:20,22 77:10
77:12,14
**culpability**
43:22
**culpable** 94:21
**Curious** 93:12
**current** 5:10
132:3
**currently** 7:21
**curve** 57:9

———————
**D**

**D** 1:19,19,20
2:17
**dad** 76:16
**DADE** 136:3
137:3
**dance** 59:15
**dancer** 63:9
**dancing** 60:6,12
60:18,22 61:21
61:23 62:7,23
63:5,7,7,10,11
63:16
**dark** 42:12
**date** 5:20 11:2

27:10 45:1
54:5 101:9,24
102:6 125:12
138:16
**dated** 14:18 21:5
37:25 46:22
47:10,17 48:12
55:3 58:25
62:1 73:8 78:1
81:19 83:15
89:17 92:6
93:23 96:8,14
97:21 99:4
100:1,7 101:7
102:2,22
105:23 106:20
107:13 119:25
122:2 132:4
137:14
**dates** 71:24 80:9
104:5 133:6
**dating** 124:25
125:9 126:6,10
126:11
**David** 101:21
**Davidovich**
16:22 17:3,10
**day** 5:16 15:17
30:23,25 37:6
41:1,13 43:1,9
43:11 48:24
49:5 65:4
66:12 79:16,17
86:2 87:2 95:6
96:17 97:13
109:23 118:18
118:20,23
135:3 136:8
137:14
**days** 21:24 25:17
27:8 81:14
90:4,4 95:11
96:5
**deadline** 110:9
**deal** 40:18 52:14
**dealt** 114:15

**dean** 1:12 9:25
10:3,6,10,11
12:7,7 20:9
68:4 70:17
81:15,25 85:8
89:18 90:10
93:23 95:19
97:21 98:7
100:11,21
121:11 133:2,8
134:3
**deanships**
131:22
**dear** 49:1 56:18
138:10
**Debra** 119:4,18
127:1
**decades** 5:15
**decanal** 95:8
**December** 19:18
19:22 20:7,11
20:15 21:5,21
27:11,13 28:7
37:25 38:6
46:22,24 47:2
47:11,17 48:2
48:3,12 51:12
51:12,18 52:3
53:16,16
126:24 127:13
**decide** 26:13
124:19
**decided** 129:1
**decision** 19:21
19:23,24 20:6
91:13 106:13
110:16,25
**declare** 139:22
**deemed** 66:20
**deeply** 25:15
**Deerfield** 129:25
130:17
**Defendant** 1:24
2:8
**Defendant's** 3:3
3:3,4,4,5,5,6,6

3:7,7,8,8,9,9
3:10,10,11,11
3:12,12,13,13
3:14,14,15,15
3:16,16,17,17
3:18,18,19,19
3:20
**defendants** 1:15
4:20
**defined** 117:24
**definitely** 19:16
**definition**
116:16
**degree** 9:8
**deliberative**
98:22
**deliver** 39:5,16
84:20 85:15
87:14 108:11
**delivered** 40:11
56:16 93:23
96:17 108:13
**delivering** 86:21
**delivery** 83:18
130:20
**demanding**
52:16
**demonstrated**
109:7
**denied** 85:25
94:23 109:12
**deny** 109:9
**denying** 104:2
**departing** 38:25
43:2
**department**
10:16 20:9
66:14,18 67:5
70:1 82:13
**departure** 130:5
**Depo** 138:7
139:3
**DEPONENT**
134:21
**deposed** 5:22
**deposition** 1:24

4:8,9 7:9 10:22
15:1 42:7
93:22 134:17
137:7 138:11
138:17 139:23
**describe** 13:19
32:6 34:23
35:2 42:4
49:24 58:4,11
58:14,19 65:20
71:10,11,17,19
77:11 79:19
115:9,14 123:4
123:6
**described** 48:6
52:9 88:12
123:19,22
127:21
**describing** 35:1
54:9
**description** 69:5
**design** 6:5 9:1
11:18
**despite** 65:21
115:22,25
**destroyed** 61:14
**detail** 58:5,11,14
58:19
**determination**
68:5,9 99:22
102:13,14
**dictionary**
116:16
**different** 71:15
118:3
**difficult** 38:24
43:1,9 82:2
123:20 124:5
**difficulty** 31:21
**dinner** 13:2
27:15 28:8,21
28:24
**direct** 2:18 5:3
69:2 71:20
**directly** 69:7,10
**director** 1:10

Drisin vs. Florida                                    July 24, 2018

Page 145

| | | | | |
|---|---|---|---|---|
| 9:21 11:12 70:18 96:23 **disagree** 77:17 **disappointed** 76:24 **discharged** 107:22 **disciplinary** 94:5 122:9,14 **discrimination** 112:13 113:15 113:24 114:18 **discuss** 28:4 56:25 64:8 71:22 **discussed** 14:3,6 14:7,7 20:2 24:12 26:3,15 26:17 81:9 82:3 121:2 **discussing** 22:4 78:12 87:10 121:14 **discussion** 22:23 45:4 46:3,8,12 52:19 61:5 87:11 125:13 129:9 **dislodged** 118:10 **dismiss** 94:7 95:4 96:19 106:14 133:12 **dismissal** 98:23 100:12,16 106:10 **dismissed** 100:8 **disparate** 114:3 114:15 115:19 **dispersing** 29:16 **displaying** 63:21 **disputes** 100:24 **distant** 120:17 126:18 134:4 **distraction** 57:11 | **DISTRICT** 1:1 1:1 **Diversity** 1:10 92:19 99:15 **Diversity's** 102:14 **divorce** 8:18 61:18 65:10 124:18,19 **divorced** 119:16 124:2 **divorcing** 74:7 **doctor** 127:22,23 127:25 **document** 14:13 14:25 15:2 21:6 27:17 28:2 38:2 42:9 46:25 47:12 48:15 51:13 55:5 56:14 59:3 62:4 64:20 73:9 78:4 81:21 83:11 86:4 89:22 91:22 92:9 94:1 96:11 97:22 99:7 100:3 101:10 102:4 102:24 104:12 105:25 106:25 107:12,13,16 107:20 113:18 113:22 114:24 115:1,2,5 119:22 **documents** 7:10 7:11 27:19 51:22 113:10 113:12 **doing** 79:5 81:7 **domestic** 52:20 52:23 53:5 **door** 29:20 79:1 **doubt** 35:15 | 116:2 **Dr** 102:2 106:3 107:4 127:22 127:25 128:8 129:6 **dragged** 60:21 **dream** 52:4,7,8,9 52:19,20,23 54:10,15,15,17 54:23,24,25 55:8,14,17,24 56:5,20 58:7 58:12,16,20 69:16 71:17 **dreams** 15:14 **dress** 57:19 **drew** 5:16 **drinks** 28:12 **Drisin** 1:4,22 2:19 4:4,8,17 4:25 5:7 7:24 34:15 52:1 85:8 88:17 93:21 107:22 109:9 129:19 129:19 130:1 131:5 132:18 134:24 136:5 138:2,6,7,10 139:2,3 **Drisin's** 108:24 **Drive** 1:17 2:11 4:10 **dropped** 60:8 **drowsy** 33:4 **drugs** 7:17 **due** 98:18,21 103:9 109:9 **duly** 5:1 136:6 **Duncan** 101:21 **dynamic** 58:2 _____ **E** **E** 1:19,19,20 2:17 3:2 **e-mail** 14:18,23 15:7 16:22 | 21:4,10,12,15 21:18,21 22:11 23:18 25:5 26:3,19,23 27:8,10,23,24 28:2 37:24 38:8,12,16,18 38:19,21 40:20 42:7,18,22 44:3,15 46:21 46:23,24 47:10 47:11,15,16 48:3,11,20 49:12 51:11 54:9 55:3,20 56:2,13,18,23 58:9,25 59:6 61:25 62:12 64:10,18,25 65:1 69:15 70:4 71:16 73:7,12,14 75:11 78:1,11 84:18 85:8 86:2,7,10,24 101:7,9,13 **e-mailing** 65:17 **e-mails** 48:14 51:16 52:1 62:3,10 63:21 64:23 66:19 69:12 71:11 **e-mall** 58:4 **ear** 32:14 33:5,6 **earlier** 62:22 **earliest** 138:13 **early** 20:11,15 29:5 43:10 53:25 71:21,22 **easier** 42:16 **easy** 43:5 **eat** 41:6 **educational** 8:24 **EEOC** 112:13 112:17,18 113:15 114:18 | 114:25 **EEOP** 110:13 **effect** 34:10 45:15 **effective** 100:8 **egregious** 90:24 **either** 50:5 61:12 **Elijah** 2:15 4:21 **Elizabeth** 105:16 105:20,23 106:21 **emotionally** 126:18 **employed** 109:8 129:10 137:11 **employee** 130:22 **employment** 9:7 100:22 104:3 130:4 **enclosed** 100:17 100:17 **encounter** 71:18 122:8,25 123:8 **encourage** 19:12 **ended** 26:11 29:15 **engage** 37:16 80:21 **engaged** 50:22 74:22 89:10 **engaging** 79:19 **enjoy** 25:13 **enjoying** 33:15 34:19 77:5 **enraged** 60:13 60:20 **ensued** 94:19 **ENTER** 139:4 **entered** 139:23 **entitled** 107:12 **EOPD** 93:11 **EOPD's** 93:5 **Equal** 1:10 92:18 99:15 102:13 **erotic** 52:8 54:10 |

54:16,25 56:19
58:7 69:16
**ERRATA**
134:20 139:1
**errors** 82:8
87:23
**ESQ** 2:4,10,10
2:15 138:2
**essentially** 34:16
98:10 130:12
**establish** 102:15
**establishes** 99:17
**establishment**
28:12,16
**et** 63:21 138:6
139:2
**Europe** 38:4
49:13 122:7
**evening** 27:13
28:6 29:15,21
30:2,6,19
**event** 49:23 60:8
60:11 61:20
72:1 89:9
**events** 32:23
51:6 113:3
**eventually** 88:8
88:14
**everybody** 29:16
41:19 44:17
131:24
**evidence** 84:2,3
92:14 93:6,7
95:16 99:17
103:18,22
114:6 118:15
118:15
**ex-wife** 8:17
**ex-wife's** 8:13
**exact** 11:2
**exactly** 90:11
**EXAMINATI...**
5:3 132:24
**examined** 5:2
**exchange** 48:12
51:11 62:1

78:1,3,11
**excited** 19:16
**excuse** 68:10
112:15
**executive** 1:11
96:23
**exercise** 101:16
**exercised** 101:3
**exhibit** 3:3,3,4,4
3:5,5,6,6,7,7,8
3:8,9,9,10,10
3:11,11,12,12
3:13,13,14,14
3:15,15,16,16
3:17,17,18,18
3:19,19,20
14:12,14 21:4
21:7 25:8
37:24 38:3
42:6,10,22
46:21 47:1,9
47:13,23,24,25
48:4,11,16
51:10,14 54:14
55:3,6 58:24
59:4 61:25
62:5 64:17,21
73:7,10 77:25
78:5 81:18,22
83:12,14 86:1
86:5,24 89:23
91:17,23 92:5
92:10 93:22
94:2 96:7,12
97:20,23 99:3
99:8,25 100:4
101:6,11 102:1
102:5,21,25
104:8,13
105:22 106:1
106:19 107:1
107:11,17
113:14,19
114:23 115:3
119:21,23
**exotic** 54:16

**expert** 5:23 6:3
**expires** 135:8
136:13
**explain** 43:21
53:1 60:7
**explanation** 79:6
**expressed** 19:14
26:20,24
103:24
**extent** 91:14
129:8
**extremely** 36:17
**eyes** 57:6

---

**F**
**fabrication**
130:20
**Fabricators**
129:23 130:17
131:4,15
**face** 15:11 40:19
40:19
**Facebook** 15:16
45:13
**fact** 30:20 35:25
61:22 64:8
65:12 76:25
77:4 81:9
84:14 87:23
88:11 89:20
90:7 107:8
109:6 112:12
115:22,25
117:21 118:15
124:4
**facts** 88:9 89:15
91:1,1 100:15
**factual** 115:23
**faculty** 19:25
27:14 28:8,22
69:2,7 82:12
82:16,23 83:4
91:5 109:14
**fair** 6:25 23:3
26:19,23 34:7
50:23 89:1
**faith** 89:14

**fall** 13:20,21
14:10 19:13,19
23:1 26:10
51:17 82:13
**falling** 50:2
117:12
**false** 114:4
115:21 117:16
**falsification**
116:17,23
**falsified** 90:25
**familiar** 15:3,5
115:1
**family** 14:5 26:7
**far** 24:18 46:14
76:1 77:5
**farm** 79:4
**father** 45:24
**favor** 108:9
**favorable** 114:11
**February** 66:12
67:1,13 68:22
69:22 71:22
72:2 78:2 80:6
80:10 107:13
119:2 120:1
**federal** 110:12
110:18,19
111:1 112:14
**fee** 131:10
**feel** 21:22 23:22
24:18 25:14,23
33:15 35:18
37:4 38:24
43:15 45:7
65:4 124:25
**feeling** 31:6,7
37:25 46:1,2
117:13
**feelings** 13:9,11
22:13 26:20,24
**feels** 35:17 122:6
**feet** 76:13
**fell** 32:9 88:15
**felt** 34:19 36:22
39:9,10 43:20

43:20,22,24
45:13 50:18
57:7 85:13
89:3,4,5
**female** 18:13,16
18:19 29:6,9
61:24 114:5,12
115:20 116:5
118:22 121:13
121:15 123:7
**FF** 136:12
**fight** 63:1
**figure** 26:9
36:10 91:7
**file** 39:25 50:6,9
72:11 110:12
124:22 138:16
**filed** 8:17 66:13
72:4 78:17
80:11,17 81:6
87:22,25 88:8
94:17 104:3
105:16 112:12
112:15 113:15
114:17 117:21
124:23
**files** 7:14
**filings** 7:12
**filled** 90:24
**final** 20:5
**finally** 122:5
**financial** 109:11
**financially**
137:12
**find** 47:21 65:4
74:9 88:23
93:5
**finding** 84:2
93:8
**findings** 83:24
91:16 92:14,18
93:5,10 98:12
98:16 103:18
103:23
**finds** 92:13
106:9

**fine** 31:20 60:17
 64:13,14,15
 68:19 75:19
**finish** 81:3
**fired** 95:1
**firm** 106:22
 110:2,5 111:5
 129:14,16
 130:1,10,11
**first** 8:15 11:4
 14:2 17:1 30:8
 34:23 46:23
 47:16,23 48:2
 48:20 62:13
 87:22 88:20
 97:7 100:14
 105:19 107:15
 114:3 115:14
 119:25 120:3,6
 121:20 122:21
**FIU** 7:12 9:12,14
 10:11,17,19
 12:12 18:16,19
 19:2 27:20,24
 29:23 30:5,9
 30:18 31:2,13
 50:6,12,14,21
 56:12,16 66:6
 68:6,17 69:4
 73:23 82:4
 95:8 96:5
 97:19 101:22
 106:14 107:23
 108:9,11 109:8
 109:11,14
 110:22 111:6,7
 111:12 112:6,8
 112:11 114:11
 115:22 121:12
 130:5
**FIU's** 66:14,18
 97:14,17 98:25
 99:18 102:15
 117:24
**five** 29:17 59:21
 60:9 61:23

 90:4 93:13
**fix** 95:12
**flew** 19:18 27:9
**fling** 63:3
**flirt** 76:4
**flirtatious** 15:24
 16:1 18:5
 63:25 77:23
 121:16
**flirtiness** 27:5
**flirting** 22:9,10
 58:22 71:7,12
 71:18
**flirty** 20:23,24
 24:13,15,15
 49:22 58:1
 63:16 71:19
 77:22,23
**Florence** 15:17
**Florida** 1:1,7,8
 1:17 2:6,12 4:4
 4:10,22 5:13
 9:11,19 94:9
 109:15 135:7
 136:2,12 137:2
 137:5 138:4,6
 139:2,20
**following** 4:1
 30:22,22 40:23
 41:13 72:12
 107:21 109:4
**follows** 5:2 16:7
**fondled** 33:9
 58:12
**food** 41:3,6,7,13
**foreclosed**
 111:13
**foregoing** 137:7
**forgive** 22:18
 23:24
**form** 67:9 72:15
 74:24 77:16
 79:14 85:22
 95:17,25
 111:15,23
 117:2 133:19

 139:23
**formally** 70:5
**Fort** 132:10
**forth** 16:17
 24:15 27:7
 59:14 99:20
**forward** 82:22
 88:5 108:24
 109:6 124:25
**found** 15:13
 26:2 60:5
 94:21 103:3,17
 103:22 108:8
 119:11 126:3
**Foundation**
 11:16 12:12,13
**four** 8:1 31:17
 88:5
**fourth** 97:7
**frame** 51:18
 88:4
**France** 25:6,10
 26:4,7,7,8,13
 26:15,18
**frequency** 127:7
**Friday** 54:3,6,12
 56:20 57:6
**friend** 22:22
 23:6 26:12
**friendly** 14:2,10
 15:21,25 18:15
 18:18,20,22
 20:20,23 49:22
 57:22 77:22
**friends** 27:5 42:3
 42:5
**friendship** 23:5
 27:6
**frivolous** 114:5
**front** 23:23,24
 40:3,15 107:20
**frustrating** 53:1
 53:7
**fuck** 23:19 32:18
 32:19 45:23
**fucked** 25:20

**fucking** 57:9,23
 88:17
**full** 5:5
**full-time** 83:4
**fully** 32:13
**fun** 25:19,19
 60:19
**funding** 12:14
**further** 110:7
 112:20 132:18
 134:21 137:10
 138:17
**Furton** 1:11 4:6

_____
**G**
**gang** 123:21
**gap** 116:17,23
**GAs** 60:11
**gelato** 17:11,16
 17:17,18,20
**gender** 113:25
 114:3
**general** 4:21
 121:19
**generally** 131:8
 131:13
**Genoa** 13:24,25
 19:4,18,21
 20:7 27:9 28:7
 38:25 40:24
 43:2 44:20
 46:15 50:4
 80:8,13 88:2
 89:2 122:22
 123:23
**gentleman's**
 17:2
**Germany** 23:8
 26:12
**getting** 36:9
 41:20 131:21
**give** 6:14 14:16
 37:17 39:22
 80:9 82:7
 86:12 87:12
 91:7 108:19
 112:3

**given** 27:20
 63:20 108:14
 115:22 137:9
**giving** 52:13
 74:12 77:2
 86:20
**glad** 62:13
**Gmail** 47:16
 56:9
**go** 9:7 18:7
 19:21 20:6
 22:14,22 24:14
 25:17 26:9,13
 26:14,18 28:21
 40:2 45:22
 57:4 64:13
 72:22 74:9
 76:10,23 80:25
 84:11 108:12
 110:6,23 112:1
 112:2 115:5,18
 117:3 121:8
 122:1 124:11
 125:15 126:23
**god** 61:22
**goes** 22:11 58:4
**going** 14:8,16
 19:16 20:4
 22:21 23:6
 25:6,10 26:4,6
 26:15,18 27:22
 28:6 31:18,21
 32:4,5 39:23
 39:24,25 40:1
 40:6 42:14
 49:12 50:25
 51:15 56:19
 58:24 74:7
 77:25 86:1
 87:14 88:7,25
 92:5 95:12,23
 98:6 111:20
 124:18 125:21
 132:11 134:11
**good** 4:18 33:16
 34:19 46:18

64:13 82:5,6
90:13,18
120:10,20
**good-byes** 23:21
**gosh** 5:11
**gotten** 47:6 48:7
49:23 119:12
120:17
**government**
110:12
**grabbed** 61:3
**grad** 122:8,25
123:7
**graduate** 11:21
12:1,4,8,15
43:23 59:21
60:9 67:7,20
68:3 118:22
122:8
**grant** 12:11,14
12:14
**graphic** 55:19
56:20 58:11,14
58:19 69:11,19
**graphically**
71:17
**great** 15:17
75:19 109:11
**green** 15:10 18:1
18:7 57:7
**grief** 125:1,4,14
**grievance**
100:25 101:4
104:3,9,10,15
105:15 106:4,5
**grieving** 125:7
**grounds** 84:9
**Grove** 45:3 46:4
66:4
**growing** 77:24
**Growlight** 11:14
**grown** 25:2
120:17
**guaranteed** 91:6
**guard** 22:14
**guess** 17:12

20:18,21 21:17
37:22 40:6
47:4 48:25
54:18 56:16
63:12 65:3,12
68:11 86:13,14
125:11
**guide** 97:6
**guilty** 25:23 31:7
46:2 88:23
**gulag** 75:23

---

**H**

**H** 3:2
**half** 109:20
130:18
**half-awake** 33:6
**hand** 6:7 57:12
77:6,19 83:18
93:22 96:17
136:7
**handle** 101:19
**happen** 76:25
95:23
**happened** 22:17
32:23 35:1
36:25 39:10,13
40:8,14 43:19
43:21 44:2
45:8 50:19
51:1,9 60:7
88:13 98:3
117:12 118:16
121:19 123:6
123:19,22
**happening** 34:3
60:23 66:6
**happens** 5:16
79:3
**happy** 6:22 7:3
15:11,12,17
75:16,20,20
**harassment**
95:17 102:16
117:24
**hard** 37:6 82:10
82:21 110:23

112:2
**Hardrick** 1:13
4:7 92:7,12
102:2,22 103:2
**Hardrick's**
98:18
**harm** 79:25
109:11
**Harvard** 9:2,9
**hauled** 80:19
**he'll** 87:12
**head** 6:16,17
21:11 31:22
**health** 24:21
119:1,5,12
**hear** 109:1,17
133:23
**heard** 32:17
33:14 45:20,25
**heart** 19:1 22:17
22:19,20 24:1
24:3 39:2
**hearts** 39:2
**heavily** 50:1
**held** 4:2
**Helen** 62:7,24
**hell** 36:25
**Hello** 49:1
**help** 50:7 51:3
54:20 72:6,8
72:17 91:1
**helped** 72:10
**helpful** 46:19
**helping** 134:8
**Herrera-Nava...**
106:21 109:25
**hide** 25:25
**hired** 101:18,20
101:24
**history** 66:1
**hit** 60:21 61:15
**home** 53:18
60:16 79:8,11
79:21 82:20
130:3
**honest** 24:2

36:24
**honestly** 15:13
35:10 41:11
**hope** 43:5 65:4
**hoped** 45:14
**hopeful** 95:14
**hoping** 39:1,2
43:2
**horrible** 85:13
**hotel** 29:6,17
73:19,25 74:2
74:5,9
**hour** 73:15
75:12
**hourly** 131:6
**hours** 29:5 76:7
**house** 78:23
124:17
**Howard** 2:4,5
4:16 97:25
138:2,3
**huge** 60:22
**Human** 1:14
**hunch** 57:12
**hurt** 20:25 21:1
25:20,21 26:2
**husband** 25:22
25:25 60:5
63:11,22 66:13
70:6,8 71:23
74:6,6 78:13

---

**I**

**I-W-O-Z-Y-I-...**
8:8
**ID** 135:3
**idea** 11:16 23:2
30:14 37:12
82:6 111:17
**Identification**
14:14 21:7
38:3 42:10
47:1,13 48:16
51:14 55:6
59:4 62:5
64:21 73:10
78:5 81:22

83:12 86:5
89:23 91:23
92:10 94:2
96:12 97:23
99:8 100:4
101:11 102:5
102:25 104:13
106:1 107:1,17
113:19 115:3
119:23
**ignored** 109:6
**ignoring** 109:2
**ill** 82:20 125:8
**imagine** 43:4
44:4
**immediate** 65:5
105:1
**immediately**
46:4 76:2 77:6
**implication**
87:14
**important** 39:4
39:16 50:3
**importantly**
109:7
**impossible** 8:3
**inactive** 130:12
**inappropriate**
37:16 40:1
43:25 45:8
58:9 66:21,23
70:11,21,25
71:1,14,20
87:7 117:10
**incident** 18:25
36:16 38:8
40:24 43:10
45:16 46:9,12
64:7 66:10
79:10 85:14
87:2 88:2 89:2
122:7
**include** 122:14
**included** 98:11
98:15
**including** 7:11

incorporated 98:11
incorrect 28:17
increased 10:8
increasingly 134:4
independent 130:24
individual 12:17
individually 1:8 1:9,11,12,13
indulge 43:6
informal 65:5
information 51:2 65:16 93:9 99:16 109:21,22 111:8,12
informing 88:5
initial 120:1,6,25
initials 17:23
initiate 107:8
injunction 78:19 80:17
injured 109:12
innuendo 90:24
inquire 134:1
inside 57:12
insignificant 105:13
insisted 61:3
Integrity 66:15 66:19 70:2
intended 101:15
intent 79:23,24 94:7 95:4,10 95:11 96:1,19 97:14,17 98:1 133:3,7,12
intercourse 35:14,17,22,24 36:3 58:15 118:4,9
interest 14:8 19:14 68:13,18
interested 17:8

134:7 137:12
internal 82:4 100:23 101:22
internally 87:20
International 1:7,9 4:4,22 9:11,19 94:10 138:6 139:2
internist 128:1
interpersonal 121:12
interpretation 77:17 103:6,24 113:3
interview 68:22 69:25,25 71:5 81:14
interviewed 31:13,16 67:1 67:14 81:10
intimacy 24:25 52:17 120:20
intimate 74:14 74:22 75:6,8 77:4,9,13
introduce 11:17
introducing 51:16,23
introductory 16:7
inured 109:13
invented 16:15
invention 116:14
investigation 39:20 66:6 67:2 70:1 82:5 87:18 94:19 99:11 103:3,11
investigative 83:6 89:15 101:14
involved 19:10 20:10
involving 43:13 121:12
Irena 7:24

Iris 2:15 4:21
Isicoff 2:11 4:19 108:21
issue 85:18,19 91:4 107:21 108:2 123:20 133:10
issued 83:7 90:5 91:20
issues 52:13 82:19 106:5 107:19 121:11 121:12
Italians 69:21
Italy 14:7,8 19:4 23:15 49:13 71:25
Iwozyiak 8:6
IX 1:9 31:14 95:17 101:14 117:24

**J**

J 2:4 138:2
jacket 57:8,10 57:13
Jaffus 1:13 4:7 92:6 102:2,22
January 54:3,6 54:8 55:4,21 59:1,19 62:1 64:18 72:21,24 72:25 73:1,2,4 73:6,8 105:23 106:6,20
Jason 20:8 67:5 67:16,25 68:1
jeans 33:9
job 82:10,25 94:5 104:21 105:7,8,14 131:6,20 132:1
jobs 97:25 130:8 131:19
judge 80:20
July 1:18 4:10 83:7,15 86:2

89:17,20 91:20 92:6 113:22 138:7 139:3
justice 45:14,18

**K**

Karen 67:22 68:4
Keep 125:21
Kenneth 1:10 4:6
kept 22:16 88:19
Key 1:17 2:11 4:10
kicked 39:24
kind 17:9 33:4 34:24 36:1 40:2 42:12 43:21 45:9 52:7 70:14 80:21 90:19 117:9 127:18 127:23,25
kissed 32:14 33:1
kisser 15:16
kissing 15:14,14 33:5,8 37:1,2
knew 30:25 31:3 36:25 66:5 70:4,20 80:14 82:19 94:25 95:22,24
Knight 11:15 12:12,13
know 10:14,23 15:6 20:18,21 21:3 22:8,10 23:13,14,16,19 23:21 24:14 25:23 29:15,17 29:18 31:5,5 32:4 35:5,6,8 35:10,15,17 36:10 37:8,10 37:11 38:4,17 38:19,25 39:11

41:1,5 42:4 43:1,19,24 45:9,9,9,18 50:22 52:23,24 53:3,4,4,6,15 54:23 55:18 56:23 60:10,18 60:19 62:6,19 63:9,24 64:1 65:13,15,19 66:8 71:12,13 74:4 76:1 80:21 82:7,21 85:23 88:20,21 90:12,25 91:4 91:11 95:13 98:20 108:4,16 117:5 118:9 119:8 121:4,10 124:9,10 131:22 134:7
knowing 111:21
knowledge 111:18
known 118:12 135:3

**L**

l 139:6,6,6,7,7,7 139:8,8,8,9,9,9 139:10,10,10 139:11,11,11 139:12,12,12 139:13,13,13 139:14,14,14 139:15,15,15 139:16,16,16 139:17,17,17 139:18,18,18 139:19,19,19
lack 63:23 120:11,21 121:2,6,8
language 33:3 70:22,23 123:4 123:5,10
laptop 54:1 61:9

66:20
**Large** 135:7
137:5
**Larisa** 10:14,20
10:22 11:1
12:16,21 14:19
16:18 18:12
21:5 27:23
29:9 30:17
31:4,25 33:14
34:11 36:5
39:3,15 40:4,5
40:23 41:2,5,9
41:20 46:16,22
47:5,10 48:12
50:4,20 51:2
51:11 52:4
53:17 54:3
55:4,20,23
56:4,19 58:25
59:17,19 60:2
60:15 61:12,21
62:1,12 63:16
63:20,24 65:22
67:6,17 68:2
68:16 69:1
70:5 71:6,16
72:17 73:8
78:1,11 85:11
116:10 124:6,9
126:21
**Larisa's** 47:16
48:3 60:5
66:13
**late** 15:12 20:11
20:14 61:13
**Lauderdale**
132:10
**Laura** 18:13
20:8 59:17
**Laura's** 59:15
**law** 2:5 103:4
106:21 110:2,5
138:3
**lawsuits** 19:1
**lawyer** 101:18

101:21 102:9
105:16 110:1,5
111:11,24
**layer** 98:20
**lead** 11:20
**Leading** 133:19
**learn** 30:8 62:17
**learned** 79:10
**leave** 39:5,6 61:3
71:23 84:21
85:15
**led** 100:16
**Lee** 2:15 4:12
**left** 41:19 44:17
46:15 57:11,24
88:16 90:25
117:14
**left-hand** 113:16
**leg** 36:9,9
**legal** 108:17,17
**Lenox** 2:5 138:3
**lesbian** 63:3
**let's** 18:7,25 55:1
121:21 124:11
**letter** 81:18,20
83:14,17 92:6
92:8,12,17
93:22,25 94:4
94:6,13,25
95:3,10,22
96:7,10,14,18
96:18,22 97:3
97:20,24 98:1
98:3,6,8,14
99:3,6,10,20
99:25 100:2,6
100:7,13,17,19
100:21 102:1,7
102:21,23
103:2,15,21,25
104:2 105:22
105:24 106:3
106:13,16,20
106:24 107:3
108:20,22
109:2,7 110:1

110:5 113:4,5
133:3,4,7,18
133:20
**letters** 48:7
**Levine** 2:4,5,20
4:16,16 51:15
64:15 67:9
72:15 74:24
77:16 79:14
81:3 85:22
93:14 95:25
111:15,23
114:21 117:2
122:13,18
132:21,25
134:9,12 138:2
138:3
**Lexapro** 128:13
**Libby** 106:21
109:25
**Liberty** 11:16
**licensed** 119:4
**life** 23:20 50:3
56:8 129:1
**light** 42:14 76:25
91:2
**Lighthouse** 5:12
**lightly** 25:15
76:15
**liked** 76:4
**line** 56:2 67:6,17
68:2 105:4
109:17,19
139:5
**lines** 18:10
**linked** 98:3
**list** 112:8
**litany** 20:1
**literature** 14:3
17:9
**litigation** 6:4
112:14 114:24
**little** 23:22 24:25
76:23 77:22
**live** 29:19 79:2
**lives** 23:8 26:8

**loaned** 54:1 61:9
**located** 129:24
**lOL** 15:15
**long** 5:18 7:3
15:3 36:15
37:5 39:4
65:24 76:15
115:4 125:7
128:22
**look** 14:21 15:17
17:1 18:10
22:17 51:21
86:24 90:13,18
104:23 107:19
114:2 128:11
131:16
**looked** 15:18
31:22 57:6,15
57:17,19,23
**looking** 54:14
82:22 83:20
97:4,9,12
**looks** 81:23 97:2
**Lorena** 29:10
31:19,22 41:24
42:8,18,25
43:15 44:3,5
44:15 46:3,8
66:3
**Lorena's** 44:11
**lost** 104:19 105:2
105:8,13
**lot** 17:17 19:10
24:10 25:19
26:7 63:8
105:12 124:5
**love** 25:12 53:11
53:14
**lovely** 57:6,15,17
57:20 76:13
**lunch** 53:18 54:4
57:6,15,18
**lying** 32:9

_____
**M**
**M** 2:10
**made-up** 59:18

**maiden** 8:2
**majority** 29:1
104:20
**making** 16:17
17:12 59:12
131:14
**male** 16:21
17:21 23:6
**man** 25:24 80:1
**manage** 130:20
**manifested**
63:23
**manner** 89:1
**March** 128:11
**Marenco** 10:20
10:23 11:1,21
12:9,16,18,21
12:23 13:6,12
13:15,20 14:19
16:18 17:22
18:2 19:12
20:13 21:5,22
25:6 26:4,20
26:24 27:23
29:10 30:17
33:14 34:11,18
36:5 40:23
46:22 48:12,23
49:4 50:4
53:25 54:9
55:4,20,24
56:5,12,15,23
57:14 58:25
59:20 60:4
61:8,20 63:17
64:8,18 66:13
66:17 67:6
71:6,17,22
72:11,22 73:8
74:23 78:1,19
80:18,21 81:6
116:11
**Marenco's** 53:17
71:2
**Maria** 62:8,24
**mark** 1:8 4:5

14:12 21:4
37:24 42:14
58:24 61:25
73:7 77:25
81:18 83:10
85:24 86:1
91:17 92:5
97:20 101:18
101:24 102:1,1
102:9 104:6
119:20
**marked** 14:14
21:7 38:3
42:10 47:1,13
47:20 48:4,16
51:14 55:6
59:4 62:5
64:21 73:10
78:5 81:22
83:12,21 86:5
89:23 91:23
92:10 93:21
94:2 96:12
97:23 99:8
100:4 101:11
102:5,25
104:13 106:1
107:1,17
113:19 115:3
119:23
**marketing** 96:23
**marking** 42:6
46:21 47:9
48:11 51:10
55:3 64:17
83:14 96:7
99:3,25 101:6
102:21 104:7
105:22 106:19
107:11 113:14
114:23
**marriage** 22:4,5
24:7,10,17,25
25:1 52:13
64:2,4,5,6
125:1,5,7

**marriages** 23:4
**married** 7:21,23
7:25 8:9,15
10:19 12:17
22:23 26:1
59:25 60:2
120:9,14
**marrying** 126:20
**Marylys** 31:10
**massage** 74:12
77:2
**massaging** 76:13
**master's** 9:1,5,8
**matter** 108:23
109:5 112:12
138:12,18
**McWhorter** 1:9
4:6 30:11
31:13,17,25
32:8,12,17
33:1,7,14,23
35:21,23 81:10
84:18 86:3
87:4 88:5 90:5
91:16,21 99:5
99:10 101:7,13
117:7,19
**McWhorter's**
83:6 87:18
92:14 98:12,16
99:14
**mean** 15:23 16:9
17:7,12 20:10
20:19,21,24
21:9 22:3,3,7
22:10 23:3
24:11,13 35:7
35:8,16 36:24
37:7,8,15,20
38:5 40:25
52:14 56:6
63:15 65:10,24
65:25 71:11
77:12 82:19
85:23 86:21
104:6 110:10

116:13 117:18
122:16 126:11
126:16
**meaning** 85:7
**means** 52:24
53:4 116:16
**meant** 22:15
39:20,21 53:4
53:6,8,15
124:12
**medical** 119:17
**medication** 7:18
127:15,18
128:4,12,25
129:3
**medications**
128:17,19
129:5
**meet** 11:1 40:14
40:23 43:3
44:20,22 132:3
**meeting** 11:9
41:3 45:6 66:4
67:4,11,12,13
67:22 69:22,24
70:13,16 106:7
**meetings** 105:21
**meltdown** 41:5
**member** 19:25
69:2,7 91:5
**members** 27:14
28:8
**memory** 22:2
104:7 116:17
116:23 117:11
**mental** 119:1,4
119:12
**mentioned** 45:11
91:15 131:18
**mentioning**
54:19
**Meredith** 105:19
**meritorious**
115:25
**message** 40:11
42:13 43:7

44:18 89:17
**messages** 71:12
**messaging** 65:6
**met** 12:16 14:3
41:13 105:16
105:19 124:10
132:5
**Miami** 1:17 2:6
2:12 4:10
11:11 44:19,23
44:25 46:5
138:4
**MIAMI-DADE**
135:1 139:21
**microphone**
132:23
**middle** 5:8 49:12
60:17 62:13
127:2
**mind** 39:21
**mine** 76:11,14
**minute** 111:3
**minutes** 32:2
61:23 62:22
93:13
**misconduct**
50:23 84:4
87:21 89:10
99:18 115:21
117:17
**miscued** 37:9
**missed** 44:18
49:9
**misses** 49:13
**misspeak** 122:17
**mistake** 24:7
126:20
**mistreatment**
23:25
**misunderstan...**
68:11
**misunderstood**
39:19
**models** 61:15
**moment** 5:11
15:4 34:25

36:24 39:1
41:1 108:19
**Monday** 73:15
75:12 77:14
109:4
**money** 12:13
87:12,12
**monitoring**
65:11
**month** 131:17
**monthly** 131:9
131:11
**months** 8:1
12:22,24,25
46:5,5 88:2,5
89:8 109:5,21
**morning** 4:4
29:5 39:2 43:4
43:10 61:12
75:14 76:6
77:14 90:1
**mother** 53:17
**motion** 72:11
80:16
**move** 40:9 72:6
72:8,17 108:23
109:5 110:17
**moved** 46:1
110:19 118:8
**moving** 107:4
124:24
**MSW** 119:8
**multiple** 133:10

_____

### N

**N** 1:20 2:17
**N.E** 5:12
**naked** 35:9,10
43:18 44:8
**name** 5:5,8 8:2,3
8:13 10:20
12:17 17:2
23:8 31:22
108:11 109:16
109:24 111:5
111:25 112:2,4
112:6,16

Drisin vs. Florida
July 24, 2018

**named** 9:24
101:21
**narrative** 117:7
118:3
**nature** 20:12
45:4 88:17
**necessarily**
124:3
**neck** 32:14 33:5
**need** 7:4 16:5
39:5 43:4 44:4
57:4 78:9
84:20 85:15
132:22
**needed** 39:16
43:15,20 44:6
45:18 50:18
61:17 82:14,17
127:8
**negate** 93:10
**neighbor** 78:24
78:25 79:4
**neighbors** 79:6
**Nepomechie**
31:10 50:11
**nervous** 73:21
**neutral** 100:23
**never** 26:15
34:25 36:3
38:17 48:1
68:8 80:22
85:25 108:2,13
112:2 117:9,23
118:24 123:10
**new** 15:9,10
16:11 65:3,7
82:22,22 97:4
97:9,12
**Newman** 105:19
**nice** 26:14 42:2
47:6 52:4,9
54:23 57:19
60:11
**night** 15:12
43:10 47:6
52:5 54:12

56:20 61:11,13
63:3,8 73:5,18
74:2,4,23 76:5
77:1,13 118:21
**nod** 6:16
**nonconsensual**
29:23 30:5
**nonspeculative**
115:23
**normal** 34:21
57:21
**Notary** 135:7
136:12 137:4
**note** 51:20 82:12
**notepad** 32:9
**notes** 84:18
119:25 120:6
122:1,24
124:11,16,24
125:15 126:5
128:11
**notice** 1:24
97:17 107:12
134:2 138:17
**notification** 94:7
95:3 96:19
**notified** 30:23
97:14
**notoriety** 124:3
**November** 20:11
20:15 108:21
125:16,17,19
125:23,24,25
126:1
**nuanced** 33:3
**number** 4:7 5:15
72:7 87:11
105:20 131:21
138:8
**numerous**
108:10 111:24
131:18
**nutshell** 14:9
**nuzzling** 33:5

———
**O**

**O** 1:19,20,20

**O-U-R** 59:2
**OATH** 136:1
**object** 51:15
67:9 72:15
74:24 77:16
79:14 85:22
95:25 111:23
117:2 133:19
**objection** 51:21
51:24 111:15
**obtain** 9:3
109:21
**obtained** 9:8
66:20
**obviously** 14:4
75:19 91:2
**occasions** 5:24
108:10 111:25
**occurred** 30:19
80:7,12 122:7
122:10,21
**October** 14:18
102:22 104:2
109:1 125:22
**odd** 34:17
**offer** 50:6 51:3
**offered** 51:4
72:6,7,8
**offers** 131:20
132:1
**office** 1:10 4:22
92:18 99:15
102:13 108:5
110:22 113:4
120:2 130:2
138:13
**Officer** 1:12
**Offices** 2:5 138:3
**Official** 136:7
**officially** 30:23
**oh** 5:11 29:18
55:18 61:22
62:6 65:24
66:5 80:10
124:12
**okay** 4:3 5:10,14

7:2,7 8:7,23
10:14 11:1
15:4,7,21 16:7
17:6,25 18:7
18:25 19:9,18
20:11 21:4
25:20 27:12,13
28:5,18,24
29:2,5,12
31:25 32:7,22
33:7,13 38:21
38:23 41:12
42:15 46:11
47:5 48:20
49:4,21 50:17
51:20 53:10,16
54:14 55:2
56:19 61:25
62:21 64:12,17
64:25 70:19
72:3,19 76:19
76:21 79:18
81:9,24 83:2
84:24 85:24
86:1 88:1
89:25 90:7,16
91:15,25 92:2
92:21 93:18,21
96:4 97:20
99:10 100:21
101:6,23 102:6
102:9 104:1,9
105:11 106:19
108:2 114:23
116:5,15,22
122:1 126:5,23
127:7,11
128:24 129:10
130:7 132:11
132:20 134:13
**Oliver** 2:15 4:12
**omissions** 87:23
**once** 5:25 8:12
25:25 66:7
89:13 109:3
**ones** 15:10

**opened** 24:3
**opening** 23:25
**Operating** 1:12
**opinion** 134:6
**opportunity**
1:10 92:18
99:15 102:14
108:15
**opposing** 112:1
**option** 111:10
**order** 72:5,10,12
129:2
**orgasm** 58:19
**original** 36:2
138:16
**originally**
117:22
**outcome** 80:16
87:18 99:11
137:13
**outlined** 100:12
100:16
**outside** 60:18
78:24 79:1,3
79:11,21
**over-the-top**
71:12
**overheated**
15:11
**overwhelmingly**
114:6
**owe** 39:4 84:19
85:14
**owed** 39:15,21
40:5

———
**P**

**P** 1:19,20
**P.A** 129:19,20
130:1 131:5
**p.m** 1:18 134:18
**PA** 106:22
**page** 3:3,3,4,4,5
3:5,6,6,7,7,8,8
3:9,9,10,10,11
3:11,12,12,13
3:13,14,14,15

3:15,16,16,17
3:17,18,18,19
3:19,20 17:1
18:8,11 25:8,9
46:23 48:21,24
49:2 62:13
83:20,21,25
84:7,11 97:7
104:10,23
105:4 107:15
107:20 115:5
115:18 119:25
120:6 121:22
122:1,3,5
124:13 126:23
126:24 139:5
**Pages** 138:8
**paid** 12:9,11,13
131:3,8,10
**pale** 86:22
**panic** 35:20 36:8
36:21 39:11
40:10 122:7
**panicked** 36:19
**pants** 36:6,8,9
36:11
**paragraph** 17:2
25:5 76:10
82:11 84:15,15
84:23,24 85:3
93:4 97:7
100:15 114:3
**parents** 119:16
**part** 12:6 23:5
32:24 50:3
58:2 64:1
77:23 97:16
98:13 102:16
116:4 118:16
118:18 121:3,3
121:20
**partially** 32:12
**participant** 35:5
**participants**
74:13 75:7
77:3

**participate** 19:3
**particular**
131:10
**particularly**
21:24 34:20
**parties** 138:17
**parties'** 107:24
**partner** 108:21
**party** 40:15 81:8
112:2 138:17
**pay** 131:6
**payoff** 86:16
87:15
**pays** 131:4
**peace** 23:22
**peculiar** 44:10
**peeled** 29:3
**penalties** 139:22
**penalty** 6:11
**pending** 7:4,6
**people** 16:16
17:17 19:10
29:1 32:4
59:13 60:22
63:8
**percipient**
115:25 116:9
**period** 65:23
66:3 91:6
118:2
**perjury** 6:11
139:22
**perpetrated** 31:8
41:23
**person** 10:24
25:21 39:5,17
40:12 84:20
85:15 90:14
112:3
**personal** 27:19
82:12
**personally** 135:3
136:5
**pertaining** 106:5
**petition** 78:17
80:11

**Phillips** 106:22
**phone** 38:15,18
41:8,11 65:12
86:9 90:14,15
**photos** 15:16
**physical** 76:25
86:16
**physically** 74:14
74:22 75:6,7
77:3,9,13
**piggy** 15:15
**pin** 5:14
**place** 4:9 29:19
**plaintiff** 1:5 2:3
4:17
**plan** 71:23 127:3
**planned** 26:6
**planning** 22:22
41:14 50:5,21
**plausibility**
116:1
**play** 35:6 89:1
**pleasant** 54:24
**please** 5:6 23:24
86:9 94:6
96:18 108:19
109:16 138:12
**plural** 69:14
**Plus** 85:21
**point** 5:12 11:12
11:22 13:14
16:15 29:21
30:1 33:24
34:2 36:7,14
49:21 56:8
57:25 61:7,16
61:17 65:18
66:9,11 68:1
69:6 70:19
73:22 77:21
80:3,6,14,24
87:24 91:3
94:16 105:12
108:6 112:21
114:17 123:11
133:11 134:3

**pointedly** 95:9
**police** 78:24,25
**policies** 68:15
98:25 117:25
**policy** 44:1
71:15 94:5
96:5 100:23,24
**Polish** 8:3
**position** 12:9,11
37:13,18 92:24
94:8 95:5,5
96:20,23 97:18
100:8 108:14
108:16 116:25
117:4 118:13
**positioned** 91:2
**positions** 95:7,8
97:1
**possible** 46:14
**possibly** 75:13
88:23
**potential** 68:12
68:18 69:3
**precisely** 95:23
133:20
**preclude** 112:18
**preface** 57:5
**preferentially**
115:20
**prepare** 7:8
**preponderance**
84:3 99:17
**prescribe** 128:2
**prescribed** 127:7
**present** 2:14
4:21 67:25
**presented** 27:17
102:12 107:19
111:10
**presently** 129:10
**preserve** 51:24
**preserving** 66:8
**president** 1:8,11
1:14 90:19
95:20 98:17
105:17

**press** 80:24
**pretty** 15:15
24:24 44:19
118:9 125:5
**prevent** 78:12
**prevented**
111:20
**previous** 47:6
**previously** 8:9
57:16
**primary** 104:21
**prior** 14:25 26:3
30:14 138:16
**private** 21:15
79:22
**probably** 11:4
12:22,24 20:24
21:20 22:9
24:6 41:10
55:16,16,17
56:6 57:18
58:9 71:9,19
117:7 123:15
**problem** 40:7
69:3 122:18
**problematic**
24:22 120:18
**problems** 19:24
121:15
**procedure**
100:25 101:4
**procedures**
68:15
**proceed** 138:16
**proceedings** 4:1
**process** 7:11
12:6 74:6
89:15 95:13
98:19,21,22
101:22 103:10
109:9
**processed**
124:25
**produce** 66:2
**produced** 51:19
65:22 114:24

119:17
**production**
51:18,22
**professional**
14:1,10 15:22
15:25 18:15,17
18:18,20,22
20:20,23 24:8
32:3 49:22
57:23 68:17
71:7 77:22
119:2,5
**professor** 9:9,9
9:10,21 20:4
24:9 41:4
44:11 50:10
94:8 107:22
108:23 109:9
**professor's** 44:8
44:9
**program** 9:21
19:3,6,13
**Programs** 1:10
99:15 102:14
**Progress** 127:3
**project** 11:14,15
11:19,22 60:10
**prompt** 138:18
**pronounce** 8:4
**property** 79:22
**proposed** 107:22
**provide** 109:16
109:18,24
112:6
**providers** 65:25
**providing**
109:22
**provocative** 63:9
**provocatively**
62:23 63:11
**provost** 1:11
90:18 91:9
95:19 96:2
133:22 134:1
**psychologist**
119:7

**public** 1:7 60:11
135:7 136:12
137:5
**pull** 41:3 75:25
77:19
**pulled** 77:6
**punishing** 76:2,8
**purpose** 119:15
**pursuant** 1:24
100:6
**pursue** 111:1,1
112:20,22,25
**pursued** 112:13
**pursuing** 110:6
113:1
**pushed** 34:5
35:20 36:4
60:21,24
**pushing** 76:11
**put** 31:22 91:1
132:22
**putting** 37:6
87:6

_____

**Q**
**question** 6:20,21
6:23 7:4,5
17:18 21:10
22:7 28:6 58:1
62:9 77:24
95:9 98:6
108:17 115:9
**questionnaire**
114:25
**questions** 7:19
115:6 132:19
132:21
**quickly** 35:19
90:20 125:5
**quite** 25:4 36:15
37:3 58:1
108:4 120:20
127:16
**quote** 109:2,3
117:16

_____

**R**

**Ragatz** 2:10,11
2:20 4:18,18
4:20 5:4 14:12
14:15 51:10,20
51:25 64:16
67:10 72:16
74:25 81:4
83:10,13 93:13
93:20 111:16
119:20,24
122:16,19
132:11,18
133:19 134:10
134:13,16
**rage** 61:14
**raise** 6:7
**raised** 106:5
**random** 98:2
**raped** 123:21
**rationally** 95:14
**read** 7:10 15:9
15:10 16:8,12
22:14 23:9
42:17 48:1,2
55:19 56:21,23
86:15 87:9
110:1 113:5,9
134:11 139:22
**reading** 22:16
56:2 65:15
120:13 122:11
138:8,12,15
**reads** 75:11
**ready** 125:9,12
**reality** 65:3,7
**realized** 29:16
33:24 35:19
61:17
**realizing** 32:13
**really** 22:13
40:25 46:19
57:19 65:2
76:12 88:6
**reason** 22:13
35:4 89:13
100:18 126:17

139:5
**reasonable** 79:6
89:1,16 115:23
116:2
**reasonableness**
98:21
**reasons** 64:9
100:11,15
**reassigned** 69:1
69:7
**Rebecca** 8:14,17
126:20
**rebut** 116:1
**recall** 11:10 13:1
18:14 21:3,10
32:10,15,20,21
33:17 41:16
54:8 56:4 57:1
57:3 64:11
71:4,24 73:3
83:8 104:5
106:17,24
119:11 120:4
121:14,25
123:15 133:1,7
133:17,20
**receive** 40:20
131:20 138:14
**received** 83:17
87:17 92:8
93:25 94:25
99:6 100:2
101:14 102:23
104:2 105:24
114:10 131:25
**receiving** 106:24
133:7
**recess** 93:17
132:15
**recipient** 106:23
**reciprocated**
26:21,25
**recognize** 48:14
52:1 62:3,9
64:23 78:3
**recollect** 53:8

**recollection**
30:16 31:3,24
54:20 60:14
110:11,15,21
**recommendati...**
72:9
**record** 4:14 5:5
51:16 93:5,15
93:19 99:16
113:6 122:14
122:15 132:13
132:16 134:14
137:8
**records** 92:13
106:4 119:17
131:16
**redacted** 90:25
**refer** 10:22
116:9
**referencing**
23:12
**referred** 14:13
21:6 38:2 42:9
46:25 47:12
48:15 51:13
55:5 59:3 62:4
64:20 73:9
78:4 81:21
83:11 86:4
89:22 91:22
92:9 94:1
96:11 97:22
99:7 100:3
101:10 102:4
102:24 104:12
105:25 106:25
107:16 113:18
115:2 119:22
**referring** 10:23
22:1 39:14
47:20 54:25
55:11 65:7
68:9 82:18
92:25 100:14
116:6,10 121:4
**refers** 75:10

**refresh** 54:20
**refused** 110:22
**refute** 98:22
**regarding** 78:12
  97:24 108:9
  119:18
**regardless**
  131:11
**regular** 7:5
  131:7
**regulation** 99:18
  102:16
**reinstatement**
  104:18 105:1
**reiterated** 90:23
**rejection** 98:18
**relate** 55:25 56:5
**related** 6:4 7:14
  19:1 54:15,17
  137:11
**relationship**
  13:5,15,19
  14:1,9 15:24
  16:15 18:16,18
  18:23 20:12,22
  20:22 24:8
  41:24 49:21,25
  57:22,25 58:3
  61:16 63:20
  65:9 68:15
  71:6,14 77:21
  117:10 120:10
  120:11,21
  121:17 134:5
**relationships**
  121:12,15
**relative** 66:10
  110:13 120:14
**relatively** 129:2
**released** 68:5
**relying** 50:1
**remains** 131:11
**remedy** 104:24
**remember** 11:2
  14:2,6 16:14
  16:25 18:4

19:14 21:8
22:3,21,23
23:1,7 26:10
31:9 36:9
41:11 44:16
45:1,12 51:4,7
53:24 72:14
73:11 80:4
82:18 86:14
90:11,12 97:1
101:24 117:12
121:5,17,19,24
124:20 125:13
126:11,13
128:3 133:6,15
133:15,21
**removal** 11:25
**remove** 96:1
**removed** 69:2
**Renovitch** 108:8
**repeat** 6:22
  100:18
**rephrase** 6:22
**replaced** 116:17
  116:23
**report** 68:5,13
  69:3 71:20
  83:6,15,17
  84:8,11 86:11
  86:15 87:8,24
  88:11,12,18,22
  90:5,23,24
  91:20 100:18
  101:14 117:8
  117:18,22
  137:7
**reported** 69:8,11
  87:4
**reporter** 4:14
  6:6,15 136:11
  137:4,18
  138:22
**REPORTER'S**
  137:1
**reporting** 67:6
  67:17 68:2

87:9
**represent** 4:16
  116:15
**represented**
  114:19,21
**representing**
  82:4 101:21
**reproduction**
  113:20
**request** 51:17,22
  55:9,14 56:3
  65:21 86:9
  104:8,21 109:5
  134:2
**requested** 55:25
**requesting** 56:5
  108:23
**required** 108:24
**research** 78:12
**resided** 5:18
**resignation**
  81:24
**resigned** 81:15
**resolution**
  100:24
**resolved** 90:19
**Resources** 1:14
**respond** 6:16
  7:19 16:5
  44:15 78:9
  94:14 95:11
  96:6
**responded** 63:17
  97:17,19
  106:16 109:1
**response** 23:25
  40:20 52:20
  57:2 71:2,3
  91:20 98:7,10
  115:19 116:3
**responses** 6:14
  6:15 114:25
**responsive** 51:23
**restraining** 72:5
  72:10,12
**result** 74:12 77:2

**retrospect** 58:8
**return** 27:16
  46:4 59:15
**returning** 82:12
  82:16,23
**reus** 88:11
  117:22
**revealed** 57:10
**reverse** 92:23
**review** 15:4 93:4
  104:8
**reviewed** 14:25
  92:13 106:4
**reviews** 20:5
**Rice** 41:4
**Richard** 101:18
  101:25 102:2,9
  106:22
**right** 11:25 17:5
  17:11,15 20:16
  27:12,21 28:4
  31:23 32:2
  35:9 38:24
  41:15 47:23
  48:7 52:5,18
  53:18 54:1
  56:10 58:20
  59:25 63:4,4,6
  66:24 68:13
  69:14,16,17
  71:21,23 75:4
  75:9,9,15,17
  77:14 85:2,12
  87:1,3 89:6
  94:13,21,23
  95:20,23 96:20
  97:15 98:8
  99:12,18,21
  100:9 101:16
  101:17 102:17
  103:7 104:16
  106:11 112:21
  116:11 117:17
  119:20 121:23
  122:22,25
  124:2 127:5

134:10
**rights** 91:5 98:25
  99:21 101:3
  109:10,12,13
**Rind** 106:22
**Rivera** 29:10,22
  30:4,14,18
  31:1,12 32:14
  32:18 33:2,8
  33:15,24 34:5
  34:12 36:4,22
  37:19,25 38:9
  39:15 41:14
  43:13 46:11
  50:5,20 85:7
  86:25 87:21
  88:3,11 89:5
  94:17 99:12
  101:15 102:16
  114:10 116:6
  116:22 117:8
  117:16
**Rivera's** 30:8
  32:24 64:7
  81:11 131:23
**road** 79:21
**Rode** 119:4,18
  120:3,24 122:5
  125:15 128:8
**Rode's** 124:11
**role** 10:10,11
  11:19
**romantic** 13:5,8
  25:24
**room** 34:13
  36:11 73:25
  74:2,5 88:14
**roommate** 15:15
**roommates**
  41:21
**Rosenberg** 1:8
  4:5
**rubbing** 62:7,23
**runs** 132:8
**Russia** 14:5
**Russian** 14:3,4

17:9

**S**

**S** 1:20 3:2
**sad** 76:3
**salary** 131:7,8
**Sally** 4:14
  136:11 137:4
  137:18 138:22
**Saturday** 39:1
  43:3
**Savannah** 73:21
  73:23
**saw** 12:23 45:21
  45:22 47:16
  51:8 70:11
  87:23 88:17,21
**SAYETH**
  134:21
**saying** 28:3
  45:12,22 52:15
  62:6 111:19
  112:24
**says** 75:4 77:11
  88:14 92:22
  95:10 115:6
  120:1,4,14
**school** 39:24
  122:10,15
**Schriner** 1:12
  4:6 20:9 68:4
  68:21 70:17
  81:19 89:19,21
  89:24,25 90:10
  93:24 95:19
  97:21 98:7
  100:1,11,22
  133:2,8 134:4
**Seal** 136:7
**Seaman** 8:14,17
**search** 96:8
**Seasons** 132:6
**second** 25:8,9
  48:21,23,25
  93:4 100:15
**second-to-the-...**
  83:20 85:2

104:23 105:4
126:24
**section** 16:8
**secure** 65:1,5
**security** 64:9
**seduction** 32:25
**see** 12:25 17:4
  21:13 25:7,13
  25:17 28:1
  30:12 44:8
  47:18 49:2,7
  49:15 52:22
  53:2 55:10
  62:15 73:16
  74:15 76:17
  77:7 83:22
  84:22 85:17
  87:8 91:9
  94:11 95:15
  97:5,10 101:1
  105:3 107:6,25
  114:8 115:12
  120:12,22
  121:9,21 122:3
  122:11 125:19
  125:19 126:8
  127:2,9
**seeing** 57:9
  119:1 121:18
  121:23
**seeking** 72:10
  78:18 104:20
**seemingly** 76:14
**seen** 15:2 62:7
  62:22 102:7
  115:4
**select** 12:5
  108:25
**selected** 12:4
**semester** 13:24
  19:19
**semester-long**
  19:3
**send** 18:21 57:2
  58:9 86:25
**sending** 17:22

69:11 70:6,8
70:20
**senior** 10:3,6,11
  12:7 81:15,25
**sent** 23:11 27:9
  38:18 42:18,21
  42:22 46:24
  54:9 55:20
  56:9,12,25
  69:15,18 70:5
  71:16 73:12
  84:18 85:8
  86:7,10 108:20
  108:23 110:5
**sentence** 85:3
  93:3 100:14
  107:3 114:2
  115:14
**separate** 68:19
**September** 8:18
  99:4 100:1,8
  101:7 102:2
  108:22 109:10
  124:11,12,16
  125:9 133:4
  138:8
**sequence** 41:16
**series** 45:25
  51:16
**seriously** 126:12
**serve** 6:3 11:21
**served** 45:14,19
**session** 125:15
**sessions** 119:18
**set** 76:5
**sets** 99:20
**setting** 66:4
**seven** 88:1 89:8
**sex** 35:7 37:10
  37:15 45:24
  118:25
**sexual** 13:11,14
  29:23 30:6
  49:24 50:23
  55:19 56:20
  71:18 84:4

87:21 89:10
95:17 99:18
102:15 115:21
117:9,10,17,24
118:4,9 122:8
122:25 123:8
124:4
**sexually** 34:16
  34:24 35:3
  37:14 69:11,19
  123:2
**sexy** 57:9,23
**shade** 57:7
**shake** 6:16
**share** 49:10
**shared** 24:9,20
  66:17 122:6
**SHEET** 134:20
  139:1
**Sherbakova**
  10:14,23
**Shirlyon** 1:9 4:6
  30:11 31:13
  81:10 83:6
  86:13,19 90:5
  91:20 99:4
  101:7 117:7,19
**Shirlyon's** 90:23
**shirt** 57:8
**shit** 25:22
**shocked** 86:17
**short** 64:12
  132:12
**shortly** 46:9
**show** 42:6 47:9
  56:16 82:6
  89:17
**showed** 60:5,20
  62:22 78:23
**showing** 106:23
**shrink** 125:6
**side** 87:13
**signature** 104:11
  107:14 113:16
**signed** 109:25
  113:22

**significant** 24:21
  87:24 121:20
**signing** 138:12
  138:15
**signs** 12:7
**similar** 14:4
  115:10,15
**simply** 69:1
  110:6,15
**Sincerely** 138:20
**sitting** 79:3,23
  111:19
**situation** 115:10
  115:15
**six** 12:22,24,25
**six-month** 91:4,6
  133:10,13
  134:2
**sixth** 122:1
**sleep** 34:17
**sleeping** 37:23
**slip** 57:12
**slowly** 129:8
**small** 83:1
**smaller** 28:11,15
  28:20
**solely** 10:12
**solve** 69:3
**somebody** 35:18
  50:14,18,25,25
  79:1 116:16
  117:6
**soon** 44:25
**sorry** 16:6 22:18
  23:18 27:24
  30:20 33:22
  47:23 48:24
  53:13 55:11
  63:18 80:9,10
  106:20 113:11
  124:12 125:25
  129:19
**sort** 14:2 16:15
  16:16 17:8
  20:2 24:14
  27:4,6 35:24

36:8 40:8
41:17,22 50:2
50:22 52:15
59:13 61:16
80:20 88:25
110:13 118:25
129:1
**sought** 104:18
104:24
**South** 13:2
**SOUTHERN**
1:1
**speak** 39:3
**specific** 69:24
**specifically**
70:25
**spell** 8:5
**spend** 23:3 73:4
73:18
**spent** 73:15 74:2
74:4 75:12
118:21
**spin** 87:6,8
**spoke** 41:10
90:18 95:18
109:3
**spoken** 41:8
**sponsored** 73:23
**spoon** 75:20
76:12,14
**spooning** 76:22
**spreadsheet**
97:25
**spring** 22:25
26:10
**spying** 63:18
**SS** 135:1 136:2
137:2
**stalking** 65:13
78:19
**stamped** 84:12
**standard** 84:3
**standing** 90:12
**STARK** 136:11
137:4,18
138:22

**start** 9:12 56:18
125:9 130:10
130:16
**started** 9:19 19:7
19:8 32:8 63:2
66:8 74:12
77:1 119:1
**starting** 19:11
48:20,25 85:5
**starts** 18:8 21:22
25:10 84:24
**state** 4:13 5:5
17:25 33:4,6
36:7 38:23
40:9 42:25
47:5,15 57:14
59:8,15 62:13
62:21 64:25
70:25 73:14
74:11 76:11
82:11 97:3
98:23 124:16
124:17,24
135:7 136:2,12
137:2,5 139:20
**stated** 34:11
36:16 37:21
39:15 71:6
84:25 85:7,7
94:13
**statement** 32:7
33:13 35:25
85:20 86:12
93:12 107:21
**statements**
45:25 106:6
**states** 1:1 22:11
25:6,12 49:9
49:12 89:25
92:17 94:4
95:3 100:6,11
100:22 105:1
106:13 107:20
108:22 120:16
122:9,15
128:12

**stating** 15:7
21:22 35:24
56:18 57:4
85:13
**stay** 34:12 46:13
**staying** 29:18
**steamy** 15:11
18:1,3,7,12
**steel** 130:21
**stenographica...**
137:7
**step** 51:5 104:8
**steps** 78:12
**Stevenson**
127:22,25
129:6
**stink** 39:23 40:2
**stolen** 27:18 28:2
56:15
**stonewalled**
108:6
**stop** 55:19 56:22
64:9 122:13
**stopped** 76:1
128:25 130:13
**story** 16:16,17
16:19 59:2,13
69:21 118:16
118:18 124:7
**straddling** 33:24
**strange** 92:23
118:13
**street** 5:12 35:11
**strictly** 57:22
**strike** 34:17
**Strikes** 34:21
**strip** 80:20
**stroking** 76:15
**strongly** 117:6
**structural**
130:21
**struggling** 123:4
**student** 10:16
11:4 18:21
20:1 24:9 42:1
114:5 122:9,25

123:8
**students** 18:16
18:19 19:2
20:3 27:14
28:8,11,15,20
28:23 29:6,9
29:13,18 30:25
43:23 59:21
60:9 118:22
122:8
**studies** 9:2
**Studios** 11:11
**study-abroad**
19:3
**stuff** 17:12 24:10
45:9 56:21
65:16 74:14
75:6,8 76:25
77:4,9,13
**styled** 4:4
**subject** 27:24
55:8,12,14
59:1 100:23,24
139:23
**submit** 81:24
**submitted** 91:19
**subscribed**
135:2
**subsequent**
29:21 30:1
**subset** 28:11,15
28:20
**substance** 90:9
139:23
**substantial**
103:18,22
**substantiated**
84:5
**sudden** 75:23
**sufficient** 109:23
**suggest** 75:13
88:10 95:16
98:2 138:13
**suit** 137:12
**suitable** 138:14
**Suite** 2:6,12

138:4
**sun** 57:7
**Sunday** 54:8
76:4 77:1,13
**support** 11:16
12:13 89:15
93:8
**supported** 11:15
92:14 93:5
114:6 124:6
**supports** 103:18
103:22
**suppose** 87:6
**supposed** 59:17
112:3
**sure** 8:25 12:2
14:22 15:15
20:22 22:5
25:4 30:1 34:8
35:12 36:25
67:11 80:1
88:6 93:14
97:7,16 103:21
116:4,21 118:9
119:9 120:14
122:12,16
133:13
**surprise** 90:22
**surrounded**
60:19
**surroundings**
34:3
**suspect** 91:11
**suspicion** 22:17
**suspicious** 79:7
**swear** 4:15
**swore** 6:7
**sworn** 5:1 135:2
136:6

---

**T**

**T** 1:19,20 3:2
**tactics** 109:8
**tag** 37:6
**take** 7:2,4,5
14:21 15:4
39:3 63:15

Drisin vs. Florida                                July 24, 2018

Page 158

64:12 83:9
93:13 127:15
127:18 129:4
132:11
**taken** 1:24 36:22
37:4,13,18
89:5 93:17
109:20 132:15
138:7 139:3
**talk** 18:25 43:5
43:15 44:4,6
90:1,7 91:9
**talked** 36:5 81:7
98:17 122:24
**talking** 23:4,14
23:16 52:12
60:16 67:22
76:16 86:23
121:5 125:23
**talks** 68:17
**tampon** 118:7
118:10,13
**taper** 129:8
**teacher** 11:5,7
**teaching** 10:13
19:25 82:24
130:12,13
**tear** 20:5
**tears** 41:4
**telephone**
138:13
**tell** 6:7 8:23
14:21 24:17
25:1 30:21
33:7,11 35:21
40:3 50:14,18
50:25 55:18
56:19 57:21
68:1 110:22
120:13 121:18
121:22 123:2,7
123:14,17
124:6 125:16
**telling** 32:10,15
32:20,21 33:17
57:5,14 126:13

**tells** 48:23 49:4
**temporary** 78:18
80:17
**ten** 62:22 95:11
96:5
**ten-day** 133:18
**Tennessee** 9:10
**tenure** 95:8
**tenured** 9:20
91:5
**Teresa** 2:10 4:18
**term** 12:2,3 31:5
50:15 67:7,20
68:3,15 116:5
**terminate** 97:15
97:18 133:4,8
**termination**
9:16 98:8
100:22 104:4
104:16 109:10
133:4
**terms** 46:18
**terrible** 23:2
38:24 39:9
**terrified** 20:4
74:9,10
**test** 104:7
**testified** 5:2 89:3
95:18
**testimony** 30:13
55:23 56:1
61:19 82:24
111:2 112:9
137:8
**text** 15:8 16:10
47:6 49:5
89:17,18,20
**texted** 23:15,16
41:9 60:15
**texting** 64:9 65:2
65:17
**texts** 22:14 23:10
23:11 49:9
63:21 65:22
66:1,2
**Thank** 14:16

58:24 74:21
81:5 107:11
109:25 132:19
134:10,16
**therapist** 122:21
126:5,13
**therapy** 127:11
**thereabouts**
30:11
**thereof** 137:13
**thereunder**
100:25
**thing** 34:21 40:6
41:23 60:17
88:24 124:4
**things** 19:17
32:24 41:20,22
45:12,22 49:10
50:2 66:8
70:11,15 82:1
87:22 90:13,18
90:25 120:24
**think** 6:2 9:6
11:6,10 12:7
13:1 17:7 18:5
21:9,20 22:3
22:15,25 23:2
23:2,8,15,16
24:7,14,16
26:8,11,13,17
26:17 27:1
29:3 30:10,22
31:3,9 32:3
34:1,8,24 35:4
36:7,8,11,15
37:8,8 38:14
38:18 40:13
41:1,10 42:16
43:18 44:7,16
44:17 45:17
46:10 47:22
50:9,15,24
51:21 53:23
55:16 56:14
60:14,21 61:5
61:5,15,15,17

62:19 63:22,24
63:25 64:1,5
65:9,11,14
68:16,25,25
69:13,14 70:10
70:10,22,24
72:1,7,8,9,18
73:3 75:4,9
76:2 77:20
78:15 79:13,15
79:17 80:3,24
82:19 88:4
90:23 91:3
92:22 95:12
97:24 101:20
104:20,21
108:4 110:13
111:4 117:6
118:10 119:8
123:5 125:11
128:1 129:7
130:8 131:17
132:12 134:3,5
134:7
**thinking** 18:4
37:12 40:17
49:5 62:21
88:19
**third** 48:24
84:15,15 115:5
**thought** 25:12
35:4 37:9
39:20,25 40:15
51:6 54:25
57:5,17 63:12
63:13,16 77:5
82:5,6 87:7
90:23
**threatened** 74:7
**threatening**
79:20
**three** 15:10 29:6
29:9,12 43:23
118:21
**three-quarters**
83:24 84:14

**threesome** 37:11
**ticking** 110:13
**time** 4:11 7:2
8:15 11:22
12:20,23 13:8
13:11,14,23
15:3 18:5
21:16,19,23,24
22:4 23:4
24:20 26:21
36:15 37:5,6
38:12 39:1
40:17 41:18,25
42:22 43:4
47:16 48:2
51:18 59:25
60:2 61:7 65:9
65:18,23 66:3
66:9,11 69:6
69:10 71:8,8
71:21 76:15
79:15,16 80:6
80:12 82:4
91:7 94:16
101:20 102:10
109:23 110:16
114:17 115:4
118:2 119:13
122:21 123:11
125:2,7 126:10
127:16 133:2
138:11
**times** 8:11 14:2
25:3
**timing** 38:1
72:14 84:8
**tired** 31:22
**Title** 1:9 31:14
95:17 101:14
117:24
**today** 6:14 7:9
7:18 30:13
109:23
**told** 17:7 18:6
23:1 24:6,19
30:17 31:17,25

32:12,17 33:1
33:3,23 34:5,6
35:23 36:2
39:10 41:13
50:4,20,25
52:4 55:17,23
57:16 62:19
67:5,16 68:7,8
68:20,25 70:19
80:7,11 86:14
86:19 88:16
95:19 96:2
113:2 120:24
121:16 122:10
122:20 123:12
125:2,6,11,12
129:7
**top** 17:25 21:11
25:8,9 34:4
35:19 37:3
38:9 120:1
**tore** 80:20
**totally** 45:8
57:11,24
**touch** 44:18
**touched** 58:12
**touching** 118:25
**town** 53:17
**track** 110:17
**training** 129:13
**transcribe** 6:15
**transcript**
134:21 137:8
138:11,14,16
139:4,23
**transformation**
45:21
**transpired** 69:5
**treated** 21:23
24:12 115:11
115:16,20
**treatment** 114:4
114:11,15
115:19 119:12
127:1,3,8
128:5,6,7,20

**tried** 37:15
46:13 101:5,5
111:25 112:22
112:24
**triggered** 121:7
**trip** 20:16 22:22
25:24 26:4
72:22 73:23
**Triple** 129:23
130:16 131:4
131:14
**trips** 26:11
**trouble** 22:5
35:1 64:2,3,6
**troubled** 126:19
**troubles** 25:16
**troubling** 121:17
**true** 37:14 46:6
54:17 60:4
61:10 67:16
71:5 89:11
92:23 93:1,10
95:6 98:12
111:21 112:14
112:25 116:18
116:24 134:20
137:8 139:23
**trust** 63:19,23
120:11,21
121:2,6,8
134:6
**Trustees** 1:7 4:5
138:6 139:2
**truth** 6:8 36:2
**trying** 13:21
26:8 36:10,12
70:14 121:18
133:5,12
**Tuesday** 46:24
**tugged** 61:6
**turn** 84:7 121:21
**turned** 37:1
134:5,6
**turning** 61:16
**twice** 80:4
**twist** 53:1,7

**two** 5:19 13:3
21:24 25:17
26:11 46:18
53:18 60:6
73:15 84:15
87:22 109:5,20
114:14 115:25
116:9 128:17
**two-hundred-...**
130:8

_____
**U**
**UFF** 112:11
**uh-huh** 6:17
14:20 15:20
16:2,4,23 18:9
18:9 19:5 30:3
33:18,20 39:8
42:11 47:2,14
47:19 48:5,8
48:17,22 49:8
49:11,11,16,18
55:7 58:6
60:25 64:22
66:16 70:3
71:9 74:16,18
74:20 75:22
76:9,18 77:8
78:6,8 82:15
83:16 84:1,17
85:4,6 86:6
87:19 97:2,8
97:11 104:25
105:5,7 120:8
120:15,19
124:15 126:4
126:25
**ultimately** 12:6
92:2 124:23
**unable** 99:16
102:15 108:7
**unbuttoned** 33:8
**uncomfortable**
75:14
**underneath** 57:8
**undersigned**
136:4

**understand** 6:6
6:10,21 7:19
24:11 25:15
27:21 37:5
39:12 40:8
44:6 65:1
86:22
**understanding**
21:25 116:19
**understood** 6:19
6:24 66:7
**underwear**
35:11
**unfavorable**
87:17
**United** 1:1
109:14
**university** 1:7,9
4:5,23 9:1,2,9
9:10,11,20
66:14,18 70:2
71:15 94:10
106:4 138:6
139:2
**University's**
94:7 95:4
96:19
**unjust** 109:10
**unprepared**
108:18
**unreasonable**
98:4
**unsuccessful**
92:3 102:19
**untoward** 43:19
60:23 82:1
88:10
**upset** 36:17
**Urban** 11:11
**use** 5:9 12:2,3
38:17 43:23
64:9 70:23
89:15 116:5

_____
**V**
**V** 1:19
**vagina** 118:8

**version** 50:25
51:6
**versus** 4:4
114:16
**vice** 1:11,13
98:17 105:17
**victim** 37:7 46:2
114:7
**victimized** 89:3
123:9,18
**video** 6:14
**videoed** 6:13
**videographer**
2:15 4:3,12
93:15,18
132:13,16,22
134:14
**videotaped** 4:8
**Vienna** 23:8
**view** 79:24 111:7
111:11
**violate** 68:14
**violation** 44:1
69:4 71:15
98:18,21 99:18
102:15 103:10
107:23
**violent** 25:3
61:18
**visit** 22:22 23:6
26:12 120:2,3
120:7,25
**void** 65:4
**vs** 1:6 138:6
139:2
**vulnerable** 24:1

_____
**W**
**wages** 104:18
105:2,8,13
**waist** 77:20
**waited** 88:1 89:8
**waiting** 78:23
79:1,4,11
**wake** 44:7
**waking** 117:13
**walk** 29:20

Drisin vs. Florida

July 24, 2018

Page 160

**walked** 61:20,22
**want** 7:2 15:4
  23:22 32:18,18
  40:13 55:19
  56:21 60:15
  64:12 75:25
  80:24,25 90:19
  95:20 98:5
  126:19 129:2
  131:17
**wanted** 22:6
  26:9 27:16
  31:8 35:6,7
  37:2,10 39:22
  40:2,3,8 57:12
  63:1 65:10
  74:9 76:12
  86:12 104:22
  105:14
**wanting** 75:20
**warranted** 92:19
**wasn't** 17:18
  19:23 22:5
  25:4 36:24
  39:23,24,24
  40:1,6 46:4
  53:21 61:20
  69:20 77:10
  80:1 88:6
  134:7
**watched** 46:1
**watching** 63:17
**way** 12:21 21:23
  24:5 25:14
  27:2 29:19
  40:18 43:25
  58:11 65:5,20
  77:11 88:4
  105:21
**we'll** 28:4
**we're** 27:22
  44:19 60:17,18
  60:18,18
**wearing** 36:5,13
  57:8,19
**week** 121:24

**weekly** 121:23
  121:25
**weeks** 123:15
**weird** 63:19,22
  117:13
**went** 5:15 7:11
  13:25 19:15
  24:18 26:7
  27:6,14 28:8
  28:12,15,22,24
  29:6,13 33:7
  34:12 61:13
  77:5 79:2,4
  80:19 88:14
  121:9
**weren't** 49:25
  67:2 108:14
**whipped** 31:4,6
  41:22
**whispering** 33:6
**white** 22:15,16
  23:10
**wife** 24:20 52:16
  53:12,15,20
  61:3,8 66:19
  70:20 79:25
  80:2,7,12 81:1
  81:5 82:20
  120:16 121:8
  122:10 123:12
  123:14,17,20
  124:17,19
  125:8 132:3
**wife's** 8:2 121:3
**willing** 35:5 37:9
  43:3 82:7,7
**window** 133:13
  133:18
**wish** 15:13
**witness** 2:18
  4:15 5:1,23
  84:25 85:8
  87:11 88:21
  132:20 136:7
  137:9
**witnessed** 45:16

**witnesses** 116:1
  116:10
**woke** 32:13 33:4
  35:18 36:25
  38:9 43:17
  53:11,14 73:14
  75:11 88:15
**woman** 42:2
  126:21
**women** 126:7,14
  126:18
**wonderful** 57:10
**word** 83:9
  116:13,20
  122:14
**words** 15:19
  37:21 39:7
  111:9 117:15
**work** 9:12 32:5,8
  121:11 131:12
**worked** 9:14
**working** 58:10
  60:10 82:20
  110:8
**worried** 74:5
**worth** 25:18
**wouldn't** 32:6
  34:23 35:2
  49:24 58:7
  65:19,19 77:11
  92:23 112:4
**write** 18:3 23:20
  38:24 139:4
**writes** 117:19
**writing** 15:12
  16:14,16,18,21
  59:9,11 97:14
**writings** 69:18
**written** 18:12
  22:15 23:10
  27:24 40:9
**wrong** 23:23
  40:1 70:5
**wrongly** 76:2
**wrote** 14:23
  15:19 17:14

38:8,21 44:17
47:11 49:13
52:3 55:18
59:6,8 75:11
81:20 85:25
91:25 92:23
96:10 98:7
101:9 120:9
121:11 122:5
123:1 126:6,6
127:1 133:18

**X**
**X** 2:17 3:2
**Xanax** 128:15

**Y**
**Yannuzzi** 2:10
  4:19
**yeah** 5:17 13:4
  15:6 17:7,9,13
  17:15,15,15
  18:20 19:8
  20:21 21:14,17
  23:7 24:4 27:6
  27:12,16 28:19
  28:23 29:1,4
  30:23,23 34:4
  34:8,10,25
  36:18,21,21
  37:15,22,22
  38:4,4,7 39:18
  40:25 41:7,19
  46:19 47:4,8
  47:22,22,25
  48:1 50:2,13
  50:15 51:9
  52:10,24 53:3
  53:8 54:22
  55:13 58:2,17
  58:23 59:5,10
  59:22 62:6
  65:15 69:13
  70:11 71:11
  72:20 73:1,17
  79:17,23 80:14
  80:15 83:1,1,3

85:1 86:13
89:7 90:17
96:25 97:19
105:20 114:16
115:4 116:21
118:20,23
119:19 125:13
125:23 126:2
127:4,6 130:15
131:13 133:9
**year** 11:4,25
  128:23 130:18
**years** 5:19 9:15
  10:2 26:1
  120:10,16
**Yep** 105:10
  122:12
**young** 42:2
  59:20
**youth** 11:16

**Z**

**0**
**0352** 84:12
**0361** 83:21

**1**
**1** 3:3 14:12,14
  21:5,21 27:11
  47:17,23 48:3
  78:17 80:10
  84:25 85:9
  138:1,8
**1:16-cv-24939...**
  1:2 4:7
**10** 3:7 27:8
  58:24 59:4
  99:4
**10-17-62** 5:21
**100** 3:15
**101** 3:15
**102** 3:16,16
**104** 3:17 68:6,17
  69:4
**105** 3:17
**106** 3:18

**107** 3:18
**10th** 30:10
**11** 3:8 9:15 27:8
59:19 61:25
62:5 81:14
100:1 128:11
**11:32** 93:16
**11:49** 93:19
**113** 3:19
**115** 3:19
**119** 3:20
**11th** 81:19
**12** 3:8 19:18
27:13 28:7
64:17,18,21
66:12 76:7
**12:41** 132:14
**12:46** 132:17
**12:48** 1:18
134:15,18
**12th** 37:25 62:1
101:8
**13** 3:9 38:6
51:18 73:7,10
**132** 2:20
**139** 138:8
**14** 3:3,9 67:1
68:22 69:22
77:25 78:5
89:17,21 100:8
109:10 120:9
120:16
**14-year** 125:5
**14th** 67:13 109:2
**15** 3:10 18:10
72:25 81:18,22
105:23 122:2
126:24 127:13
**15,000** 131:17
**1560** 2:5 138:3
**15th** 122:20
**16** 3:10 46:22,24
47:11 48:2
83:12,14
**16th** 47:2
**17** 3:11 86:1,5

93:23 95:1
98:8 100:7,12
100:17 133:3,8
**18** 3:11 89:23
96:8,14
**19** 3:12 91:17,23
108:22
**1985** 9:4
**1988** 130:11
**1997** 9:6,8
**1st** 136:8 137:14

──────────
**2**
──────────
**2** 3:3 21:4,7
47:24,25 48:4
49:2 54:3,6
86:24 104:8
107:13 124:11
**20** 3:12 92:5,10
102:22 104:2
**2004** 8:16 9:13
9:16,20
**2005** 6:2
**2011** 9:24
**2013** 10:2
**2014** 13:20,21
14:10,18 19:13
19:19,22 20:7
20:12 21:5,22
27:14 28:7
46:23,24 47:17
48:13 51:19
**2015** 8:19 31:13
52:3 53:17,25
54:3,6,9 55:4
55:21 59:1,19
62:2 64:19
66:12 67:1
69:22 71:22
72:21 73:1,2,4
73:6,8 78:2,17
80:6,10 81:10
81:15,19 82:13
83:15 89:18,21
91:20 92:6
93:23 95:1
96:8,14 97:21

98:8 99:4
100:1,7,9,12
101:8 102:3,22
104:2 109:10
119:2 120:1
122:2 124:12
124:12,16
125:10,16
126:1 128:12
133:3,8
**2016** 9:17
105:23 106:6
106:20 107:13
108:21,22
113:22 126:24
127:13
**2018** 1:18 4:11
135:3 136:8
137:14 138:1,7
138:8 139:3
**21** 3:3,13 93:22
94:2
**22** 3:13 78:2
80:6 96:7,12
**23** 3:14 14:18
97:20,23
**24** 1:18 3:14
4:10 99:3,8
138:7 139:3
**25** 3:15 99:25
100:4 120:1
**26** 3:15 97:21
101:6,11
**27** 3:16 102:1,5
**27th** 48:13
**28** 3:16 52:3
73:8 102:21,25
106:20
**28th** 48:13 51:12
**29** 3:17 51:12
104:8,13
106:20
**2932** 5:12

──────────
**3**
──────────
**3** 3:4 37:24 38:3
42:22 87:11

**30** 3:17 92:6
102:2 105:22
106:1 108:21
**307** 2:6 138:4
**31** 3:18 106:19
107:1
**32** 3:18 107:11
107:17
**33** 3:19 113:14
113:19
**33131** 2:12
**33139** 2:6 138:4
**34** 3:19 114:23
115:3
**35** 3:20 119:21
119:23
**36th** 5:12
**38** 3:4

──────────
**4**
──────────
**4** 3:4 8:18 42:6
42:10 54:8
55:4,21
**42** 3:4
**45** 32:2
**46** 3:5
**47** 3:5
**48** 3:6

──────────
**5**
──────────
**5** 2:20 3:5 18:8
46:21 47:1
59:1 106:6
125:16,17,19
126:1
**5-13-2020**
136:13
**5:00** 65:6
**51** 3:6
**52** 132:6
**55** 3:7
**59** 3:7

──────────
**6**
──────────
**6** 3:5 18:11 47:9
47:13 107:23
113:22

**601** 1:17 2:11
4:9
**62** 3:8
**64** 3:8

──────────
**7**
──────────
**7** 3:6 31:13
48:11,16 81:10
125:22
**73** 3:9
**750** 2:12
**78** 3:9

──────────
**8**
──────────
**8** 3:6 51:10,14
54:14
**81** 3:10
**83** 3:10
**86** 3:11
**89** 3:11
**8A** 115:6

──────────
**9**
──────────
**9** 3:7 55:3,6 83:7
83:15 86:2
91:20 107:23
124:12,16
125:10
**9-16** 125:20
**9-2** 125:20
**9-20** 125:22
**9-9** 125:20
**9:00** 65:6
**9:40** 1:18 4:11
**91** 3:12
**92** 3:12
**94** 3:13
**96** 3:13
**97** 3:14
**976823** 136:12
**99** 3:14